# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| ERIC WALLACE, FRED PATMON, TIMOTHY ROBINSON, TONISHA JOHNSON, THALIA OUTLAW, STEVEN MILLER, IDA WEAVER, LATORIA BROWNLEE, BOBBY HENDERSON, LACRITA SUMMERLIN, ROGER HAVENS, JIMMY NANNEY, STEPHEN POWERS, MONDRICK BRADLEY, ERIC KENNEDY, THADDEUS JARVIS, LUTHER HINTON, JUSTIN HILL, PERVIS EVERETT, KEITH O'BRIEN, ANTHONY LOEWENSTEIN, LARRY ALLEN, LEE NIX, TERRY LATTIMORE, DERRICK GUYTON, WILLIAM WALDEN, SYLVIA SMITH, PEGGY STARNS, JEANNIE MATHIS, JUDY WILBANKS, MELISSA ADAMS, on behalf of themselves and others similarly situated, and DISABILITY RIGHTS MISSISSIPPI | **PLAINTIFFS** |
| | |
| **VS.** | CIVIL ACTION NO. 3:21-cv-516-CWR-LGI |
| | |
| MISSISSIPPI DEPARTMENT OF CORRECTIONS, NATHAN "BURL" CAIN, in his official capacity as Commissioner of the Mississippi Department of Corrections, JEWORSKI MALLET, in his official capacity as Deputy Commissioner of Institutions, DONALD FAUCETT, in his official capacity as Chief Medical Officer, VITALCORE HEALTH STRATEGIES, LLC, JOHN & JANE DOE DEFENDANTS, and XYZ CORPORATIONS | **DEFENDANTS** |

## COMPLAINT
*Jury Trial Requested*

## PRELIMINARY STATEMENT

1.      This class action is brought by offenders who are currently in custody with the Mississippi
Department of Corrections ("MDOC").  The above-named Plaintiffs bring this case to
remedy (a) the Defendants' failure to provide adequate medical care to persons in the
custody of MDOC; (b) the Defendants' failure to provide adequate mental health care to
persons in MDOC custody; and (c) the Defendants' failure to provide offenders with
disabilities with the accommodations and services to which they are entitled under the
Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973
("§ 504"). Plaintiffs seek declaratory and injunctive relief for the inhumane and
discriminatory practices and conditions they face every day in MDOC custody.

2.      MDOC is responsible for many different correctional facilities throughout the state of
Mississippi, including but not limited to Central Mississippi Correctional Facility[1] ("CMCF"),
Mississippi State Penitentiary[2] ("MSP"), and South Mississippi Correctional Institution[3]
("SMCI").  MDOC also oversees several private and regional facilities as well as community
work and restitution centers[4].

3.      MDOC facilities have been underfunded and understaffed for decades, resulting in horrific
conditions, increasing & deadly violence, and an environment that in no way is conducive to
rehabilitation.  The conditions at these facilities are so severe and barbaric that individuals in

---

[1] Central Mississippi Correctional Facility is located in Pearl, Mississippi.  This facility is overseen by Superintendent
Marc McClure and houses approximately 3,108 offenders with an approximate 74% capacity.  The offender to guard
ratio, as reported by MDOC in its 2020 Annual Report is 16 to 1.
[2] Mississippi State Penitentiary, also known as Parchman, is located in Parchman, Mississippi.  This facility is overseen by
Superintendent Timothy Morris and houses approximately 2,204 offenders with an approximate 80% capacity. The
offender to guard ration, as reported by MDOC in its 2020 Annual Report is 11 to 1.
[3] South Mississippi Correctional Institution is located in Leakesville, Mississippi.  This facility is overseen by
Superintendent Andrew Mills and houses approximately 2,549 offenders with an approximate 83% capacity.  The
offender to guard ratio as reported by MDOC in its 2020 Annual Report, is 21 to 1.
[4] Mississippi has 21 correctional facilities. That includes the three state facilities. Three prisons are run by private
companies, and 15 regional facilities are run by counties.

these facilities are faced with imminent risk of substantial harm on a daily basis in violation of their constitutional rights.

4.    The above-named Offender Plaintiffs, are of whom are in MDOC custody, are entirely dependent on COMMISSIONER NATHAN "BURL" CAIN, MDOC, and VITALCORE HEALTH STRATEGIES, LLC (collectively, "DEFENDANTS") for day-to-day medical, and mental health care. Yet the system of care provided by Defendants as listed previously is grossly inadequate and subjects all offenders to a substantial risk of serious harm, including unnecessary pain, loss of function, injury and death.

5.    DISABILITY RIGHTS MISSISSIPPI, P&A PLAINTIFF, is the designated Protection and Advocacy ("P&A") agency for the state of Mississippi.   The P&A system is a national network of disability rights agencies investigating abuse and neglect and providing legal representation and other advocacy services to people with disabilities through extensive authority provided by Congress[5].  As Mississippi's P&A, DRMS may investigate incidents of abuse and neglect, provide resources and referrals, monitor service providers[6] with respect to safeguarding the rights of people with disabilities, and pursue any and all administrative, legal, and other remedies on behalf of the individuals that DRMS is tasked with protecting.

6.    Offender Plaintiffs are all members of the class of individuals that DRMS is tasked with protecting as each one has a qualifying disability under the ADA.

---

[5] The authority was first codified through the passage of the Protection & Advocacy for People with Developmental Disabilities ("PADD") Act, 42 USC § 15043(a)(2)(B).  Over time, Congress extended the protections of the PADD Act, incorporating them by reference into legislation protecting persons with other forms of disabilities. This includes both the Protection & Advocacy for Individual Rights ("PAIR") Act, 29 USC § 794(e)(f)(1), and the Protection and Advocacy for Individuals with Traumatic Brain Injury ("PATBI") Act. .42 USC §300d-53(eff. April 28, 2008).  Similarly, Congress expanded the P&A system through passage of the Protection & Advocacy for Individuals with Mental Illness ("PAIMI") Act  42 CFR §51.42(c)(2) and the Protection & Advocacy for Beneficiaries of Social Security ("PABSS") Ticket to Work and Work Incentives Improvement Act of 1999, as amended (TWWIIA) 42, USC §1320b-21.
[6] 45 CFR §1386.19 (PADD: 45 CFR §1326.27 (b)(2) (PADD));42 CFR §51.2 (PAIMI:  "Service provider includes any public or private residential setting that provides overnight care accompanied by treatment services.").

7.     Due to the Defendants' deliberate indifference to the obvious medical and mental health care needs of the persons in their custody, Offender Plaintiffs and others similarly situated go extended periods of time without appropriate diagnoses, treatment, or care of medical conditions – both pre-existing prior to incarceration and those developed while in MDOC custody. Numerous offenders have died from a failure to treat certain medical conditions due to the negligence and inexperience of the MDOC staff.  Many offenders have required emergency surgery, lost the use of limbs, or experienced lost/diminished eyesight after having been left to suffer with untreated symptoms for lengthy periods of time.

8.     Offenders with mental illnesses or serious psychological problems are entirely denied mental health care or provided only with medication with little or no management, follow-up, or concern for side effects – many of which are debilitating. Offenders with a history of self-harm are ignored and/or placed in solitary confinement as a means of treatment/punishment for a mental health illness. DRMS has encountered many offenders who have attempted self-harm, which was ignored by MDOC staff. In some cases, the self-harm was *encouraged* by MDOC staff.

9.     Offenders with physical or mental disabilities face discriminatory, dangerous, and even deadly circumstances while incarcerated with MDOC. They are housed in facilities with an utter lack of accommodations that prevent them from access to restrooms, showers, and other common areas. They are denied basic human needs for the simple reason that they are unable to physically access it.

10.    Offender Plaintiffs and those similarly situated are often housed in prisons or housing units for offenders with higher security classifications for no reason other than their disabilities. They are not provided with necessary assistive services or devices, such as functioning wheelchairs, shower chairs, ramps, or forms that they can read. They are punished for things

they cannot do or do not know how to do because of their disabilities.  Additionally, some offenders are attacked and bullied because of his or her disability and the MDOC staff refuse to intervene.

11.    Defendants are solely responsible for the horrific and dehumanizing conditions in these facilities – conditions that have been repeatedly reported to them.  Nothing has been done and people in these facilities continue to suffer – especially people with disabilities. Incarceration is punitive, but denying offenders basic human rights and, even worse, the opportunity to utilize incarceration as rehabilitation is grossly negligent, inhumane, and cruel.

12.    Accordingly, Plaintiffs respectfully request that this Court enter its order providing the declaratory and injunctive relief requested herein.

## JURISDICTION, VENUE, AND JOINDER

13.    Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201 and 2202, 29 U.S.C. § 794a, and 42 U.S.C. §§ 1983 and 12133.  This Court has federal question jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1343.   Plaintiffs seek relief pursuant to the Americans with Disabilities Act (42 USC § 12101 *et seq.*) as well as Section 504 of the Rehabilitation Act (29 U.S.C. §794).

14.    Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. §1391 as Defendants are subject to this Court's jurisdiction given the location of their principal places of business.  Defendants oversee all facilities across the state from their primary office located at 301 North Lamar Street in Jackson, Mississippi.  Defendant VitalCore ("VitalCore") is a Limited Liability Company and registered to conduct business in the state of Mississippi. VitalCore provides contracted medical services to MDOC facilities.

15.    Joinder of the Plaintiffs listed herein is proper pursuant to Fed. R. Civ. P. 20. Plaintiffs: (a) assert rights to relief jointly that arise out of the same transactions, occurrences, or series of

transactions or occurrences. Additionally, questions of both law and fact common to all parties will arise in this action, such that the claims at issue share an aggregate of operative facts. However, the joinder of Plaintiffs in this action does not in any way diminish their request for class certification, as the potential class members includes all offenders with disabilities at MDOC facilities, as well as those offenders who will be held in MDOC custody in the future.

16. Due to the number of potential class members and the fluidity of class membership (i.e. admission and discharge into MDOC facilities), joinder of all qualified Plaintiffs is impracticable.  However, DRMS, as the P&A for the state of Mississippi, will continue to monitor these facilities to assist current and new offenders.  Further, DRMS is asserting associational standing as a Plaintiff in this matter for the reasons stated herein.

## PARTIES[7][8]

**Plaintiffs**

17. ERIC WALLACE (MDOC No. 180342) is currently being held at CMCF and has been in MDOC custody since 2012[10].  He has a T1 spinal injury which causes limited mobility and requires the use of a wheelchair.  He is regularly denied his daily medication.  Further, he has regularly been detained in solitary confinement (i.e. Secured Housing Unit referred to as "SHU") for a period of thirty (30) days in retaliation for his requests for sick calls.  While in solitary confinement, he was denied a shower for approximately 72 hours.  Also, his requests for a wheelchair to assist in his mobility have gone answered.

18. FRED PATMON (MDOC No. 119016) is currently being held at Wilkerson County Correctional Facility ("WCCF"), located in Woodville, Mississippi and has been in MDOC

---

[7] Information for each Offender Plaintiff is based on information known to DRMS as of date of filing. Each of these offenders were discovered through DRMS monitoring of the facility where they are currently housed.
[8] The following individuals may be collectively referred to as OFFENDER PLAINTIFFS.
[9] Those Plaintiffs who are incarcerated are collectively referenced as "Offender Plaintiffs" when necessary.
[10] Wallace is currently set for release in January 2035.

custody since 2019[11],  He has been diagnosed with bipolar disorder, schizophrenia, and depression.  He was prescribed Depakote and Risperdal; however, he has not received mental health treatment in over six (6) months.  While he currently resides at WCCF, Patmon has resided at MSP and at a MDOC facility in Green County Correctional Facility ("GCCF").  At all of these facilities, Patmon has exhibited suicidal tendencies and has actively requested help from MDOC to prevent self-harm.  Defendants have ignored all of these pleas for help (i.e. sick calls[12]).

19.     TIMOTHY ROBINSON (MDOC No. 49090) is currently being held at CMCF and has been in MDOC custody at this location since January 2020[13].  Robinson suffered a gunshot wound to the face which left him with a hole in upper corner of his mouth and requiring a tube to assist with feeding.  He has not seen a medical provider since May 2020. Prior to his transfer to CMCF, Robinson resided at the GCCF.  At all facilities, MDOC has refused to provide the necessary supplies for Robinson to clean his feeding tube or provide any new feeding tubes.  Robinson had to resort to extreme measures (i.e. removing his own tube) in order to trigger a more emergent need for medical care.

20.     TONISHA JOHNSON (MDOC No. 205762) is currently being held at CMCF and has been in MDOC custody since October 2016[14].  While incarcerated, Johnson gave birth to a child. She now suffers from a uterine prolapse and anxiety attacks.  MDOC has refused to provide the necessary medical supplies so that she can care for her prolapse, including a prescribed medical chair to utilize while showering. Further, following the diagnosis of her prolapse, she was referred to additional medical treatment, including surgery, which she has never

---

[11] Patmon is currently set for release in January 2030.
[12] For purposes of this Complaint, the term "sick calls" references the process an offender must complete to receive medical treatment.  This term is used interchangeably with the term "medical requests".
[13] Robinson is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.
[14] Johnson is currently set for release in July 2035.

received.  If medical care/follow-up is further denied, Johnson could lose her ability to bear children in the future.  Plaintiff is also only provided undergarments twice per year – which is a major issue as vaginal discharge is a side effect of her diagnosis.

21.    THALIA OUTLAW (MDOC No. R7934) is currently being held at CMCF and has been in MDOC custody since 1999[15]. She suffers from Type 2 Diabetes, high blood pressure, and vertigo.  Outlaw was diagnosed while in MDOC custody, but has had little to no ongoing medical care for her disabilities.  She has experienced significant symptoms, including persistent blood in her urine, for over six (6) months.  She has not been provided any medical treatment and/or diagnosis regarding her symptoms.  She has made a total of five (5) sick calls within a three (3) month period due to her symptoms becoming more severe. They have all gone unanswered.  She has also followed up with at least three Administrative Remedy Requests.  The most recent having been provided in November 2020, which continues to go unanswered.  She is forced to get her medication from other offenders as MDOC will not refill her prescriptions accordingly.

22.    STEVEN MILLER (MDOC No. 87559) is currently being held at CMCF and has been in MDOC custody since 2016[16].  He suffers from Crohn's Disease and has suffered a stroke and a heart attack.  Miller requires use of a prosthetic leg.  Miller has made numerous requests to receive assistance with his medical issues, including his necessary medication as well as issues with his prosthetic leg. He consistently goes without his medication and experiences constant leg infections following denial of necessary medical supplies to care for his prosthetic.  All of his medical requests have gone unanswered for months.

---

[15] Outlaw is currently serving a life sentence which means that she will depend upon Defendants for basic human needs and care for the remainder of her life.
[16] Miller is currently set for release in July 2024.

23.     IDA WEAVER (MDOC No. 147068) is currently being held at CMCF and has been in MDOC custody since 2009[17].  Weaver suffers from a hearing impairment, limited mobility, and arthritis.  On at least two occasions, she has attempted to complete suicide.  Weaver has not received any mental health evaluation or assessment.  Not only have the Defendants completely ignored her disintegrating mental health but, they have also refused to provide any accommodations or assistance with her struggles as a result of her hearing impairment.

24.     LATORIA BROWNLEE (MDOC No. M6969) is currently being held at CMCF and has been in MDOC custody since April 2020[18].  She has a stint in her brain and suffers from Hydrocephalus, high blood pressure, and depression.  She has been denied any response to her sick calls and does not receive her medication.  She is denied her "Keep on Offender" ("KOP") medications.

25.     BOBBY HENDERSON (MDOC No. 138059) is currently being held at EMCF and has been in MDOC custody since 2011[19]. He suffers from schizophrenia and bipolar disorder. Prior to being transferred to EMCF, Henderson was housed at MSP.  He has regularly been denied medical and mental health care at both facilities and all of his medical requests have gone unanswered – even though he has regularly noted that he is 'hearing voices in his head' and wants assistance.

26.     LACRITA SUMMERLIN (MDOC No. 205860) is currently being held at CMCF and has been in MDOC custody since 2016[20]. In 2018, Summerlin underwent a cranialoptomy related to a tumor located at the back of her head and, following that procedure, she has continued to have issues, including seizures related to the procedure.  She was most recently

---

[17] Weaver is currently serving a life sentence which means that she will depend upon Defendants for basic human needs and care for the remainder of her life.
[18] Brownlee is currently serving a life sentence which means that she will depend upon Defendants for basic human needs and care for the remainder of her life.
[19] Henderson is currently set for release in October 2025.
[20] Summerlin is currently set for release in March 2026.

hospitalized in May 2021 for her seizures, but only following months of denied medical requests.

27.     ROGER HAVENS (MDOC No. 207382) is currently being held at CMCF and has been in MDOC custody since 2018[21].  Due to issues related to a neck injury, Havens requires the use of a wheelchair and also suffers from nerve damage, high blood pressure, and anxiety. He has had numerous issues with regards to receiving medication as many of his medical requests have been denied or ignored.

28.     JIMMY NANNEY (MDOC No. T5609) is currently being held at CMCF and has been in MDOC custody since 2018[22].  Nanney is blind and suffers from high blood pressure.  He has purposefully also been denied the opportunity to participate in any of the MDOC programs to reduce time served in the facility due to his disability.  Nanney was told directly that his participation would be 'too much trouble'.  Further, Nanney has been refused his daily medication.

29.     STEPHEN POWERS (MDOC No. K5020) is currently being held at MSP and has been in MDOC custody since December 2000. Since being incarcerated, he has had multiple strokes and is currently suffering from a bleeding aneurysm. Powers has been refused medical care and has only been provided ibuprofen – but this is a medication that could actually worsen his condition.  All of his sick calls have gone unanswered, including a request for a medical assessment of his condition.

30.     MONDRICK BRADLEY (MDOC No.46406) is currently being held at MSP and has been in MDOC custody since July 1991[23]. Since his incarceration, he has become paralyzed on his

---

[21] Havens is currently set for release in June 2024.
[22] Nanney is currently set for release in August 2035.
[23] Bradley is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.

left side. He also suffers from seizures and hypertension. Instead of providing Bradley a wheelchair to aid his mobility, he was given a brace and a cane. He has made several sick calls, and requested that he be given a wheelchair. Those requests have been denied.

31.   ERIC KENNEDY (MDOC No. T0146) is currently being held at MSP and has been in MDOC custody since June 1998[24]. He is suffering from hyperthyroid disease and has been recommended by a medical doctor to receive an operation for treatment. These requests for the medical procedure are consistently denied. Further, he suffers from an antisocial disorder for which he takes medication. This medication is consistently refused or late.

32.   THADDEUS JARVIS (MDOC No. 210400) is currently being held at MSP and has been in MDOC custody since June 2017[25]. He has been diagnosed with depression, post-traumatic stress disorder, and bipolar disorder. Since being incarcerated, he has made several sick calls for medication and continued treatment for his disorders, but has not received any medication or treatment.

33.   LUTHER HINTON (MDOC No. 30805) is currently being held at SMCI and has been in custody since October 1986[26]. He experiences blindness in one (1) eye, which occurred while in MDOC custody. He was moved to SMCI for the purpose of receiving a medical procedure to help him regain eyesight; however, he has been denied that procedure.

34.   JUSTIN HILL (MDOC No. 163236) is currently being held at SMCI and has been in MDOC custody since November 2010[27]. Hill is legally blind and has made numerous requests to be reassigned to a disability unit where he could safely reside. These requests

---

[24] Kennedy is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.
[25] Jarvis is currently set for release in September 2051.
[26] Hinton is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.
[27] Hill is currently set for release in June 2047.

have been denied. Further, he has made numerous sick calls which have been ignored or wholly denied.

35.     PERVIS EVERETT (MDOC No. 90583) is currently being held at SMCI and has been in MDOC custody since May 2018[28]. He suffers from an enlarged prostate and hypertension. He also has glaucoma in both eyes which is steadily decreasing his vision. Everett has not received any medical treatment for his vision or his other diagnoses – despite making multiple requests.

36.     KEITH O'BRIEN (MDOC No. 164413) is currently being held at SMCI and has been in MDOC custody since August 2016[29]. He suffers from severe back injuries as well as neuropathy of his hands and feet. He has been prescribed orthopedic shoes, but, despite making multiple requests, he has not received them.  Further, he is consistently denied his daily medications.

37.     ANTHONY LOEWENSTEIN (MDOC No. 179971) is currently being held at SMCI and has been in MDOC custody since October 2019[30]. He has a temporary surgical stint in his kidney that should have been removed shortly after surgery in 2019, but has not been removed since incarceration. This causes him severe pain, and he has not been issued medication for the pain, nor has he been to see a specialist concerning his stint.

38.     LARRY ALLEN (MDOC No. 179184) is currently being held at EMCF and has been in MDOC custody since October 2012[31]. Allen requires the use of a prosthetic leg and has been refused medical supplies to maintain his prosthetic.  He has made multiple requests for these

---

[28] Everett is currently set for release in May 2070.
[29] O'Brien is currently set for release in October 2023.
[30] Loewenstein is current set for release in March 2028.
[31] Allen is currently set for release in November 2022.

supplies or, in the alternative, a wheelchair so that he could discontinue the use of a prosthetic he cannot maintain.

39.    LEE NIX (MDOC No. 126666) is currently being held at SMCI and has been in MDOC custody since January 2007[32]. Since incarceration, he has been diagnosed with prostate cancer. Since diagnosis, Nix has been refused any kind of treatment for cancer nor has he been provided an opportunity to see a specialist.  His illness has progressed over time to the point that he is unable to urinate on his own and requires the use of a catheter.  Further, he is not provided necessary medical supplies (i.e. new catheters) and, oftentimes, he just has to reuse his catheters.

40.    TERRY LATTIMORE (MDOC No. 16811) is currently being held at CMCF and has been in MDOC custody since August 2002[33]. Since being incarceration, he suffered a heart attack. This has resulted in many medical difficulties for Lattimore, including constant chest pain and difficulty breathing.  He has made numerous sick calls which go mostly unanswered; however, the medication that was prescribed to him when he was seen by a physician is not given to him for days at a time which further complicates his medical situation.

41.    DERRICK GUYTON (MDOC No. 46245) is currently being held at CMCF and has been in MDOC custody since February 2009[34]. He has multiple sclerosis, a seizure disorder, and hypertension. These ailments, coupled with a missing limb, severely prohibit his mobility. He has no one to assist him when getting out of bed, to the shower, and to the toilet. These daily activities are only performed with the assistance of another inmate. In addition to this,

---

[32] Nix is currently set for release in January 2027.
[33] Lattimore is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.
[34] Guyton is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.

he has developed an open bed sore. Although he is seen daily for care by the medical provider, he continues to deteriorate.

42.    WILLIAM WALDEN (MDOC No. 176296) is currently being held at George County Correctional Facility ("GCCF") in Lucedale, Mississippi and has been in MDOC custody since June 2012[35]. He has schizophrenia, depression and bipolar disorder. He has not received his medication since being incarcerated and has made several sick calls regarding the matter.  This has caused numerous outbursts and other behavioral issues that could potentially lead to him serving more time incarcerated due to his untreated illness.

43.    SYLVIA SMITH (MDOC No. K9446) is currently being held at CMCF and has been in MDOC custody since March 2012[36]. She has been diagnosed with schizophrenia, bipolar disorder, and asthma. Since being incarcerated, she has not received her daily psychiatric medications on a regular basis. Her asthma has gone untreated for months when the medical provider refused to answer her sick calls.

44.    PEGGY STARNS (MDOC No. L0793) is currently being held at CMCF and has been in MDOC custody since April 2002[37].  Starns entered MDOC custody with cornea issues which caused visual impairment.  She was provided surgery while incarcerated; however, she has been completely denied follow-up care.  Medical requests have been completely ignored and Starns' vision has continued to deteriorate to the point that she is almost completely blind.

45.    JEANNIE MATHIS (MDOC No. 157892) is currently being held at CMCF and has been in MDOC custody since April 2010[38]. She suffers from congestive heart failure and has an

---

[35] Walden is currently set for release in February 2028.
[36] Smith is currently set for release in January 2025.
[37] Starns is currently serving a life sentence which means that she will depend upon Defendants for basic human needs and care for the remainder of her life.
[38] Mathis is currently set for release in March 2025.

artificial valve. She has consistently been denied necessary, daily medication and her medical requests have gone ignored.

46.   JUDY WILBANKS (MDOC No. L5879) is currently being held at CMCF and has been in MDOC custody since 2003[39]. She suffers from degenerative disk disease, fibromyalgia, high blood pressure, and digestive tract issues.  She has had surgery on her gall bladder and stomach while in MDOC custody.  Since that time, Wilbanks has developed incontinence issues and also suffers from an eye disorder that continues to worsen.  Every six (6) months, Wilbanks is prescribed new eye glasses in order to see; however, MDOC refuses to have the eye illness diagnosed by an ophthalmologist and consistently refused to provide Wilbanks necessary medical care.

47.   MELISSA ADAMS (MDOC No. 222588) is currently being held at CMCF and has been in MDOC custody since 2019[40]. She suffers from visual impairments, bipolar disorder, and osteoarthritis.  She also has limited mobility issues and currently suffers from an untreated bed sore.  She most recently had hip surgery in June 2021 and was not provided a walker for assistance after the procedure.  She was also not provided any pain medication or a pillow to place between her legs as prescribed by her physician.  She has also not received her medication for any of her mental health disorders.  She also developed a bed sore as a result of not being provided a walker or assistance device by MDOC.

48.   DISABILITY RIGHTS MISSISSIPPI[41] ("DRMS") is designated as Mississippi's authorized P&A agency under federal laws designed to protect individuals with disabilities. DRMS has statutory authority to pursue legal and other appropriate remedies to ensure the protection

---

[39] Wilbanks is currently serving a life sentence which means that she will depend upon Defendants for basic human needs and care for the remainder of her life.
[40] Adams is currently set for release in March 2026.
[41] DRMS is referenced as the P&A Plaintiff when necessary.

of persons with mental illness, developmental disabilities, and other disabilities who are or will be receiving care and treatment in the State of Mississippi. 42 U.S.C. § 10801 et seq.; 42 U.S.C. § 15001 et seq.; 29 U.S.C. § 794e. DRMS is pursuing this action to protect and advocate for the rights and interests of offenders in MDOC custody who are persons with mental illness and persons with mental or physical disabilities. Prior to commencement of this lawsuit, DRMS spent significant time and resources advocating on behalf of offenders with disabilities in MDOC custody, monitoring and investigating the treatment and accommodation of offenders with disabilities in MDOC custody. DMRS' pre-litigation efforts and expenditures of resources were necessitated by the MDOC policies and practices challenged, which serve to frustrate and perceptibly impair DMRS' advocacy efforts and its ability to accomplish the statutory purposes for which it was created.

**Defendants**

49.   MISSISSIPPI DEPARTMENT OF CORRECTIONS ("MDOC") is the state agency that is tasked with the management and oversight of Mississippi's correctional facilities. Headquartered in Jackson, Mississippi, MDOC has several area locations across Mississippi's 82 counties. The agency attempts to maintain three main state facilities, three private facilities, and at least 15 regional facilities[42].

50.   NATHAN "BURL" CAIN ("Cain") is the appointed Commissioner of the Mississippi Department of Corrections.  In his official capacity, Cain is responsible for overseeing all aspects of Mississippi's correctional system as well as ensuring that all facilities under the control of MDOC operate in compliance with state and federal laws. Since his time as Commissioner, Cain has been made aware of the issues at MDOC facilities.  However, ever

---

[42] This information is referenced on MDOC's website as of the date of filing. (https://www.mdoc.ms.gov/Pages/Facility-Locations.aspx)

the showman, Cain has maintained the "smoke and mirrors" of his intention to make the necessary corrections at these facilities.  Cain has had direct knowledge of the harrowing circumstances in these facilities and has failed to take corrective and/or preventative action.  Moreover, Cain has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his direct control.  Cain is being sued in his official capacity and, at all times relevant, has acted under color of state law.

51.    JEWORSKI MALLETT ("Mallett") is the Deputy Commissioner for Institutions at MDOC. He is responsible, along with Commissioner Cain, for the daily operation and administration of all MDOC facilities.  Again, like other MDOC officials, Mallett has been aware of the dire circumstances at MDOC facilities, but has filed to take reasonable measures to remedy these conditions and abate the risks associated with the same.  Moreover, Mallett has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his control/direction.  Mallett is being sued in his official capacity and, at all times relevant, has acted under color of state law.

52.    DONALD FAUCETT ("Faucett") is the Chief Medical Officer at MDOC and is the senior medical official within the agency.  In this role, Faucett is responsible for approving all MDOC policies related to healthcare, overseeing specialty care provided to offenders, investigating and responding to complaints regarding medical care, and reviewing summaries of deaths that occur.  Faucett is also responsible for the oversight of VitalCore to ensure its compliance with its contractual and other obligations to MDOC and its facilities.  Upon information and belief, Faucett has direct knowledge of the systemic failure by both MDOC and its medical provider, VitalCore, to provide adequate medical care to offenders at MDOC facilities.  Faucett has substantially failed to take reasonable measures to remedy these issues and abate substantial risks of the same.  Moreover, Faucett has shown deliberate indifference

to the health, well-being, and care (or lack thereof) of the individuals under his care and the care of his medical staff.

53.     VITALCORE HEALTH STRATEGIES, LLC ("VitalCore") is a limited liability company doing business in, and in good standing with, the State of Mississippi and may be served with process through its Registered Agent, C. T. Corporation System, 645 Lakeland Drive, Ste. 101, Flowood, Mississippi 39232.  Defendant VitalCore has contracted with MDOC to provide medical, dental, and mental health care services to offenders in MDOC custody at its facilities and, at all times relevant hereto, was acting under color of state law. Upon information and belief, VitalCore has direct knowledge of the systemic failures by MDOC and its staff – including those that are staffed by and through VitalCore themselves. VitalCore and its staff has substantially failed to take reasonable measures to remedy these issues and abate substantial risks of the same.  Moreover, VitalCore has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under their care and the care of their staff.

54.     JOHN AND JANE DOE DEFENDANTS are individual defendants who, acting in their official capacity or under color of state law, are responsible, in whole or in part, for conditions at MDOC facilities as set forth in this Complaint, but who are presently unknown.  Plaintiffs expressly reserve the right to substitute persons as Defendants in place of John and Jane Doe Defendants, if and when their identities are uncovered in this matter.

55.     XYZ CORPORATIONS are entities, acting under color of state law, with responsibility, in whole or in part, for the conditions at MDOC facilities as set forth in this Complaint, but which are presently unknown to the Plaintiffs.  Plaintiffs expressly reserve their right to substitute such entities in place of XYZ Corporations, if and when their identities are uncovered in this matter.

## FACTS

*"Cast into hell we look upward for a way out"[43]*
*-From the poem "Humbled" by Stephen, an adult incarcerated writer in Mississippi State Penitentiary*

56.     The above refrain from Stephen's poem is certainly fitting for the horrors that can be found in facilities under the management of the Mississippi Department of Corrections.  MDOC has long suffered from staffing shortages, inexperience (from leadership to administration to day-to-day staff), and corruption, putting its facilities in a continuous and dangerous state of flux.  This dire situation has built, much like a pressure cooker, over several years while Mississippi leaders covered their eyes from the inevitable – which, ultimately, happened at the end of 2019.

57.     Riots erupted at MSP and multiple deaths started to occur at SMCI, MSP, and other regional facilities. As 2020 began, so did an unprecedented number of deaths in MDOC facilities. Mississippi prisons were splashed into the national spotlight as videos of the violence were released through contraband cell phones, depicting what could be mistaken as war zones. Unrest continued throughout 2020 and DRMS, through access authority under PAIMI, PADD, and PAIR, ramped up facility monitoring at multiple MDOC facilities.

58.     DRMS began receiving complaints daily from offenders, their families, and even their attorneys.  Many mentioned the horrific violence that had shaken the facilities over the past year; however, it became clear that there were bigger systemic issues plaguing those in MDOC custody:  lack of medical care, lack of mental health care, and significant accessibility issues for those with disabilities.

---

[43] Featured in *Mississippi Prison Writing* (2021), Vox Publications

59.     Following many months of extensive monitoring, DRMS issued a public report entitled *Cruel and Unusual Punishment in Mississippi Prisons: A Tale of Abuse, Discrimination, and Undue Death Sentences* in January 2021[44].  Copies were delivered to Defendants as well as state leadership and members of the Mississippi Legislature.  There was no response.

60.     DRMS continued to monitor MDOC and its facilities with no noticeable changes.  In fact, situations became worse.  DRMS conducted multiple death investigations over the course of its monitoring.  It was reported to DRMS through clients that offenders were experiencing retaliation for speaking with DRMS' prison team and they were being blocked from filing grievances as DRMS had advised them to do.

61.     Defendants, fueled by a dysfunctional Mississippi Legislature and inept state leadership, have continued to willfully and with deliberate indifference ignore the problems with MDOC and its facilities.  As a final effort, DRMS issued a letter[45] to Defendants and others in Mississippi leadership, requesting them to address the issues they've repeatedly been made aware of.  Again, there has been no response.  All the while, people in the Defendants' custody continue to needlessly suffer and even die.

## DEFENDANTS HAVE FAILED TO PROVIDE ADEQUATE MEDICAL CARE

62.     Defendants have exhibited a policy and practice of failing to provide offenders with adequate health care and are deliberately indifferent to the fact that the systemic failure to do so results in significant injury and a substantial risk of serious harm.

63.     Defendants have failed to provide adequate care in approving medications, equipment, and treatment for those who are in their custody.  Their practice of ignoring and/or refusing

---

[44] A copy of the report is attached hereto as **Exhibit A** for the Court's convenience.
[45] A copy of the correspondence is attached hereto as **Exhibit B.**

"sick calls" and delaying outside appointments and follow-up examinations have resulted in worsening health conditions, further injury/sickness, and even deaths of MDOC inmates.

64.   The State of Mississippi pays hundreds of thousands of dollars to VitalCore for the provision of medical care to MDOC facilities.  But, the result is questionable, at best.

65.   Offender Plaintiffs and those similarly situated are routinely denied health care at the hands of a bureaucratic system that is inaccessible and riddled with incompetence.

66.   Offender Plaintiffs and those similarly situated are required to fill out a form to request what is called a "sick call," and immediately the offender is required to pay from their accounts for just making the request.

67.   Often times, offenders are unable to procure the necessary forms to make this request and, if they do get the form, they are at the mercy of a passing guard or nurse to take this form and deposit it in the proper location.

68.   The MDOC Inmate Legal Assistance Program ("I.L.A.P."), which is purportedly there solely to help Offender Plaintiffs and those similarly situated, often refuses to give offenders the necessary forms and/or refuses assistance with filling out the forms.

69.   Medical care is consistently delayed for weeks and often times marked as "refused" without any follow-up reason.

70.   Offender Plaintiffs and those similarly situated may be eventually transported to medical, or maybe not, but they are still charged for the service and receive minimal or subpar care.

71.   Offender Plaintiffs and those similarly situated who require wheelchair use are often made to ride in vehicles that are not properly equipped to transport wheelchairs.  These individuals are either forced to ride in the center aisle, hoping their wheelchair brakes will keep them safe, or they are forced to sign a refusal for treatment – only because Defendants cannot properly transport them to treatment.

<u>FAILURE TO PROVIDE ADEQUATE HEALTHCARE STAFF</u>

72.    Defendants consistently fail to provide an adequate number of healthcare staff at MDOC facilities and they do so knowingly.

73.    MDOC facilities suffer from dangerously deficient staffing shortages, incompetency, and corruption among employees that threaten the safety of those in MDOC care and custody – this is especially true for those offenders that have a disability.

74.    Offender Plaintiffs and those similarly situated are often without their medication as MDOC staff nurses will not bring their medications ("Pill Call") to the units if there is not a guard present.  Instead of attempting find a guard to escort them or establish regular pill call times to ensure the security they need is present, pill call is simply skipped – sometimes for days and weeks.

75.    In their search for a new medical provider, Defendants Cain and MDOC put out a request for proposal for the medical care contract that included a listing of minimum staffing requirements that set the level of staffing at each facility far below what is needed to provide adequate care. Further, the request for proposal was explicit in valuing cost containment far more than adequacy of care.   The contract ultimately awarded reflected the importance of cost containment and provides inadequate staffing throughout the MDOC system.

76.    Currently, MDOC has a contractual relationship with fellow Defendant, VitalCore, which was entered into in October 2020.  This contract addresses the amount of medical staff to be placed at each MDOC facility.  To date, the medical staff of each facility remains grossly inadequate, not meeting the required contractual terms as outlined by the most recent contract signed between the parties.

77.    Offender Plaintiffs and those similarly situated report that their ignored sick calls are often attributed to a lack of staff to see them.  Further, many instances of missed "pill call" is

attributed to the fact that a nurse or medical staff is not available to bring them their medication.

78.    Offender Plaintiffs and those similarly situated are often times transported to receive medical care, but are never examined.  They are left to sit in waiting and then shipped back to their cells without seeing a healthcare provider.

79.    If an examination does occur which results in a diagnosis of any kind, Offender Plaintiffs and those similarly situated are rarely, if ever, given any follow-up care.

<u>FAILURE TO PROVIDE SERIOUS/EMERGENT MEDICAL CARE</u>

80.    Defendants consistently fail to provide medical care to offenders with serious medical needs as emergent medical care is non-existent in these facilities.

81.    The insufficiency and/or lack of serious/emergent medical care has attributed to worsening conditions/symptoms/injury, pain, loss of functions, and/or death of MDOC offenders.

82.    There have been several instances in the MDOC facilities where Offender Plaintiffs and those similarly situated have been provided very minimal medical treatment of their illnesses.

83.    More concerning, Offender Plaintiffs and those similarly situated have reported that correctional officers are given the authority to deny or delay access to medical care - whether by individual officer's affirmative actions or the systemic understaffing of custodial staff who are necessary to offenders' access to treatment.

84.    Correctional officers who are positioned on the residential units and manage the day-to-day activities of the Offender Plaintiffs and those similarly situated are not adequately trained on how to handle health care emergencies. As a result, Offender Plaintiffs and those similarly situated suffer avoidable harm and injuries, including unnecessary deaths, as correctional staff often times make critical initial decisions about the medical care needed.

85. There are many instances in MDOC facilities where correctional officers have influenced whether or not an offender can go to seek medical treatment at all.

CONSISTENT DENIAL OF BASIC MEDICAL CARE/MEDICATIONS

86. Defendants regularly deny offenders the medication prescribed to them by medical staff and fail to provide basic medical needs/care to those in MDOC custody.

87. "Pill Call" is routinely skipped for various reasons, leaving Offender Plaintiffs and those similarly situated without their daily medication to regulate medical conditions, such as diabetes, high blood pressure, and others.

88. Offender Plaintiffs and those similarly situated that request "sick calls" varies depending on which facility they are housed.

89. Offender S.W., a previous client of DRMS and further discussed herein, was housed at CMCF and offenders in her unit solely relied on guard calling the nurse in order for medical treatment to be requested. According to the tower log the week of S.W.'s death, they only called the nurse twice despite numerous requests for them to do so. S.W. was reported to be in extreme pain, begging for medical help, and relied on other offenders in her unit to help her get in requests. Many of these requests were ignored and, when they finally responded, it was too late.

90. Offender Plaintiffs and those similarly situated are denied the necessary medication used to manage such maladies as high blood pressure, diabetes, and other disability-related illnesses that could be managed with medication.

91. Defendants regularly deny the requests of Offender Plaintiffs and those similarly situated who require certain medical supplies and devices.

92. Offender Plaintiffs and those similarly situated are consistently forced to reuse catheters, bandages, feeding tubes, and other medical supplies upon being denied new, clean supplies.

This unsanitary and hazardous recycling of medical materials is dangerous to both the offender using the materials and those that reside in the same unit.

FAILURE TO DIAGNOSE

93. Defendants have caused significant delay in diagnosis or identification of serious medical concerns and illnesses, causing unnecessary pain, suffering, disability, and even death.

94. Plaintiffs and those similarly situated have made numerous requests for medical treatment which were met with denial or refusal for lengthy periods of time.  However, when they are finally seen by medical staff, they are met with extensive illnesses that, had they been identified earlier, would have been easier to treat.

95. Offender Plaintiffs and those similarly situated are being allowed to medically deteriorate through Defendants' blatant disregard of their medical needs.

96. MDOC's delayed diagnosis has even resulted in death of several inmates. Recently, DRMS investigated the death of S.W., an inmate housed at CMCF. S.W. made several sick calls regarding symptoms she was experiencing, including blood in her urine and blood expressed in her bowel movements.  S.W. begged for medical treatment for months.  The week of her death, she complained of shortness of breath, passed out in the shower, and  had to borrow the wheelchair of another offender just to be able to get around.  At the last moment, she was taken to the emergency room, but ultimately succumbed to her symptoms.

97. Understaffing of correctional staff leads to offenders missing off-site medical appointments and offenders in segregation not receiving medical treatment.

FAILURE TO PROVIDE ADEQUATE PROCEDURES FOR DISEASE PREVENTION

98. In March of 2020, the entire country began operating through the lens of COVID-19.  As the world hunkered down in a global pandemic, the offenders inside MDOC facilities faced a new horror – contracting this infectious disease while living inside an MDOC nightmare.

99.   Because of the close residential quarters provided by MDOC, one would think it would be imperative that MDOC provide the most basic of protections.

100.  Prior to the approval of vaccinations, MDOC only had the option of providing masks to prisoners.  This was never done.  Upon information and belief, MDOC was provided masks from other organizations to be distributed to the offenders; however, these masks were given to staff only.

101.  When DRMS began going back into the facilities, Offender Plaintiffs and those similarly situated were wearing underwear and dirty shirts around their faces in place of masks.

102.  Following the distribution of vaccinations, several offenders stated that they were informed by the Defendants that they would have to receive the vaccination – no questions asked - or be transferred to another location where they would be housed with offenders regardless of their classification and would lose all visitation privileges.  Many offenders apprehensively agreed to receive the vaccination as a result of this information.

103.  Further, Defendants refuse to pay for the treatment of illnesses, such as Hepatitis C, which requires ongoing treatment.  Offender Plaintiffs and those similarly situated are left to suffer from symptoms which could be easily treatment with appropriate medical care and medication management.

### DEFENDANTS HAVE FAILED TO PROVIDE MENTAL HEALTH CARE

104.  Mississippi is the most institutionalized state in the country and consistently fails its people when it comes to treating and caring for those Mississippians with mental illness.  MDOC is no exception.

105.  Defendants' mental health care system is severely understaffed and lacks adequate personnel with sufficient expertise to properly treat the individuals within its care.

106.    Defendants fail to identify, treat and medicate individuals with mental illness. Additionally, these systematic failures rise to the level of causing significant injuries and the unnecessary and wanton infliction of pain.

107.    Defendants have long been aware that the staffing of mental health professionals is inadequate and the lack of intensive, thorough mental health treatment is absent.

108.    MDOC routinely has failed to ensure adequate staffing, both as to gross numbers of mental health professionals, and as to quality and experience, of key mental health professionals. This is in direct contraction of the contractual terms that are listed clearly in the most recent contract between MDOC and VitalCore.

109.    Each facility, per the contract executed in October of 2020 has a specific number of medical care professionals that must be employed at each facility. Not one facility under the control of MDOC has the adequate number of medical staff, including mental health providers.

110.    Defendants have wholly failed to conduct a thorough assessment of offenders for mental health upon admission, resulting in offenders with acute mental illness being ignored and denied the appropriate care and medication that they require.

111.    Defendants are offering no mental health therapy.  Both individual and group therapies have been suspended throughout all MDOC facilities.

DENIAL OF NECESSARY MEDICATIONS TO MANAGE MENTAL ILLNESS

112.    Defendants are routinely and systematically failing to prescribe, provide and manage necessary psychiatric medications.

113.    As previously addressed herein, Offender Plaintiffs and those similarly situated are denied the necessary medication used to manage mental illness, such as bipolar disorder, schizophrenia, and other related mental illness.

114.    Without medication, Offender Plaintiffs and those similarly situated are left to deal with their mental health issues on their own, which can trigger behavioral problems, aggression, and self-harm.

115.    In this regard, Defendants have created a tragic circle of events where they deny individuals with mental health concerns any type of treatment and/or medication and then punish them when they are left to deal with the side effects and repercussions of their illness on their own.

<u>USE OF SECLUSION FOR MENTALLY ILL OFFENDERS</u>

116.    Defendants have a practice of utilizing seclusion to 'deal with' Offender Plaintiffs and those similarly situated with mental health concerns by placing them in segregation without regard for the harmful side effects.

117.    Defendants are aware, or should be aware, that this is a dangerous practice (especially coupled with Defendants lack of mental health care and medication management) that can cause both immediate and long-term harm to these Offender Plaintiffs and those similarly situated.

**DEFENDANTS HAVE SYSTEMICALLY DISCRIMINATED AGAINST OFFENDERS WITH DISABILITIES**

<u>FAILURE TO REMOVE ARCHITECTURAL BARRIERS/PROVIDE SAFE ENVIROMENTS</u>

118.    Defendants have failed to remove architectural barriers that exist at several of their facilities throughout the State of Mississippi.

119.    Restrooms throughout many MDOC facilities are completely inaccessible.  Toilets at some facilities are on raised platforms. This causes Offender Plaintiffs and those similarly situated who utilize wheelchairs to choose between soiling themselves, or hanging by their arms to hold the top of the stall walls.  These tops are angled metal and offenders that do this cut

their hands.  Some residential units have only showers with controls at the very top of the shower head that are significantly out of reach for certain individuals.

120.  Access to the shower areas in many facilities are impossible for an offender with a physical disability or mobility issue.  Many showers require a person to step up and/or over an obstacle to get inside which is impossible for a wheelchair to maneuver.

121.  Access to common areas and outside recreational areas often require the use of stairs. Ramps and other architectural additions that would allow someone with a disability to access these areas are absent.

122.  Superintendents and other staff at these facilities indicated, during monitoring visits conducted by DRMS, that individuals were not housed in residential units that were not accessible. However, these assertions were repeatedly belied by the presence of offenders with disabilities in such residential units and confirmation that they did indeed live there.

123.  Many of the facilities at MDOC locations are not accessible to those who require the use of a wheelchair and may suffer from limited mobility.  Most all of the facilities do not have any restrooms that comply with the ADA standards that allow for accessibility of those with wheelchairs.  Despite knowing this fact, MDOC has still continuously failed to modify these issues and /or provide reasonable accommodation for the offenders that are housed in these facilities.

124.  Offender Plaintiffs and those similarly situated who require the use of wheelchairs often are forced to pay other able-bodied offenders to assist them in navigating the bathroom/shower area.  Defendants do not have a program or any type of service that would partner an offender with a disability with an able-bodied person to assist them.

125.  Facilities in ruin and egregious conditions are not new to MDOC.  In fact, in June 2019, then-Commissioner Pelicia Hall issued a report regarding one of MDOC's facilities – MSP.

126.   Commissioner Hall reported problems with flooding, power, and buildings in an extreme state of disrepair, as well as issues with food safety and other environmental issues.

127.   This report noted that buildings were unsafe for use due to age and deterioration, but this is putting it mildly. Conditions, especially at facilities like MSP, are hazardous.

128.   The management of many disabilities that offenders in these facilities live with relies heavily on basic human needs and a clean, safe environment.  They require decent food and a supply of potable water.  Frequently this is not provided to them in MDOC facilities.

129.   Food and water are not guaranteed in MDOC facilities. If there is a staffing shortage or a security concern in a facility, things like food services, pill call, and sick calls are the first to be ignored.

FAILURE TO PROVIDE SERVICES/PROGRAMMING TO OFFENDERS WITH PHYSICAL DISABILITIES

130.   Defendants have a policy and practice which discriminates against offenders with disabilities by requiring offenders complete a written form to request medical care and/or filing a grievance.

131.   Many offenders with vision or intellectual disabilities cannot complete the necessary forms to receive medical care or file a grievance. There are no systems in place to enable offenders who cannot read due to visual impairment and/or intellectual disabilities to request medical care.

132.   While responses to medical requests and grievances are completely lacking, accommodations should be present for those individuals that cannot fill out the form due to a disability.

133.   Individuals with physical disabilities rely on their mobility devices to live their day-to-day life. However, offenders with these types of medical concerns often times are denied this ability by the Defendants. Offender Plaintiffs and those similarly situated with prosthetic limbs are

often forced to utilize wheelchairs as Defendants refuse to provide them the necessary supplies to maintain their prosthetic limb.

134.   Offenders requiring canes, braces, special orthopedic shoes, and/or wheelchairs are found themselves to be bedridden and/or reliant upon the generosity of their bunkmates in order to move around the facility.

135.   Requests for these items are often ignored; however, when they are finally addressed, offenders are given medical equipment that does not work or immediately requires repair.

136.   Further, offenders with hearing and/or language impairment are completely denied any kind of assistive device to allow them to communicate with MDOC staff, other offenders, their attorney, or anyone that they need to communicate with.

137.   Offenders with disabilities are also often excluded from the few programs that are offered by MDOC, such as work release programs, due solely to their disabilities[46].

## RETALIATION AND INTIMIDATION OF OFFENDERS WITH DISABILITIES AND/OR DRMS CLIENTS

138.   Defendants have established a policy or custom that permits MDOC employees and contractors to engage in retaliatory action against offenders who exercise their rights to communicate with counsel and file complaints regarding conditions of confinement.

139.   Defendants act recklessly and with deliberate indifference with regard to permitting MDOC employees and contractors to engage in retaliatory action against these offenders.

140.   Moreover, the Defendants knew, or should have known, that MDOC employees would act unlawfully by subjecting these offenders to retaliatory treatment and failed to stop them.

141.   Defendants retaliate against offenders who exercise their rights to meet confidentially with counsel and to file complaints regarding the conditions of their confinement.

---

[46] In a PEER report, with 20 of MDOC's 21 facilities reporting, 19 facilities had treatment for alcohol and drug abuse, 17 had basic skills education, 16 had religious programs and services and 12 had vocational education.

142.     Offenders are often threatened or bullied once it becomes known by MDOC employees that they have spoken with a disability advocate and/or legal representation.  Through acts of intimidation, they are scared to file grievances (when they can actually do so) and have expressed to DRMS' monitoring team that they are scared to even be on DRMS' list for visits.

143.     The safety and well-being of Plaintiffs and those similarly situated is constantly at risk.  Peer on peer violence is prevalent[47] and MDOC staff does nothing to subside the violence when it occurs – sometimes due to inadequate staffing, sometimes due to pure cruelty.

144.     Overall, Plaintiffs and those similarly situated are aware that they are incarcerated and understand what that position requires – but they are there to serve a sentence, not fear for their lives on a daily basis.

## CLASS ACTION ALLEGATIONS

145.     Offender Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

146.     Plaintiffs seek to represent a class consisting of all prisoners with disabilities who are currently in MDOC custody, or will be in the future, at their facilities statewide.

147.     There are approximately 17,287[48] offenders in the custody of the Department of Corrections and a large number of those offenders have qualifying disabilities under the ADA.  The members in the class are too numerous and membership too fluid to permit joinder of all members.  All class members are subject to the horrific conditions and unlawful actions of the Defendants as described herein.  Common questions of law and fact exist as to all class members and all Defendants.

---

[47] The Mississippi Department of Corrections logged 853 incidents of inmate-on-inmate assaults during the 2020 state budget year, which ended June 30. That was a 29% increase from the previous year.
[48] This data is current as of August 4, 2021.

148. Common questions include, without limitation, whether conditions of confinement for offenders with disabilities at MDOC facilities violate their rights under the Eighth and Fourteenth Amendments to the Constitution of the United States; whether systemically inadequate medical and mental health care violates offenders' rights under the Eighth and Fourteenth Amendments; whether policies, procedures, and practices of Defendants fail to satisfy the Eighth and Fourteenth Amendments; and whether MDOC policies, practices, and procedures violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

149. DRMS is the duly authorized protection and advocacy agency for the state of Mississippi. DRMS asserts its associational standing to bring its claims on behalf of its constituents who include any current or future offender in the physical custody of MDOC who has a disability as that term is used in the ADA and § 504.

150. In support of its claims, DRMS adopts by reference paragraphs as if fully set forth herein.

151. Offender Plaintiffs who make up the putative class are constituents of DRMS and their factual allegations adopted herein confer upon DRMS associational standing to pursue its claims coextensively with those Plaintiffs.

152. DRMS has associational standing to pursue its claims, in part, because DRMS's constituents otherwise have standing to sue in their own right.

153. DRMS serves its constituents by prosecuting its claims herein pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801, et seq., the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001, et seq. ("DD Act"), and the Protection and Advocacy of Individual Rights Program, 29 U.S.C. §§ 794e, et seq. ("PAIR").

154.  As Mississippi's protection and advocacy agency, DRMS receives funding via PAIMI, the DD Act, and PAIR to pursue legal, and other appropriate remedies to ensure the protection of individuals with disabilities who are receiving care or treatment in Mississippi. Accordingly, DRMS has associational standing to pursue its claims, in part, because the interests DRMS seeks to protect through its claims in this case, i.e., the rights offenders with disabilities in the custody of Defendants, are germane to DRMS's central purpose.

155.  DRMS maintains advisory councils, conducts annual public forums for Mississippians with disabilities to contribute to the agency's goals and priorities, has conducted an administrative investigation into Defendants' practices with respect to DRMS's constituents, and has received communications from its constituents incarcerated in MDOC facilities regarding Defendants' practices.

156.  DRMS further asserts its associational standing to bring its claims to express these collective views and protect the collective interests of its constituents who are now incarcerated or will in the future be incarcerated in Defendants' custody.

157.  These questions of law and the resulting claims are typical to all class members.  Plaintiffs, and their counsel, are capable of representing the class.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

158.  Plaintiffs have exhausted, or should be deemed to have exhausted, all administrative remedies available to them.

159.  The administrative remedy program available in MDOC facilities ("ARP") is intended to provide Offender Plaintiffs and those similarly situated with a process for their grievances to be addressed within 90 days of completing the form.

160.    There are many issues with this process.  First and foremost, it is in violation of the ADA as there are no accommodations available to those Offender Plaintiffs and those similarly situated that have disabilities which prohibit their ability to fill out this form.

161.    Second, forms must be requested from a guard and, since grievances are often about guards' actions or misconduct, this is not an ideal process.  If the Offender Plaintiffs and those similarly situated cannot get a form, the process is over before it can even start.

162.    Finally, if (and only if) a completed form does find its way into a receptacle, it can be ignored for months only to be marked 'denied' if it is ever reviewed by an administrator.

163.    If administrative remedies are not genuinely available, Offender Plaintiffs and those similarly situated cannot be held to this requirement.  However, in an effort to ensure that this standard is met, DRMS has assisted all Offender Plaintiffs and those similarly situated with filing grievances and will continue to do so.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION: INADEQUATE MEDICAL CARE

164.    Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

165.    Through their policies and practices described herein, Defendants subject Offender Plaintiffs and constituents of P&A Plaintiff to a substantial risk of serious harm and injury from inadequate medical care in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Offender Plaintiffs' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

166.    Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

SECOND CAUSE OF ACTION: INADEQUATE MENTAL HEALTH CARE

167.    Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

168.    Through their policies and practices described herein, the Defendants subject Offender Plaintiffs, the client and constituents of P&A Plaintiff to a substantial risk of serious harm and injury from inadequate mental health treatment in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

169.    Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

THIRD CAUSE OF ACTION: VIOLATION OF RIGHTS OF OFFENDERS WITH DISABILITIES

170.    Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

171.    Through their policies and practices described herein, Defendants subject Offender Plaintiffs, the client and constituents of P&A Plaintiff to regular and systemic discrimination based on their disabilities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C.§§12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. These policies and practices continue to be implemented by DEFENDANT MDOC and its agents, officials, employees, and all persons acting in concert with MDOC under color of

state law, in their official capacities, and are the proximate cause of the Plaintiffs' ongoing deprivation of rights secured by federal law.

172.     Defendants have been and is aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

<u>FOURTH CAUSE OF ACTION: RETALIATION</u>

173.     Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

174.     Through their policies and practices described herein, the Defendants subjected Plaintiffs to retaliation for communicating with attorneys/advocates and filing a lawsuit regarding conditions of confinement and other discriminatory actions, in violation of the First and Fourteenth Amendments to the U.S. Constitution.

175.     Defendants have been and are aware of the retaliatory actions complained of herein, and have condoned or been deliberately indifferent to such conduct.

**PRAYER FOR RELIEF**

176.     Each section herein is incorporated into every other section herein, such that this Complaint is to be read as a whole.  All factual allegations apply to all claims.

177.     Plaintiffs and the classes they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants, as alleged herein, unless Plaintiffs and the class they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

178.     Named Plaintiffs and the class they represent request that this Court grant them the following relief:

a.   Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

b.   Adjudge and declare that the acts, omissions, policies, and practices of the Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of Offender Plaintiffs and the classes they represent under the Cruel and Unusual Punishment Clause of the Eighth Amendment, which protects offenders against cruel and inhumane treatment.

c.   Preliminarily and permanently enjoin all Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting Offender Plaintiffs to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above.

d.   Order the Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Offender Plaintiffs and constituents of the P&A Plaintiff suffer due to inadequate medical and mental health care of Defendants, and due to the policies and practices with regard to persons with disabilities. The plan shall include at a minimum the following:

   i.   Staffing: Medical, Mental Health, Dental and Correctional staffing shall be sufficient to provide offenders with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

   ii.   Access: Policies and practices that provide timely access to health care;

   iii.   Screening: Policies and practices that reliably screen for medical, dental, and mental health conditions that need treatment;

   iv.   Emergency Response: Timely and competent responses to health care emergencies;

     v.    Medication and Supplies: Timely prescription and distribution of medications and supplies necessary for medically adequate care;

    vi.    Chronic Care: Timely access to competent care for chronic diseases;

   vii.    Environmental Conditions: Basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, including but not limited to a smoke-free environment;

  viii.    Mental Health Treatment: Timely access to necessary treatment for serious mental illness, including medication, therapy, inpatient treatment, suicide prevention,

    ix.    Quality Assurance: A regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

    x.    Accommodations: Appropriate accommodations for individuals with disabilities, as required by the ADA and § 504.

e.    Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

f.    Retain jurisdiction of this case until all Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

g.    Award such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED, the 9th day of August, 2021.

                        DISABILITY RIGHTS MISSISSIPPI
                        COUNSEL FOR ALL PLAINTIFFS
                        _/s/ Greta Kemp Martin_
                        GRETA KEMP MARTIN, MSB#103672

Greta Kemp Martin, MSB# 103672
Brandi Brown, MSB# 101583
Disability Rights Mississippi
5 Old River Place, Ste. 101
Jackson, Mississippi 39202
Tel. (601) 968-0600
Email: gmartin@drms.ms