## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| **PERVIS EVERETT, TONISHA JOHNSON, THALIA OUTLAW, LARRY ALLEN, TERRY LATTIMORE, DERRICK GUYTON, WILLIE BRENT, ERNEST LEFFEW, THOMAS ALSOBROOKS** on behalf of themselves and others similarly situated**,** and **DISABILITY RIGHTS MISSISSIPPI** | **PLAINTIFFS** |
| **VS.** | **CIVIL ACTION NO. 3:21-cv-516-CWR-LGI** |
| **MISSISSIPPI DEPARTMENT OF CORRECTIONS, NATHAN "BURL" CAIN,** in his official capacity as Commissioner of the Mississippi Department of Corrections, **JEWORSKI MALLET,** in his official capacity as Deputy Commissioner of Institutions, **TIMOTHY DONOVAN,** in his official capacity as Interim Chief Medical Officer, **VITALCORE HEALTH STRATEGIES, LLC, JOHN & JANE DOE DEFENDANTS,** and **XYZ CORPORATIONS** | **DEFENDANTS** |

## SECOND AMENDED COMPLAINT

# EXHIBIT A

**TABLE OF CONTENTS**

I.       **PRELIMINARY STATEMENT** ................................................................. 1

II.      **JURISDICTION** ................................................................................... 4

III.     **VENUE** ................................................................................................ 4

IV.     **PARTIES** ............................................................................................. 5

      A.     PLAINTIFFS ................................................................................. 5

      B.     DEFENDANTS ............................................................................ 10

V.       **DEFINITIONS** ................................................................................... 13

VI.     **FACTS** .............................................................................................. 15

      A.     DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL CARE ............. 16

      B.     DEFENDANTS FAIL TO PROVIDE ADEQUATE PROCEDURES TO REQUEST AND RESPOND TO MEDICAL CARE NEEDS ................................ 17

      C.     DEFENDANTS FAIL TO REFER, ENSURE, AND DELIVER HIGHER LEVELS OF CARE ..................................................................... 19

      D.     DEFENDANTS FAIL TO PROVIDE EMERGENT MEDICAL CARE ............ 21

      E.     DEFENDANTS CONSISTENTLY DENY BASIC MEDICAL CARE, MEDICATIONS, MEDICAL SUPPLIES, DURABLE MEDICAL EQUIPMENT, AND ASSISTIVE DEVICES ........................................................... 23

      F.     DEFENDANTS FAIL TO PROVIDE ADEQUATE HEALTHCARE STAFF .. 25

      G.     DEFENDANTS HAVE SYSTEMICALLY DISCRIMINATED AGAINST PEOPLE WITH DISABILITIES BY FAILING TO PROVIDE REASONABLE ACCOMODATIONS .................................................................... 27

VII.    **CLASS ACTION ALLEGATIONS** ....................................................... 30

      A.     PLAINTIFF CLASS ...................................................................... 30

      B.     SUBCLASS OF PEOPLE WITH CHRONIC CONDITIONS ("CHRONIC CONDITION SUBCLASS") ......................................................... 32

      C.     SUBCLASS OF PEOPLE WITH PHYSICAL DISABILITIES ("PHYSICAL DISABILITIES SUBCLASS") ..................................................... 34

VIII.   **DRMS'S ASSOCIATIONAL STANDING** ............................................. 36

IX.     **CLAIMS FOR RELIEF** ...................................................................... 38

EXHIBIT A

    A.    FIRST CAUSE OF ACTION: INADEQUATE MEDICAL CARE.........................38

    B.    SECOND CAUSE OF ACTION: VIOLATION OF RIGHTS OF PEOPLE
         WITH DISABILITIES ................................................................................38

**X.    PRAYER FOR RELIEF...............................................................................39**

EXHIBIT A

# I.   PRELIMINARY STATEMENT

1.   This class action is brought by individuals who are currently in custody with the Mississippi Department of Corrections ("MDOC").  The above-named Plaintiffs bring this case to remedy (a) Defendants' failure to provide adequate medical care to persons in the custody of MDOC; and (b) Defendants' failure to provide people with disabilities with reasonable accommodations in the form of medical supplies, medical equipment, and assistive devices to which they are entitled under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.  Plaintiffs seek declaratory and injunctive relief for the inhumane and discriminatory practices and conditions they face every day in MDOC custody.

2.   MDOC is responsible for many different correctional facilities throughout the State of Mississippi, which include seven state facilities, 15 regional facilities, and two private facilities.[1]  This class action focuses on the unlawful policies and practices of the seven state facilities: Central Mississippi Correctional Facility[2] ("Central"), Delta Correctional Facility[3] ("Delta"), Marshall County Correctional Facility[4] ("Marshall"), Mississippi Correctional Institute for Women[5] ("MCIW"), Mississippi State Penitentiary[6] ("Parchman"), South

---

[1] This information is based on MDOC's "Facilities" webpage, available at: https://www.mdoc.ms.gov/facilities (last accessed Jan. 29, 2024).

[2] Central Mississippi Correctional Facility is located in Pearl, Mississippi.  This facility is overseen by Superintendent John Hunt and houses 2,871 people as of January 9, 2024 according to MDOC's Daily Inmate Population data for January 2024, available at https://www.mdoc.ms.gov/sites/default/files/Daily_Inmate_Population/01-2024%20Daily%20Inmate%20Population.pdf (last accessed Jan. 30, 2024) [hereinafter January 2024 MDOC Population Data].

[3] Delta Correctional Facility is located in Greenwood, Mississippi.  This facility is overseen by Warden Susan Swindle and houses 321 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[4] Marshall County Correctional Facility is located in Holly Springs, Mississippi.  The facility is overseen by Warden Chris Loden and houses 838 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[5] Mississippi Correctional Institute for Women is located in Pearl, Mississippi.  This facility is overseen by Superintendent Tereda Hairston.

[6] Mississippi State Penitentiary, also known as "Parchman," is located in Parchman, Mississippi.  This facility is overseen by Superintendent Marc McClure and houses 2,490 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

EXHIBIT A

Mississippi Correctional Institution[7] ("South"), and Walnut Grove Correctional Facility[8] ("Walnut Grove").

3.      MDOC facilities have been underfunded and understaffed for decades, resulting in horrific conditions, increasing and deadly violence, and an environment that in no way is conducive to rehabilitation.  The conditions at these facilities are so severe and barbaric that individuals in these facilities are faced with imminent risks of substantial harm daily in violation of their constitutional rights.

4.      The named Plaintiffs in this class action, who are in MDOC custody, are entirely dependent on MDOC, Commissioner Nathan "Burl" Cain, Deputy Commissioner of Institutions Jeworski Mallet, Interim Chief Medical Officer Timothy Donovan, and Vitalcore Health Strategies, LLC (collectively, "Defendants") for day-to-day medical care.  Yet, the system of care provided by Defendants is grossly inadequate and subjects all individuals to a substantial risk of serious harm, including, but not limited to, unnecessary pain, loss of function, injury, and even death.

5.      Disability Rights Mississippi ("DRMS") is the designated Protection and Advocacy ("P&A") agency for the State of Mississippi and the P&A Plaintiff in this action.  The P&A system is a national network of disability rights agencies investigating abuse and neglect and providing legal representation and other advocacy services to people with disabilities through extensive authority provided by Congress.[9]  As Mississippi's P&A, DRMS may investigate incidents of

---

[7] South Mississippi Correctional Institution is located in Leakesville, Mississippi.  This facility is overseen by Superintendent Brand Huffman and houses 2,750 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[8] Walnut Grove Correctional Facility is located in Walnut Grove, Mississippi.  This facility is overseen by Interim Superintendent Christopher Dykes and houses 363 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[9] The authority was first codified through the passage of the Protection and Advocacy for People with Developmental Disabilities (PADD) Act, 42 U.S.C. § 15043(a)(2)(B).  Over time, Congress extended the protections of the PADD Act,

EXHIBIT A

abuse and neglect, provide resources and referrals, monitor service providers[10] with respect to safeguarding the rights of people with disabilities, and pursue any and all administrative, legal, and other remedies on behalf of the individuals that DRMS is tasked with protecting.

6.  DRMS is tasked with protecting individuals who have a qualifying disability under the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134.

7.  Due to Defendants' deliberate indifference to the obvious medical needs of the persons in their custody, Plaintiffs and others similarly situated go extended periods of time without appropriate diagnoses, treatment, or care of medical conditions—both those existing prior to incarceration and those developed while in MDOC custody.  Numerous individuals have died from a failure to treat certain medical conditions due to the negligence and inexperience of MDOC staff.  Many individuals have required emergency surgery or lost the use of limbs after having been left to live with untreated symptoms for lengthy periods of time.

8.  People with physical disabilities face discriminatory, dangerous, and even deadly circumstances while incarcerated with MDOC.  They are housed in facilities with an utter lack of accommodations and are denied basic human needs.  Plaintiffs and those similarly situated are not provided with necessary assistive devices, such as functioning wheelchairs or shower chairs.  They are punished for things they cannot do or do not know how to do because of their disabilities.

---

incorporating them by reference into legislation protecting persons with other forms of disabilities, which includes both the Protection and Advocacy for Individual Rights (PAIR) Act, 29 U.S.C. § 794(e)(f)(1), and the Protection and Advocacy for Individuals with Traumatic Brain Injury (PATBI) Act, 42 U.S.C. § 300d-53 (eff. April 28, 2008).  Similarly, Congress expanded the P&A system through the passage of the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, 42 C.F.R. § 51.42(c)(2) and the Protection and Advocacy for Beneficiaries of Social Security (PABSS) Ticket to Work and Work Incentives Improvement Act of 1999, as amended (TWWIIA) 42 U.S.C. § 1320b-21.

[10] 45 C.F.R. § 1386.19 (PADD: 45 C.F.R. § 1326.27(b)(2) (PADD)); 42 C.F.R. § 51.2 (PAIMI: "Service provider includes any public or private residential setting that provides overnight care accompanied by treatment services.").

EXHIBIT A

9.      Defendants are solely responsible for the horrific and dehumanizing conditions in these facilities—conditions that have been repeatedly reported to them.  Nothing has been done and the people incarcerated in these facilities continue to suffer, especially those with disabilities.  Incarceration is intended to be punitive; however, denying those incarcerated basic human rights, and even worse, the opportunity to utilize incarceration as rehabilitation is grossly negligent, inhumane, and cruel.

10.     Accordingly, Plaintiffs respectfully request that this Court enter its order providing the declaratory and injunctive relief requested herein.

## II.     JURISDICTION

11.     The claims alleged herein arise under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution; the Americans with Disabilities Act, 42 U.S.C. § 1231, *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

12.     The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; 29 U.S.C. § 794a; and 42 U.S.C. §§ 1983 and 12133.

## III.    VENUE

13.     Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. § 1391 as Defendants are subject to this Court's jurisdiction given the location of their principal places of business.  Defendants oversee all facilities across the State of Mississippi from their primary office located at 301 North Lamar Street in Jackson, Mississippi.  Defendant VitalCore ("VitalCore") is a limited liability company and registered to conduct business in the State of Mississippi.  VitalCore provides contracted medical services to MDOC facilities.

EXHIBIT A

## IV.    PARTIES[11]

### A.    PLAINTIFFS

14.    **PERVIS EVERETT** (*MDOC No. 90583*) is currently being held at South and has been in MDOC custody since June 2018.[12]  Plaintiff Everett suffers from an enlarged prostate and hypertension, compounded by the debilitating effects of glaucoma that have resulted in blindness in one eye and substantial vision impairment in the other.  Despite his persistent and numerous requests for medical attention, Plaintiff Everett has been subjected to inadequate and limited treatment, leading to a rapid deterioration in his overall health.  Upon his entry into MDOC custody in 2018, specialty care physicians addressed his optometry and urology concerns.  However, the Defendants have since failed to uphold their obligation to provide ongoing monitoring, follow-up care, and sustained specialty interventions, exacerbating the adverse impact on Plaintiff Everett's health and well-being.  Plaintiff Everett has exhausted all available administrative remedies.

15.    **TONISHA JOHNSON** (*MDOC No. 205762*) is currently being held at MCIW and has been in MDOC custody since October 2016.[13]  Plaintiff Johnson has endured incarceration across various facilities within MDOC, including, but not limited to, Central, all of which have exposed her to consistently subpar medical care.  During her incarceration, Plaintiff Johnson faced the unique challenge of giving birth to a child in an MDOC facility, subsequently leading to health complications in the form of uterine prolapse.  Despite undergoing surgery in 2022 to address this condition, Defendants have consistently failed to provide essential follow-up

---

[11] Information for each Plaintiff is based on information known to DRMS as of date of filing.  Each of these individuals were discovered through DRMS monitoring of the facility where they are currently housed.  DRMS also confirmed this information through the MDOC Inmate Search available on its website.

[12] Plaintiff Everett is currently set for release in November 2067.

[13] Plaintiff Johnson is currently set for release in July 2035.

EXHIBIT A

care and monitoring.  The repercussions of this negligence have manifested in additional medical complications, necessitating the removal of a foreign object inadvertently left in her body during surgery.  Moreover, Plaintiff Johnson has been denied critical medical supplies, such as undergarments, essential for managing the side effects of her diagnosis, particularly excessive vaginal discharge.  The refusal to consistently furnish the necessary durable medical equipment, including a prescribed medical chair for showering, further exacerbates the challenges she faces in maintaining her health and well-being while incarcerated.  Plaintiff Johnson has exhausted all available administrative remedies.

16.     **THALIA OUTLAW** (*MDOC No. R7934*) is currently being held at Delta and has been in MDOC custody since March 1999.[14]  Plaintiff Outlaw's experience within various MDOC facilities, including Central, has been plagued by consistently inadequate medical care. Managing Type 2 Diabetes, high blood pressure, and vertigo, she grapples with persistent symptoms, including enduring recurrent episodes of blood in her urine.  Despite being diagnosed while in MDOC custody, Plaintiff Outlaw has not been provided ongoing medical attention for her disabilities.  Her efforts to seek redress through "sick calls" have been met with repeated disregard, exacerbating the deterioration of her health.  Furthermore, the administration, renewal, and timely refills of her medications have proven unreliable, further compromising her well-being.  Plaintiff Outlaw has exhausted all available administrative remedies.

17.     **LARRY ALLEN** (*MDOC No. 179184*) is currently being held at South and has been in MDOC custody since August 2023.[15]  Plaintiff Allen has experienced substandard medical

---

[14] Plaintiff Outlaw is currently serving a life sentence which means that she will depend upon Defendants for basic human needs and care for the remainder of her life.

[15] Plaintiff Allen is currently set for release in April 2030.

EXHIBIT A

care during his incarceration across various MDOC facilities, including, but not limited to, Parchman.  Compounding his challenges, Plaintiff Allen, who relies on a prosthetic leg, has faced persistent denial of essential medical supplies crucial for maintaining his prosthetic functionality.  Despite multiple requests for these devices, or, as an alternative, a wheelchair that would alleviate the burden of managing an unmaintainable prosthetic, Plaintiff Allen's pleas have been met with refusal, exacerbating the limitations imposed on his mobility and overall well-being.  Plaintiff Allen has exhausted all available administrative remedies.

18.     **TERRY LATTIMORE** (*MDOC No. 16811*) is currently being held at Central and has been in MDOC custody since September 2002.[16]  Plaintiff Lattimore has been incarcerated in and subject to inadequate medical care at MDOC multiple facilities, including, but not limited to, Walnut Grove.  During his incarceration, he experienced a heart attack, and the subsequent lack of appropriate treatment, monitoring, and ongoing care has precipitated a myriad of medical challenges and a decline in his overall health.  Diagnosed with hyperlipidemia, diabetes, hypertension, and asthma while in custody, Plaintiff Lattimore continues to face inadequate care for these chronic conditions.  The administration, renewal, and timely refills of his medications prove unreliable, further jeopardizing Plaintiff's health.  The shortcomings in medical attention underscore the urgent need for legal intervention to address the systematic failures that compromise Plaintiff Lattimore's well-being while incarcerated. Plaintiff Lattimore has exhausted all available administrative remedies.

19.     **DERRICK GUYTON** (*MDOC No. 46245*) is currently being held at Parchman and has been in MDOC custody since February 1999.[17]  Plaintiff Guyton has faced inadequate

---

[16] Plaintiff Lattimore is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.

[17] Plaintiff Guyton is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.

EXHIBIT A

medical care throughout his incarceration within various MDOC facilities, including Walnut Grove.  Struggling with multiple sclerosis, a seizure disorder, and hypertension, his mobility is severely limited, exacerbated by the challenge of a missing limb.  The absence of support leaves him without assistance for essential daily activities such as getting out of bed, showering, and using the toilet or changing his diaper.  These tasks necessitate the aid of another individual, highlighting the critical need for consistent and reliable care.  The complete lack of monitoring and ongoing attention to Plaintiff Guyton's needs while confined to his bed in May 2021 resulted in a severe bed sore, underscoring the pressing need for legal intervention to rectify the persistent failures in providing adequate medical care during his incarceration.  Plaintiff Guyton has exhausted all available administrative remedies.

20.    **WILLIE BRENT** (*MDOC No. 72777*) is currently being held at Central and has been in MDOC custody since August 2021.[18]  Plaintiff Brent contends with the challenges of kidney failure, having been a dialysis patient before his incarceration.  Despite his urgent need for continued dialysis treatment, multiple "sick calls" addressing the Defendants' failure to provide such treatment have gone unanswered.  Plaintiff Brent, in expressing his increasing concerns, emphasizes the gravity of the situation, citing instances, where others who required this treatment have died as a result of being denied or withheld dialysis.  Plaintiff Brent has exhausted all available administrative remedies.

21.    **ERNEST LEFFEW** (*MDOC No. 186927*) is currently being held at Parchman and has been in MDOC custody since November 2017.[19]  Plaintiff Leffew has experienced inadequate medical care across several MDOC facilities, including, but not limited, to South.  Afflicted with Crohn's Disease, he suffers from a range of symptoms, notably gastrointestinal issues

---

[18] Plaintiff Brent is currently set for release in January 2044.

[19] Plaintiff Leffew is currently set for release in May 2040.

EXHIBIT A

and rapid weight loss, which remain unmonitored and untreated.  While receiving limited specialty care, Plaintiff Leffew has been deprived of consistent follow-up care and ongoing monitoring, exacerbating the challenges posed by his condition.  Additionally, despite prescriptions from both his specialty care physician and the facility's medical provider, nutritional supplementation drinks crucial for his well-being have not been provided.  These persistent lapses underscore the urgent need for legal intervention to rectify systemic deficiencies in Plaintiff Leffew's medical care, ensuring he receives the necessary attention and treatments essential for managing Crohn's Disease.  Plaintiff Leffew has exhausted all available administrative remedies.

22.     **THOMAS ALSOBROOKS** (*MDOC No. 235953*) is currently being held at Parchman and has been in MDOC custody since February 2022.[20]  Plaintiff Alsobrooks has experienced inadequate medical care across various MDOC facilities, including, but not limited to, South. Afflicted with upper gastrointestinal issues, he suffers from symptoms such as bleeding in the stomach, excessive vomiting of blood, and fainting.  Moreover, even in emergent situations, such as fainting in the shower following a bout of vomiting blood, facility staff have wholly ignored these critical incidents.  Despite numerous "sick calls" addressing these pressing health concerns, Plaintiff Alsobrooks' efforts have largely been unanswered.  This pattern of disregard for his urgent medical needs underscores a systemic failure, emphasizing the pressing need for legal intervention to secure appropriate and timely medical attention for his serious upper gastrointestinal issues.   Plaintiff Alsobrooks has exhausted all available administrative remedies.

---

[20] Plaintiff Alsobrooks is currently set for release in August 2036.

EXHIBIT A

23.  **DISABILITY RIGHTS MISSISSIPPI** ("DRMS") is designated as the State of Mississippi's authorized P&A.  It is an agency created under federal laws and designed to protect people with disabilities.  DRMS has statutory authority to pursue legal and other appropriate remedies to ensure the protection of persons with mental illnesses, developmental disabilities, and other disabilities who are or will be receiving care and treatment in the State of Mississippi.  42 U.S.C. § 10801 *et seq.*; 42 U.S.C. § 15001 *et seq.*; 29 U.S.C. § 794e.  DRMS is pursuing this action to protect and advocate for the rights and interests of individuals in MDOC custody who are persons with physical disabilities.  Prior to commencement of this lawsuit, DRMS spent significant time and resources advocating on behalf of people with disabilities in MDOC custody, and monitoring and investigating the treatment and accommodation of people with disabilities in MDOC custody.  DMRS's pre-litigation efforts and expenditures of resources were necessitated by the MDOC policies and practices challenged, which serve to frustrate and perceptibly impair DMRS's advocacy efforts and its ability to accomplish the statutory purposes for which it was created.

B.  **DEFENDANTS**

24.  **MISSISSIPPI DEPARTMENT OF CORRECTIONS** ("MDOC") is the state agency that is tasked with the management and oversight of Mississippi's correctional facilities. Headquartered in Jackson, Mississippi, Defendant MDOC has several area locations across Mississippi's 82 counties.  The agency attempts to maintain seven state facilities, 15 regional facilities, and two private facilities.[21]  This class action focuses on the unlawful policies and practices of the seven state facilities: Central Mississippi Correctional Facility, Delta Correctional Facility, Marshall County Correctional Facility, Mississippi Correctional Institute

---

[21] This information is based on MDOC's "Facilities" webpage, available at: https://www.mdoc.ms.gov/facilities (last accessed Jan. 29, 2024).

EXHIBIT A

for Women, Mississippi State Penitentiary, South Mississippi Correctional Institution, and Walnut Grove Correctional Facility.

25.    **NATHAN "BURL" CAIN** ("Cain") is the appointed Commissioner of the Mississippi Department of Corrections.   In his official capacity, Defendant Cain is responsible for overseeing all aspects of Mississippi's correctional system as well as ensuring that all facilities under the control of MDOC operate in compliance with state and federal laws.  Defendant Cain authorizes or ratifies the policy and practice of subjecting people to a substantial risk of serious harm and discrimination based on disability.  Since his time as Commissioner, Defendant Cain has been made aware of the issues at MDOC facilities and has had direct knowledge of the harrowing circumstances in these facilities.  However, Defendant Cain has failed to take corrective and/or preventative action.  Moreover, Defendant Cain has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his direct control.  Defendant Cain is being sued in his official capacity and, at all times relevant, has acted under the color of state law.

26.    **JEWORSKI MALLETT** ("Mallett") is the Deputy Commissioner for Institutions at MDOC.   He is responsible, along with Defendant Cain, for the daily operation and administration of all MDOC facilities.  Defendant Mallet authorizes or ratifies the policy and practice of subjecting people to a substantial risk of serious harm and discrimination based on disability.  Defendant Mallett has been aware of the dire circumstances at MDOC facilities but has failed to take reasonable measures to remedy these conditions and abate the risks associated with the same.  Moreover, Defendant Mallett has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his control/direction.  Defendant Mallett is being sued in his official capacity and, at all times relevant, has acted under the color of state law.

EXHIBIT A

27.    **TIMOTHY DONOVAN** ("Donovan") is the Interim Chief Medical Officer at MDOC and is the senior medical official within the agency.  Defendant Donovan authorizes or ratifies the policy and practice of subjecting people to a substantial risk of serious harm and discrimination based on disability.  In this role, Defendant Donovan is responsible for approving all MDOC policies related to healthcare, overseeing specialty care provided to individuals, investigating, and responding to complaints regarding medical care, and reviewing summaries of deaths that occur.  Defendant Donovan is also responsible for the oversight of VitalCore to ensure its compliance with its contractual and other obligations to MDOC and its facilities.  Upon information and belief, Defendant Donovan has direct knowledge of the systemic failure by both MDOC and its medical provider, VitalCore, to provide adequate medical care to individuals incarcerated in MDOC facilities.  Defendant Donovan has substantially failed to take reasonable measures to remedy these issues and abate substantial risks of the same.  Moreover, Defendant Donovan has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his care and the care of his medical staff.  Defendant Donovan is being sued in his official capacity and, at all times relevant, has acted under the color of state law.

28.    **VITALCORE HEALTH STRATEGIES, LLC** ("VitalCore") is a limited liability company doing business in, and in good standing with, the State of Mississippi and may be served with process through its Registered Agent, C. T. Corporation System at 645 Lakeland Drive, Suite 101, Flowood, Mississippi 39232.  Defendant VitalCore has contracted with MDOC to provide medical, dental, and mental health care services to individuals in MDOC custody at its facilities and, at all times relevant hereto, was acting under color of state law.  Upon information and belief, Defendant VitalCore has direct knowledge of the systemic failures by Defendant MDOC and its staff—including those that are staffed by and through

EXHIBIT A

Defendant VitalCore themselves.  Defendant VitalCore and its staff have substantially failed to take reasonable measures to remedy these issues and abate substantial risks of the same. Moreover, Defendant VitalCore has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under their care and the care of their staff.

29.   **JOHN AND JANE DOE DEFENDANTS** are individual defendants who, acting in their official capacity or under color of state law, are responsible, in whole or in part, for conditions at MDOC facilities as set forth in this Complaint, but who are presently unknown.  Plaintiffs expressly reserve the right to substitute persons as Defendants in place of John and Jane Doe Defendants, if and when their identities are uncovered in this matter.

30.   **XYZ CORPORATIONS** are entities, acting under color of state law, with responsibility, in whole or in part, for the conditions at MDOC facilities as outlined in this Complaint, but which are presently unknown to the Plaintiffs.  Plaintiffs expressly reserve their right to substitute such entities in place of XYZ Corporations, if and when their identities are uncovered in this matter.

**V.   <u>DEFINITIONS</u>**

31.   The following terms used herein shall have the meaning given to them in the definitions below, regardless of whether the terms are capitalized in this Complaint:

  a.   <u>Chronic Condition</u>: A physiological disease that persists over an extended period of time and requires periodic medical care and treatment (including, but not limited to, diabetes, hypertension, asthma, HIV, and seizures).  It does not refer to mental illness or mental health conditions.

  b.   <u>Physical Disability</u>: Any physiological disorder or condition, disfigurement, or anatomical loss that affects one or more bodily systems (including, but not limited to,

Page **13** of **42**

EXHIBIT A

neurological, musculoskeletal, respiratory, reproductive, cardiovascular, or endocrine systems). It does not refer to vision, auditory, learning, cognitive, developmental, intellectual, mental health, autism spectrum, or speech disorders or conditions.

c.    <u>Assistive Devices</u>: Any medical equipment, including, but not limited to, wheelchairs, medical chairs, canes, crutches, walkers, prosthetic devices, and orthopedic braces, that ensures people with physical disabilities can perform major life activities and/or access prison programs and services. They can also include durable medical equipment.

d.    <u>Medical Supplies</u>: Any supplies that provide therapeutic benefits to treat, manage, or accommodate medical conditions or physical disabilities.

e.    <u>Durable Medical Equipment</u>: Equipment that is considered medically necessary as prescribed by a physician for use in a patient's home. It can also include any equipment that can withstand repeated use when used for a medical reason. *See, e.g.*, Durable Medical Equipment Reference List, Centers for Medicare & Medicaid Servs., https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=190 (last visited Feb. 1, 2024).

f.    <u>Reasonable Accommodation</u>: Any modification to a policy or procedure that enables a person with a physical disability to fully and equally participate in programs, activities, services, and/or benefit.

EXHIBIT A

## VI.   FACTS

***"Cast into hell we look upward for a way out"[22]***
*— **From the poem "Humbled" by Stephen, an adult incarcerated writer in Mississippi State Penitentiary***

32.     The above refrain from a poem by an individual named Stephen is certainly fitting for the horrors that can be found in facilities under the management of Defendants.  MDOC has long suffered from staffing shortages, inexperience (from leadership to administration to day-to-day staff), and corruption, putting its facilities in a continuous and dangerous state of flux. This dire situation has built, much like a pressure cooker, over several years while Mississippi leaders covered their eyes from the inevitable series of terrible events that began to take place at the end of 2019.

33.     Riots erupted at Parchman and multiple deaths began to occur there as well as at South and other regional facilities.  As 2020 began, an unprecedented number of deaths took place in MDOC facilities.  Mississippi prisons were splashed into the national spotlight as videos of the violence were released through contraband cell phones, depicting what could be mistaken as war zones.  Unrest continued throughout 2020.

34.     In response, DRMS, through access authority under PAIMI, PADD, and PAIR, ramped up its facility monitoring at multiple MDOC facilities.

35.     DRMS began receiving complaints daily from individuals, their families, and even their attorneys.  Many mentioned the horrific violence that had shaken the facilities over the past year.  However, it became clear that there were bigger systemic issues plaguing those in MDOC custody: lack of medical care and significant accommodation issues for those with disabilities.

---

[22] Featured in *Mississippi Prison Writing* (2021), Vox Publications.

EXHIBIT A

36. Following many months of extensive monitoring, DRMS issued a public report entitled *Cruel and Unusual Punishment in Mississippi Prisons: A Tale of Abuse, Discrimination, and Undue Death Sentences* in January 2021.[23]  Copies were delivered to Defendants as well as state leadership and members of the Mississippi Legislature.  There was no response.

37. DRMS continued to monitor MDOC and the situation in its facilities which only became worse.  Throughout its monitoring, DRMS conducted multiple death investigations.  It was reported to DRMS, through its clients, that people were experiencing retaliation for speaking with DRMS's prison team and they were being blocked from filing grievances as DRMS had advised them to do.

38. Defendants, fueled by a dysfunctional Mississippi Legislature and inept state leadership, have continued to discriminate against people with disabilities and willfully and with deliberate indifference ignore the problems with MDOC and its facilities.

39. As a final effort, DRMS issued a letter[24] to Defendants and others in Mississippi leadership, requesting them to address the issues they have repeatedly been made aware of.  Again, there has been no response.  All the while, people in Defendants' custody continue to needlessly suffer and even die.

## A.    DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL CARE

40. Defendants, through a consistent pattern and practice, have demonstrated a policy of willful neglect in delivering sufficient healthcare to individuals within their custody. This deliberate indifference is evident in their systemic failure to provide adequate medical care, thereby

---

[23] A copy of the report is attached hereto as **Exhibit A**.

[24] A copy of the correspondence is attached hereto as **Exhibit B**.

EXHIBIT A

exposing those under their jurisdiction to a substantial risk of serious harm and resulting in significant injuries.

41.    The callous disregard for the well-being of individuals within the correctional system, as evidenced by this pervasive policy and practice, underscores a systemic flaw that extends beyond isolated incidents.

42.    The Defendants' deliberate indifference to the potential consequences of their actions highlights a critical need for legal intervention to rectify the ongoing injustice and secure the right to proper medical care for all individuals under their care.

43.    The State of Mississippi allocates substantial financial resources, amounting to hundreds of thousands of dollars, to VitalCore for the purported provision of medical care within MDOC facilities.

44.    Despite this significant investment, the outcome remains questionable, at best.  Plaintiffs and those in similar circumstances consistently encounter the denial of healthcare within a bureaucratic system that is not only inaccessible but also marked by pervasive incompetence.

45.    The financial commitment to VitalCore does not translate into the expected standard of care for individuals within the correctional system. Instead, the bureaucratic hurdles and systemic incompetence contribute to a disturbing trend of denied healthcare, necessitating legal scrutiny and intervention to rectify these systemic deficiencies and ensure that funds allocated for medical care are effectively utilized to meet the critical needs of those under MDOC's jurisdiction.

**B.    DEFENDANTS FAIL TO PROVIDE ADEQUATE PROCEDURES TO REQUEST AND RESPOND TO MEDICAL CARE NEEDS**

46.    Defendants have failed to provide adequate procedures to approve medication, assistive devices, durable medical equipment, and treatment for those who are in their custody.  Their

EXHIBIT A

practice of ignoring and/or refusing "sick calls" and administrative remedy program requests, which are equivalent to a medical request an individual must complete to receive medical treatment, and delaying outside appointments and follow-up examinations have resulted in worsening health conditions, further injury/sickness, and even deaths.

47.   Individuals are oftentimes unable to procure the necessary forms to make a "sick call," and even if they can obtain the form, they are at the mercy of a passing guard or nurse to take the form and deposit it in the proper locations.

48.   If they can complete the process of getting a "sick call" made, they are required to make a payment to submit a medical request, rendering those without funds unable to seek crucial medical assistance.

49.   Additionally, the system often imposes charges on individuals, regardless of whether they receive a response to their medical request, exacerbating the financial burden placed on those already grappling with limited resources.

50.   The imposition of fees without commensurate services received further underscores the urgent need for legal intervention to rectify these inequities within the MDOC healthcare system.

51.   Plaintiffs and those similarly situated may be eventually transported to medical, or maybe not, but they are still charged for the service and receive minimal or subpar care.

52.   The provision of medical care consistently faces unwarranted delays, stretching for weeks on end, and is frequently labeled as "refused" without any subsequent explanation or follow-up. This recurrent pattern not only compromises the timely delivery of necessary medical attention but also leaves individuals in the dark regarding the reasons behind the refusal.

EXHIBIT A

53.     The systemic issues contributing to these prolonged delays and inadequate explanations demand immediate legal attention to ensure individuals receive the prompt and just medical care to which they are entitled.

54.     The current procedures in place for responding to medical requests are grossly inadequate, creating a situation where timely and appropriate medical care is denied or substantially delayed.

55.     A critical factor contributing to this deficiency is the absence of qualified personnel tasked with the responsibility of promptly reviewing and triaging medical requests.

56.     Defendants, by failing to ensure the presence of individuals with the requisite expertise, have systematically failed to provide adequate and timely healthcare.  Furthermore, Defendants have neglected their duty to implement proper triage procedures, thorough examinations, and the performance of necessary diagnostic testing and medical services.  This neglect extends to the provision of follow-up care and monitoring over an unreasonably prolonged period, exacerbating the potential harm to individuals seeking essential medical attention.

57.     The consequential impact of these systemic failures constitutes a violation of the duty owed to the Plaintiffs and those similarly situated.

C.     **DEFENDANTS FAIL TO REFER, ENSURE, AND DELIVER HIGHER LEVELS OF CARE**

58.     Defendants' actions have resulted in substantial delays in the diagnosis or identification of medical concerns and illnesses, leading to unwarranted pain, prolonged suffering, increased disability, and, in extreme cases, tragic fatalities.

59.     The systemic failure to expedite necessary medical assessments and interventions contributes to avoidable anguish and harm experienced by individuals under their care.  This egregious pattern underscores a critical need for legal intervention to rectify the ongoing lapses in the

EXHIBIT A

correctional healthcare system and prevent further instances of unnecessary suffering and loss of life.

60.    Plaintiffs and those similarly situated have made numerous requests for medical treatment which were met with delay, denial, or refusal of appropriate triage, examination, monitoring, diagnostic, and follow-up for lengthy periods.  As such, when they are finally seen by medical staff, they are met with extensive illnesses that, had they been identified earlier, would have been easier to treat.

61.    Defendants' blatant disregard for the medical needs of Plaintiffs and those in similar circumstances has led to a distressing outcome: individuals are being permitted to undergo severe medical deterioration.

62.    This callous neglect of their well-being not only compromises the health and quality of life for the affected individuals but also points to a systemic failure in ensuring timely and appropriate medical care within the correctional system.

63.    Legal intervention is imperative to address these severe consequences and hold the Defendants accountable for the preventable medical deterioration experienced by Plaintiffs and others similarly situated.

64.    The delayed diagnosis by Defendant MDOC has tragically resulted in the death of several individuals, exemplified by the death of S.W.  Despite making multiple "sick calls" detailing distressing symptoms such as blood in her urine and bowel movements, S.W.'s pleas for medical treatment went unanswered for months.  In the week leading up to her death, she experienced shortness of breath, fainted in the shower, and had to borrow a wheelchair to move around.  While she was finally taken to the emergency room at the eleventh hour, S.W. ultimately succumbed to her symptoms.  This heartbreaking incident exemplifies the severe

EXHIBIT A

consequences of delayed medical intervention within the correctional system and underscores the critical need for legal intervention to prevent further instances of preventable loss of life.

65.     Defendants have demonstrated a gross lack of care for people with chronic conditions, specifically regarding in-patient care, individualized treatment plans, and referrals for specialty care.

66.     Defendants, in violation of their duty to provide adequate medical care to incarcerated individuals, have failed to address the unique needs of those with chronic conditions.  The absence of sufficient attention to in-patient care has resulted in inadequate treatment and support for individuals requiring more intensive medical intervention.

67.     Furthermore, Defendants have neglected to implement individualized care plans tailored to the specific health requirements of those with chronic conditions, denying them the necessary personalized attention critical for managing and improving their health.

68.     Additionally, the failure to facilitate timely and appropriate referrals for specialty care further compounds the deficiencies in the overall healthcare provided at Defendants' facilities.  These systemic shortcomings not only breach the duty owed to incarcerated individuals but also constitute a violation of their constitutional rights to adequate medical care.

## D.     **DEFENDANTS FAIL TO PROVIDE EMERGENT MEDICAL CARE**

69.     Emergent medical care is non-existent in MDOC facilities.

70.     The insufficiency and/or lack of emergent medical care has been attributed to worsening conditions, symptoms, injury, pain, loss of functions, and/or death of individuals.

71.     More concerning, Plaintiffs and those similarly situated have reported that correctional officers are given the authority to deny or delay access to medical care—whether by an

EXHIBIT A

individual officer's affirmative actions or the systemic understaffing of custodial staff who are necessary to the individuals' access to treatment.

72. Correctional officers who are positioned on the residential units and manage the day-to-day activities of the Plaintiffs and those similarly situated are not adequately trained on how to handle health care emergencies. As a result, Plaintiffs and those similarly situated suffer avoidable harm and injuries, including unnecessary deaths, as unqualified correctional staff oftentimes make critical initial decisions about the medical care needed.

73. There are many instances in MDOC facilities where correctional officers have influenced whether an individual can go to seek medical treatment at all.

74. Defendants have systematically failed to provide adequate emergent care, allowing correctional officers an unreasonable level of authority in determining whether an individual receives urgently needed emergency care. This overreliance on correctional officers to make critical healthcare decisions has resulted in a negligent system that places individuals at risk by permitting non-medical personnel to exercise undue control over matters of life and death.

75. Furthermore, even in instances where an overseeing officer authorizes emergent care, Defendants fail to uphold an acceptable standard, neglecting to ensure the provision and maintenance of quality emergency healthcare, further breaching its duty by inadequately staffing medical facilities.

76. Defendants have wholly failed to establish and maintain a system that guarantees prompt, quality, and medically appropriate emergency care for all incarcerated individuals under its care.

77. These systemic failures compromise the constitutional rights of those within the prison system, warranting legal intervention to address and rectify these grave lapses in the provision of emergency medical care.

EXHIBIT A

E.  **DEFENDANTS CONSISTENTLY DENY BASIC MEDICAL CARE, MEDICATIONS, MEDICAL SUPPLIES, DURABLE MEDICAL EQUIPMENT, AND ASSISTIVE DEVICES**

78.  Defendants consistently withhold prescribed medications from individuals in their custody, as recommended by medical staff, and neglect to fulfill even the most fundamental medical needs and care for those under MDOC jurisdiction.

79.  This recurrent pattern of denial not only jeopardizes the health and well-being of individuals within the correctional system but also underscores a systemic failure in the provision of essential medical services.

80.  Legal intervention is imperative to address and rectify these repeated instances of denied medications and insufficient medical care, ensuring the constitutional rights and health of those in MDOC custody are adequately protected.

81.  The routine skipping of "pill call" for various reasons results in Plaintiffs and individuals in similar circumstances being deprived of their daily medication crucial for managing medical conditions like diabetes, high blood pressure, and others.

82.  This systematic failure jeopardizes the health and well-being of those in custody, emphasizing the urgent need for legal intervention to address and rectify these lapses in the correctional healthcare system.

83.  The responses to "sick calls" made by Plaintiffs and individuals in comparable situations exhibit inconsistency and variance based on the facility in which they are housed. This lack of uniformity in addressing health-related requests further underscores systemic issues within the correctional system, warranting legal scrutiny and intervention to ensure equitable and standardized access to medical care for all individuals, regardless of their housing location.

84.  An example is that of S.W., a former client of DRMS who has since passed away and was housed at Central. In her unit, the sole avenue for requesting medical treatment relied on

EXHIBIT A

guards calling a nurse.  Shockingly, the tower log for the week of S.W.'s death revealed that, despite numerous pleas for medical assistance, the guards summoned a nurse only twice. S.W., grappling with extreme pain, fervently sought medical help, and had to depend on others in her unit to convey her requests.  Regrettably, many of these pleas were left unaddressed, and when responses did occur, they were tragically delayed, ultimately proving too late.

85.   Plaintiffs and those similarly situated consistently face denial of the vital medications essential for managing conditions like high blood pressure, diabetes, and other disability-related illnesses that are otherwise controllable with medication.

86.   This systematic denial not only jeopardizes the health and well-being of those in custody but also emphasizes the urgent need for legal intervention to rectify and address these pervasive lapses in the provision of necessary medical care within the correctional system.

87.   Defendants routinely reject the requests of Plaintiffs and others in similar circumstances who urgently require specific medical supplies, durable medical equipment, and assistive devices. Consequently, individuals among the Plaintiffs and those facing analogous challenges are consistently compelled to reuse catheters, bandages, feeding tubes, and various medical supplies after being denied access to new, clean materials on a consistent basis.

88.   This unsanitary and perilous practice of recycling medical supplies poses a significant threat to both the individuals utilizing these materials and their co-residents within the same unit.

89.   Furthermore, Defendants neglect to provide adequate care for people with chronic conditions, overlooking the provision of treatment plans, continued monitoring, diagnostic services, necessary hospitalization, and follow-up treatments.

EXHIBIT A

90.    Defendants consistently neglect to ensure timely referrals for necessary specialty care.  Even when referrals are made, they often limit them to singular visits, lacking any scheduled follow-up care with the specialty care provider.

91.    Furthermore, the orders, additional treatments, which may include surgeries, and prescriptions provided by specialty care providers are routinely ignored or abruptly halted shortly after the initial care is administered.

92.    This pattern of neglect and discontinuity in specialty care undermines the overall effectiveness of medical interventions, leaving individuals without the essential follow-up and ongoing support required for their health conditions.

93.    The pervasive failures in meeting these essential healthcare needs underscore the urgent need for legal intervention to safeguard the well-being of those in custody.

F.    **DEFENDANTS FAIL TO PROVIDE ADEQUATE HEALTHCARE STAFF**

94.    Defendants persistently and knowingly fall short in ensuring an adequate number of healthcare staff at MDOC facilities.

95.    This chronic understaffing of correctional personnel results in individuals missing off-site medical appointments and being deprived of essential medical treatment.

96.    The deliberate negligence in addressing staffing needs not only compromises the overall healthcare infrastructure within the correctional system but also directly impacts the timely and necessary medical care that individuals under MDOC jurisdiction are entitled to receive.

97.    Legal intervention is imperative to rectify these systemic deficiencies and guarantee the provision of adequate healthcare staffing for the well-being of those in custody.

EXHIBIT A

98.     MDOC facilities grapple with perilously inadequate staffing levels, marked by incompetence and corruption among employees, posing a severe threat to the safety of individuals under MDOC care and custody.

99.     This issue is particularly pronounced for people with disabilities, who face heightened vulnerabilities within this compromised system.  The prevalence of deficient staffing, incompetency, and corruption not only jeopardizes the overall security within MDOC facilities but also exacerbates the risks and challenges faced by those with disabilities.

100.    Plaintiffs and those similarly situated are often without their medication as MDOC staff nurses will not bring their medications ("pill call") to the units if there is no guard present. Instead of attempting to find a guard to escort them or establish regular "pill call" times to ensure the security they need is present, "pill call" is simply skipped, sometimes for days and weeks.

101.    In the pursuit of a new medical provider, Defendants Cain and MDOC issued a Request for Proposal ("RFP") for the medical care contract, outlining minimal staffing requirements that fell significantly below the necessary levels for providing adequate care at each facility. Furthermore, the RFP explicitly prioritized cost containment over the adequacy of care.

102.    The contract subsequently awarded underscores the emphasis on cost containment, resulting in inadequate staffing levels across the entire MDOC system.  This prioritization compromises the quality of care and raises concerns about the well-being and safety of individuals within the correctional system.

103.    Currently, Defendant MDOC has a contractual relationship with Defendant VitalCore, which was entered into in October 2020.  This contract addresses the number of medical staff to be placed at each MDOC facility.  To date, the medical staff of each facility remains grossly

EXHIBIT A

inadequate, not meeting the required contractual terms as outlined by the most recent contract signed between the parties.

104.    Plaintiffs and those facing similar circumstances consistently report that their ignored "sick calls" are frequently ascribed to a shortage of available staff to attend to their medical needs. Moreover, instances of missed "pill calls" are often attributed to the unavailability of a nurse or medical staff to administer their required medications.  This is exacerbated if there is an ongoing security issue occurring at the time of "pill call."

105.    Plaintiffs are routinely transported to receive medical care yet find themselves left unexamined.  After enduring prolonged waits, they are sent back to their cells without the opportunity to consult with a healthcare provider.

106.    Even if an examination takes place, resulting in a diagnosis, Plaintiffs rarely, if ever, receive any follow-up care.  This consistent pattern of inadequate medical attention underscores the urgent need for legal intervention to address the systemic deficiencies in providing timely and thorough healthcare for individuals within the correctional system.

**G.    DEFENDANTS HAVE SYSTEMICALLY DISCRIMINATED AGAINST PEOPLE WITH DISABILITIES BY FAILING TO PROVIDE REASONABLE ACCOMODATIONS**

107.    Defendants exhibit a discriminatory practice of neglecting to implement a system that ensures reasonable accommodations for people with physical disabilities qualifying under the Americans with Disabilities Act.

108.    This failure to prioritize accessibility not only violates the rights of people with disabilities but also underscores a systemic disregard for the necessary measures to provide equal opportunities and support within the correctional system.

EXHIBIT A

109.    Legal intervention is imperative to rectify these discriminatory practices and guarantee the implementation of fair and inclusive policies in line with standards under the Americans with Disabilities Act.

110.    People with physical disabilities who depend on mobility devices for their day-to-day lives face persistent denial of such essential devices by Defendants.

111.    For instance, Plaintiffs and those in similar situations with prosthetic limbs often find themselves compelled to use wheelchairs due to Defendants' refusal to supply the necessary materials for prosthetic maintenance.

112.    Furthermore, individuals in need of canes, braces, special orthopedic shoes, or wheelchairs are left bedridden or dependent on the goodwill of their bunkmates to navigate the facility. This systematic failure to provide necessary mobility aids not only infringes upon the rights of people with disabilities but also exacerbates the challenges they face in maintaining a semblance of independence within the correctional system.

113.    Legal intervention is crucial to rectify these ongoing violations and ensure that people with physical disabilities receive the necessary accommodations to lead a dignified and functional daily life.

114.    Plaintiffs and those similarly situated who are reliant on wheelchairs frequently endure transportation in vehicles ill-equipped for wheelchair accessibility.  These individuals are compelled to either ride in the center aisle, relying on their wheelchair brakes for safety, or reluctantly sign a refusal for treatment simply because Defendants lack the proper means to transport them to necessary medical appointments.

EXHIBIT A

115.    This blatant oversight in providing accessible transportation not only undermines the safety and well-being of those in need but also highlights a systemic failure in accommodating people with mobility challenges within the correctional system.

116.    Requests for assistive devices and durable medical equipment are often ignored.  However, when they are finally addressed, individuals are given devices and equipment that do not work or immediately requires repair.

117.    Defendants have consistently failed to furnish individuals with the necessary medical supplies prescribed by physicians for their specific medical conditions.

118.    An egregious example of this failure is evident in the case of D.R., a person incarcerated at Parchman, who requires the use of diapers and wipes due to medical necessity.  Despite a physician's prescription, the Defendants have systematically neglected to provide these essential supplies, compelling the individual to reuse their limited resources and endure the unsanitary and degrading practice of wearing soiled supplies for extended periods, often lasting weeks at a time.

119.    This type of denial is not an uncommon practice.  Refusal to provide medically prescribed supplies not only violates the individual's right to receive necessary medical care but also subjects them to unnecessary physical and emotional distress.

120.    Defendants have consistently failed to afford people with disabilities equal access to the limited programs offered by MDOC, particularly work release programs.  This exclusion is solely based on their disabilities, constituting a discriminatory practice that denies people with disabilities the opportunity to participate in essential programs crucial for rehabilitation and successful reintegration into society.  Such discriminatory practices infringe upon the rights

EXHIBIT A

of people with disabilities, violating the principles of equal protection and necessitating legal intervention to rectify these systemic disparities.

## VII.   CLASS ACTION ALLEGATIONS

### A.   PLAINTIFF CLASS

121.   Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2).

122.   Plaintiffs seek to represent a class consisting of all people in MDOC custody who are, or will be in the future, housed in Central Mississippi Correctional Facility, Delta Correctional Facility, Marshall County Correctional Facility, Mississippi Correctional Institute for Women, Mississippi State Penitentiary, South Mississippi Correctional Institution, and Walnut Grove Correctional Facility.

123.   **Numerosity, Fed. R. Civ. P. 23(a)(1).**  There are approximately 9,633 people in MDOC custody housed in Central Mississippi Correctional Facility, Delta Correctional Facility, Marshall County Correctional Facility, Mississippi Correctional Institute for Women, Mississippi State Penitentiary, South Mississippi Correctional Institution, and Walnut Grove Correctional Facility.[25]  The members in the Plaintiff Class are so numerous and membership is too fluid to permit joinder of all members.  All class members are subject to the horrific conditions and unlawful actions of Defendants as described herein.

124.   **Commonality, Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all class members and all Defendants.  Common questions include, without limitation: whether systemically inadequate medical care violates the Eighth Amendment to the U.S. Constitution; whether policies, procedures, and practices of Defendants reflect deliberate indifference to

---

[25] This data is current as of January 9, 2024 according to the January 2024 MDOC Population Data.

EXHIBIT A

the medical needs of the Plaintiff Class such that Defendants have violated the Eighth Amendment to the U.S. Constitution; and whether policies, practices, and procedures of Defendants violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

125.   **Typicality, Fed. R. Civ. P. 23(a)(3).**  The claims of the named Plaintiffs are typical of those of the Plaintiff Class as the named Plaintiffs' claims arise from the same policies, practices, or courses of conduct as those of the Plaintiff Class.  The named Plaintiffs' claims are based on the same theory of law as the class's claims.

126.   **Adequacy, Fed. R. Civ. P. 23(a)(4).**   The named Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff Class.  The named Plaintiffs do not have any interests antagonistic to the Plaintiff Class.  The named Plaintiffs, as well as the members of the Plaintiff Class, seek to enjoin the unlawful acts and omissions of Defendants.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

127.   **Fed. R. Civ. P. 23(b)(1)(A) and (B).**  This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B) because the number of members in the Plaintiff Class is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

128.   **Fed. R. Civ. P. 23(b)(2).**  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) as Defendant MDOC's policies, practices, actions, and omissions that form

EXHIBIT A

the basis of this Complaint are common to and apply generally to all members of the Plaintiff Class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff Class.  All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central office of MDOC by Defendants.  Health care services are provided pursuant to a contract with a health authority and/or medical vendor with policies and practices that are centrally promulgated, disseminated, overseen, and enforced by the health authority and/or medical vendor and by Defendants.  Defendants have acted or refused to act on grounds that apply generally to the Plaintiff Class so that final injunctive relief or corresponding declaratory relief is appropriate and will apply to all members of the Plaintiff Class.

**B.**     **SUBCLASS OF PEOPLE WITH CHRONIC CONDITIONS ("CHRONIC CONDITION SUBLCASS")**

129.     Plaintiffs Pervis Everett, Thalia Outlaw, Terry Lattimore, Derrick Guyton, and Willie Brent bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2).

130.     Plaintiffs seek to represent a subclass consisting of all people who are currently in MDOC custody, or will be in the future, with a chronic condition.[26]

131.     **Numerosity, Fed. R. Civ. P. 23(a)(1).**  The members in the Chronic Condition Subclass are so numerous and membership is too fluid to permit joinder of all members.  Due to Defendants' policies and practices, all members of the subclass are at substantial risk of serious harm.

---

[26] *See* "Chronic Condition," *supra* Section V. Definitions.

EXHIBIT A

132. **Commonality, Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Chronic Condition Subclass and all Defendants.  Common questions include, without limitation: whether systemically inadequate medical care violates the Eighth Amendment to the U.S. Constitution; and whether policies, procedures, and practices of Defendants regarding people with chronic conditions reflect deliberate indifference to the medical needs of the Chronic Condition Subclass such that Defendants have violated the Eighth Amendment to the U.S. Constitution.

133.  **Typicality, Fed. R. Civ. P. 23(a)(3).**  The claims of the named Plaintiffs are typical of those of the Chronic Condition Subclass as the named Plaintiffs' claims arise from the same policies, practices, or courses of conduct as those of the Chronic Condition Subclass.  The named Plaintiffs' claims are based on the same theory of law as the subclass's claims.

134. **Adequacy, Fed. R. Civ. P. 23(a)(4).**  The named Plaintiffs are capable of fairly and adequately protecting the interests of the Chronic Condition Subclass.  The named Plaintiffs do not have any interests antagonistic to the Chronic Condition Subclass.  The named Plaintiffs, as well as the members of the Chronic Condition Subclass, seek to enjoin the unlawful acts and omissions of Defendants.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

135. **Fed. R. Civ. P. 23(b)(1)(A) and (B).**  This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B) because the number of members in the Chronic Condition Subclass is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as

EXHIBIT A

a practical matter, would substantially impair the ability of other members to protect their interests.

136.   **Fed. R. Civ. P. 23(b)(2).**  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) as Defendant MDOC's policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of the Chronic Condition Subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.  All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central office of MDOC by Defendants. Health care services are provided pursuant to a contract with a health authority and/or medical vendor with policies and practices that are centrally promulgated, disseminated, overseen, and enforced by the health authority and/or medical vendor and by Defendants. Defendants have acted or refused to act on grounds that apply generally to the Chronic Condition Subclass so that final injunctive relief or corresponding declaratory relief is appropriate and will apply to all members of the subclass.

## C.   SUBCLASS OF PEOPLE WITH PHYSICAL DISABILITIES ("PHYSICAL DISABILITIES SUBCLASS")

137.   Plaintiffs Larry Allen and Derrick Guyton bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2).

138.   Plaintiffs seek to represent a subclass consisting of all people who are currently in MDOC custody, or will be in the future, with a physical disability[27] that qualifies as a "disability" as defined under the Americans with Disability Act, 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

---

[27] *See* "Physical Disability," *supra* Section V. Definitions.

EXHIBIT A

139.  **Numerosity, Fed. R. Civ. P. 23(a)(1).**  The members in the Physical Disabilities Subclass are so numerous and membership is too fluid to permit joinder of all members.  Due to Defendants' policies and practices, all members of the subclass are at substantial risk of serious harm.

140.  **Commonality, Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Physical Disabilities Subclass and all Defendants.  Common questions include, without limitation: whether systemically inadequate medical care violates the Eighth Amendment to the U.S. Constitution; whether policies, procedures, and practices of Defendants regarding people with physical disabilities reflect deliberate indifference to the medical care needs of the Physical Disabilities Subclass such that Defendants have violated the Eighth Amendment to the U.S. Constitution; and whether policies, practices, and procedures of Defendants regarding people with physical disabilities violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

141.  **Typicality, Fed. R. Civ. P. 23(a)(3).**  The claims of the named Plaintiffs are typical of those of the Physical Disabilities Subclass as the named Plaintiffs' claims arise from the same policies, practices, or courses of conduct as those of the Physical Disabilities Subclass.  The named Plaintiffs' claims are based on the same theory of law as the subclass's claims.

142.  **Adequacy, Fed. R. Civ. P. 23(a)(4).**  The named Plaintiffs are capable of fairly and adequately protecting the interests of the Physical Disabilities Subclass.  The named Plaintiffs do not have any interests antagonistic to the Physical Disabilities Subclass.  The named Plaintiffs, as well as the members of the Physical Disabilities Subclass, seek to enjoin the unlawful acts and omissions of Defendants.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

EXHIBIT A

143.   **Fed. R. Civ. P. 23(b)(1)(A) and (B).**  This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B) because the number of members in the Physical Disabilities Subclass is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

144.   **Fed. R. Civ. P. 23(b)(2).**  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) as Defendant MDOC's policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of the Physical Disabilities Subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.  All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central office of MDOC by Defendants. Health care services are provided pursuant to a contract with a health authority and/or medical vendor with policies and practices that are centrally promulgated, disseminated, overseen, and enforced by the health authority and/or medical vendor and by Defendants. Defendants have acted or refused to act on grounds that apply generally to the Physical Disabilities Subclass so that final injunctive relief or corresponding declaratory relief is appropriate and will apply to all members of the subclass.

## VIII.   DRMS'S ASSOCIATIONAL STANDING

145.   DRMS is the duly authorized protection and advocacy agency for the State of Mississippi. DRMS asserts its associational standing to bring its claims on behalf of its constituents who

EXHIBIT A

include any current or future individuals in the physical custody of MDOC who has a disability as that term is used in the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

146.   In support of its claims, DRMS adopts by reference paragraphs as if fully set forth herein.

147.   Plaintiffs who make up the putative class are constituents of DRMS and their factual allegations adopted herein confer upon DRMS associational standing to pursue its claims coextensively with those Plaintiffs.  DRMS has associational standing to pursue its claims, in part, because DRMS's constituents otherwise have standing to sue in their own right.

148.   DRMS serves its constituents by prosecuting its claims herein pursuant to the Protection and Advocacy of Individual Rights (PAIR) Program, 29 U.S.C. §§ 794e, *et seq.*

149.   As Mississippi's protection and advocacy agency, DRMS receives funding via PAIMI, the DD Act, and PAIR to pursue legal, and other appropriate remedies to ensure the protection of people with disabilities who are receiving care or treatment in Mississippi.  Accordingly, DRMS has associational standing to pursue its claims, in part, because the interests DRMS seeks to protect through its claims in this case, *i.e.*, the rights of people with disabilities in the custody of Defendant MDOC, are germane to DRMS's central purpose.

150.   DRMS maintains advisory councils, conducts annual public forums for Mississippians with disabilities to contribute to the agency's goals and priorities, has conducted an administrative investigation into Defendants' practices with respect to DRMS's constituents, and has received communications from its constituents incarcerated in MDOC facilities regarding Defendants' practices.

# EXHIBIT A

151.    DRMS further asserts its associational standing to bring its claims to express these collective views and protect the collective interests of its constituents who are now incarcerated, or will in the future be incarcerated, in Defendant MDOC's custody.

## IX.    CLAIMS FOR RELIEF

### A.    FIRST CAUSE OF ACTION: INADEQUATE MEDICAL CARE

152.    Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

153.    Through their policies and practices described herein, Defendants subject Plaintiffs, clients and constituents of P&A Plaintiff, to a substantial risk of serious harm and injury from inadequate medical care in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' ongoing deprivation of rights secured under the Eighth Amendment to the U.S. Constitution.

154.    Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### B.    SECOND CAUSE OF ACTION: VIOLATION OF RIGHTS OF PEOPLE WITH DISABILITIES

155.    Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

156.    Through their policies and practices described herein, Defendants subject Plaintiffs, clients and constituents of P&A Plaintiff, to regular and systemic discrimination based on their disabilities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–

EXHIBIT A

12134 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. These policies and practices continue to be implemented by Defendant MDOC and its agents, officials, employees, and all persons acting in concert with Defendant MDOC under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' ongoing deprivation of rights secured by federal law.

157.  As a result of Defendants' policies and practices regarding people with disabilities, Plaintiffs are denied equal access to activities, programs, and services for which they are otherwise qualified because Defendants have failed to implement a system that ensures people with disabilities are reasonably accommodated with medical supplies and assistive devices.

158.  Defendants have been and is aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

## X.    PRAYER FOR RELIEF

159.  Each section herein is incorporated into every other section herein, such that this Complaint is to be read as a whole. All factual allegations apply to all claims.

160.  Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the class and subclasses they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the U.S. Constitution and the laws of the United States.

161.  Named Plaintiffs and the class and subclasses they represent request that this Court grant them the following relief:

EXHIBIT A

a.    declare that the suit is maintainable as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2);

b.    adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of Plaintiffs and the classes they represent under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, which protects individuals against cruel and inhumane treatment;

c.    preliminarily and permanently enjoin all Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law from subjecting Plaintiffs to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

d.    order Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and constituents of the P&A Plaintiff suffer due to inadequate medical care of Defendants, and due to the policies and practices with regard to persons with disabilities; the plan shall include at a minimum the following:

   i.    staffing: medical and correctional staffing shall be sufficient to provide individuals with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

   ii.    access: policies and practices that provide timely access to health care;

   iii.    screening: policies and practices that reliably screen for medical conditions that require treatment;

EXHIBIT A

iv.    emergency response: timely and competent responses to health care emergencies;

v.    medication, supplies, devices, and equipment: timely prescription and distribution of medications, supplies, devices, and equipment necessary for medically adequate care;

vi.    chronic care: timely access to competent care for chronic illnesses, including, but not limited to, diseases;

vii.    quality assurance: a regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies; and

viii.    accommodations: reasonable accommodations in the form of including, but not limited to, medical supplies and assistive devices for people with disabilities, as required by the Americans with Disabilities Act and Section 504;

e.    award Plaintiffs the costs of this suit, reasonable attorneys' fees, and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

f.    retain jurisdiction of this case until all Defendants have fully complied with the orders of this Court, and there is reasonable assurance that Defendants will continue to comply in the future absent the Court's continuing jurisdiction; and

g.    award such other and further relief as the Court deems just and proper.

# EXHIBIT A

RESPECTFULLY SUBMITTED, the 2nd day of February, 2024.

**DISABILITY RIGHTS MISSISSIPPI**
ATTORNEY FOR ALL PLAINTIFFS

/s/ *Greta K Martin*

Greta Kemp Martin, MSB#103672
5 Old River Place, Suite 101
Jackson, Mississippi 39202
Telephone: (601) 968-0600
Facsimile: (601) 968-0665
gmartin@drms.ms

PROSKAUER ROSE LLP
Margaret Ukwu (admitted *pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 284-4586
Facsimile: (310) 557-2193
mukwu@proskauer.com

Yena Hong (admitted *pro hac vice*)
11 Times Square
New York, New York 10036
Telephone: (212) 969-3258
Facsimile: (212) 969-2900
yhong@proskauer.com

EXHIBIT A

# EXHIBIT A

EXHIBIT A



# Cruel and Unusual Punishment in Mississippi Prisons:

*A Tale of Abuse, Discrimination & Undue Death Sentences*

A SPECIAL REPORT FROM DISABILITY RIGHTS MISSISSIPPI



EXHIBIT A

# EXECUTIVE SUMMARY

Investigations by Disability Rights Mississippi (DRMS) have revealed that, for many offenders incarcerated in Mississippi Department of Corrections (MDOC) facilities, what should be a simple prison sentence ends up being a death sentence. Offenders, even those with disabilities and serious physical and mental illnesses, are condemned to penitentiaries where systemic indifference, discrimination, and dangerous or life-threatening conditions are the norm.

The problems of MDOC facilities can be attributed to:

**Inadequate Medical Staffing, including Medical Care and Mental Health Treatment**
**Inadequate Staffing of Correctional Officers**
**Inadequate Healthcare Policies and Practices**
**ADA Non-Compliant Services, Procedures, Buildings and Utilities**

The Mississippi Department of Corrections (MDOC) is subjecting offenders to cruel and unusual punishment by acting deliberately indifferent to the serious medical needs of offenders in its custody. Inspections at Mississippi State Penitentiary (MSP), South Mississippi Correctional Institution (SMCI), and Central Mississippi Correctional Facility (CMCF), as well as interviews and affidavits of numerous offenders revealed the abhorrent conditions that offenders are forced to live with day after day. Furthermore, not only does MDOC subject offenders to barbaric, cruel, and unusual punishment, but they are also violating the rights of offenders with disabilities by failing to comply with the *Americans with Disabilities Act* (ADA). This blatant disregard for laws that protect the health of offenders reveal a lack of deference to the United States Constitution, ultimately causing harm and endangering the lives of offenders. MDOC has explicitly shown that saving money is more important than human life itself. Below are the consequences of such negligence (at MSP, CMCF, and SMCI):

- An offender currently battling stage III melanoma cancer has not seen a doctor since being transferred to the facility. This offender also advised that she has put in numerous medical requests to no avail. MDOC does not respond to her medical requests, nor her Administrative Remedy Program (ARP) requests related to this issue. **Therefore, she lives in constant pain daily.**
- An offender with a seizure disorder reported an episode in which he had four seizures because he received his medication late. In fact, it was hours later before the medical team even responded, due to there not being an officer on the zone. Once the other offenders were finally able to get the attention of a correctional officer, the correctional officer further delayed treatment and acted nonchalantly towards the offender's emergency. **This offender now has to wear a helmet and also requires assistance to walk.**
- An offender who was diagnosed with lupus, vertigo, and sleep apnea has trouble balancing himself in the shower and falls regularly. This offender has requested handrails for the shower to no avail. This offender also complains that it is a hassle to have medications refilled, so **he sometimes goes without.**
- An offender diagnosed with ADHD, OCD, and bipolar disorder has been routinely denied his psychiatric medications while being incarcerated. This offender advised that he frequently "snaps out of it," and is in and out mental health crises. This offender also advised that when he does act out, he is only put on suicide watch without supervision. **This offender, during suicide watch, recalls being told by a passing officer to go ahead and kill himself.**

 P a g e  | **2**

EXHIBIT A

- An offender who was experiencing complications from a total knee replacement **was refused pain medication after the surgery**. Further, she was never allowed a follow up visit after the procedure.
- One offender, who has heart issues and utilizes a pacemaker, has constant issues with his pacemaker and has been requesting to see a cardiologist for treatment since he was transferred into MDOC custody in 2015. When his interview was conducted in the spring of 2020, **the offender advised that he had yet to undergo proper treatment.**
- An offender with PTSD, bipolar disorder, arthritis, and heart complications needs heart stabilizer medications, as well as mood stabilizers. **MDOC has yet to treat this offender**.
- An offender who lives with high blood pressure, asthma, and diabetes takes 6 medications a day. He recalls guards refusing to seek medical help for him when he was once having an asthma attack and needing emergency assistance. **The guards refused, stating that because the offender was "standing and talking," he was fine.**

Offenders with disabilities face many forms of discrimination. Many offenders who use a wheelchair are not able to access critical areas of the facilities, such as the cafeteria, the shower, or the nurse's desk to receive medication during "pill call." Offenders wishing to receive medical care are expected to complete a written form to request it – a potential hurdle for those who are blind or have cognitive disabilities. Blind offenders are routinely asked to sign documents that they cannot even read. Many medications, including psychiatric medication, which causes serious side effects if doses are missed, are often changed and/or no longer administered without any discussion with offenders. Further, offenders are not allowed to give their input on whether specific medications work well for them. In addition, numerous offenders have been placed under "Do Not Resuscitate" and "Allow Natural Causes Death" orders without the offender's consent, nor close family's consent. The state's legal responsibilities are clear: **Mississippi has a constitutional obligation to provide adequate medical and mental health care to individuals in its custody.**

In 2011, the U.S. Supreme Court found in *Brown v. Plata* that depriving offenders of adequate medical care "is incompatible with the concept of human dignity and has no place in civilized society." Deliberate indifference to these medical needs constitutes "unnecessary and wanton infliction of pain" barred by the *Eighth Amendment*. Mississippi must also ensure that its prisons, programs, activities, and services are accessible to offenders with disabilities under Title II of the *Americans with Disabilities Act* (ADA) and Section 504 of the *Rehabilitation Act of 1973*. Instead, MDOC systematically violates federal law, leaving people with disabilities isolated, unable to participate in prison programs, and deprived of the medical care they so desperately need. Mississippi illegally operates correctional facilities. A conviction does not open the door for the state to engage in barbaric cruelty.

**Further, a sentence to serve time in a correctional facility should not result in a death sentence.** When Mississippi has ordered a person's incarceration, it must also accept the legal – and moral – responsibility that comes with incarcerating a human being. The offender, in essence, becomes a ward of the state of Mississippi; Mississippi is charged with providing adequate care for that offender, as it relates to housing, nutrition, and medical treatment. To put it plainly, Mississippi is not taking adequate care of its wards of the state.

# ABOUT DRMS

Disability Rights Mississippi is the federally mandated protection and advocacy (P&A) agency for the state of Mississippi and was designated as such in 1982 by the Governor. The P&A system is a national network of disability rights agencies tasked with investigating abuse and neglect and

EXHIBIT A

providing legal representation as well as other advocacy services to people with disabilities.  To fulfill their duties, P&A agencies are given extensive access authority to:

- Investigate incidents of abuse and neglect;
- Provide information, referrals, and training about the rights of people with disabilities and about DRMS services;
- Monitor service providers and program compliance with respect to the rights and safety of residents; and
- Pursue administrative, legal, and other appropriate remedies to ensure the protection of the rights of Mississippians with disabilities.

    DRMS conducted this investigation with access authority and funding as codified and delineated by Congress through Protection & Advocacy for Persons with Developmental Disabilities (PADD), Protection & Advocacy for Individuals with Mental Illness (PAIMI), and Protection & Advocacy for Individual Rights (PAIR).
    Pursuant to DRMS' duties under PADD, PAIMI, and PAIR, DRMS also prioritizes projects regarding accessibility under the *Americans with Disabilities Act* (ADA) to ensure that Mississippians with disabilities have reasonable access to public facilities, buildings, and services.  DRMS collaborates with other agencies and organizations on projects involving accessibility, voting rights, employment and housing issues, and a variety of other topics.

# INADEQUATE STAFFING

    Mississippi currently has over 19,000 offenders in custody. However, at almost every MDOC facility, the staff's vacancy rate is just short of 50%. Mississippi officials have known and commented on the astronomical ratio of offenders to correctional officers in MDOC facilities. The staff's high vacancy rate and correctional officer shortage presents many issues in regard to the facility's security. It is well-known within facilities that offenders can potentially overpower correctional officers at any time. Many believe that the shortage is attributed to the low starting salary of correctional officers, which is under $25,000 a year compared to a national average of $32,000 annually. MDOC is a top heavy organization; although they have adequate management and supervisory roles, they lack support staff. In an article published by *News Mississippi* early last year, MDOC stated it needed, at minimum, 500 officers to continue to fulfill its public safety mission, provide court-ordered programs and expand its re-entry efforts. Right now, many educational and vocational programs/services are not being offered, primarily due to the lack of adequate staffing at MDOC facilities. Thus, offenders are not receiving support or treatment through services and programs like vocational programs, mental health counseling, alcohol and drug treatment, social services, religious and recreational services, and psychological and psychiatric services.
    The inadequacy of staffing does not just stop at correctional officers; there is also inadequate staffing of medical providers, as it relates to basic medical care and mental health providers. MDOC had a contract with Centurion to provide medical services for MDOC facilities. However, that contract was voluntarily terminated by the provider (Centurion) in October 2020. MDOC now contracts with VitalCore to provide medical services to offenders in its custody. Even with a contracted provider, there were still serious shortages of doctors and nurses to provide medical care to offenders. Again, this can be attributed to low wages. During monitoring, the issue of inadequate



EXHIBIT A

staffing was candidly admitted by administrators and discussed with DRMS on several occasions, if not every visit. The extraordinary understaffing of medical staff leads to a host of predictable problems with the delivery of medical care, including delays, failures to diagnose and treat, failures to follow-up, errors, and incomplete decisions to not treat seriously ill offenders. The understaffing is a direct result of the MDOC bid process for the medical services contract, a process that places far greater emphasis on the price of the contract, versus any other factor. Prison facilities must have adequate staffing levels as to total numbers, but also as to the distribution of professionals, in an effort to adequately treat each offender in its custody (*Estelle v. Gamble*). MDOC has routinely failed to ensure adequate staffing, both as to gross numbers of mental health professionals, and as to quality and experience, of key mental health professionals. According to DRMS' investigations, half or more than half of MDOC's prison population should be receiving or receives some type of mental health treatment. Despite this fact, the level and quality of mental health staffing at MDOC facilities is woefully inadequate, and sadly, offenders are paying the price daily. **For example, numerous offenders have complained of symptoms for months without anyone addressing their concerns, only to be diagnosed with advanced stage cancer that is terminal by the time it is diagnosed. Further, prisoners with broken bones, burns, or other emergency conditions have waited hours, days, or even months for treatment,** DRMS has found.

- An offender with a seizure disorder reported an episode in which he had four seizures because he received his medication late. In fact, it was hours later before the medical team even responded, due to there not being an officer on the zone. Once the other offenders were finally able to get the attention of a correctional officer, the correctional officer further delayed treatment and acted nonchalantly towards the offender's emergency. This offender now has to wear a helmet and also requires assistance to walk.
- One offender who is a diabetic, has heart disease, kidney disease, and has strokes, complains that he does not receive his medications on time, which causes him to have convulsions. Medically, he is supposed to receive insulin every 12 hours or he will start seizing. He reports that nurses come hours late to deliver medication. As a result, his blood sugar spikes dangerously, causing him to faint and seize.
- An offender diagnosed with ADHD, OCD, and bipolar disorder has been routinely denied his psychiatric medications while incarcerated. This offender advised that he frequently "snaps out of it," and is in and out of mental health crises. This offender also advised that when he does act out, he is only put on suicide watch without supervision. This offender, during suicide watch, recalls being told by a passing officer to go ahead and kill himself.

The Supreme Court has repeatedly recognized that exposing prisoners to infectious diseases can constitute a violation of the *Eighth Amendment*. However, DRMS has found that MDOC has no effective system for preventing or managing infectious diseases. In recent years, there have been numerous tuberculosis (TB) and Hepatitis C outbreaks in Mississippi's prisons. In our investigations, DRMS has both witnessed and heard that zones where offenders are found to have TB and Hepatitis C are not effectively quarantined. At the time of writing, there is an outbreak of Hepatitis C at MDOC facilities. Documentation shows several offenders have been diagnosed, but not treated. This is also the case as it relates to high levels of COVID-19 infections, and even staph infections.

- One offender with high blood pressure and Hepatitis C complains that he has not been receiving any dietary meals or his treatments on time. Further, he alleges that he contracted Hepatitis C from the uncleanliness of the facility, and that his disease has been documented; however, the facility still refuses to administer treatment for him.

EXHIBIT A

# INADEQUATE HEALTHCARE

The *8th Amendment* to the *U.S. Constitution* provides offenders the freedom from "cruel and unusual punishment," and the denial of medical care certainly constitutes cruel and unusual punishment. Mississippi has a constitutional obligation to provide adequate medical care to the individuals in its custody. A prison that deprives offenders of adequate medical care is incompatible with the concepts of human dignity and has no place in civilized society. "[D]eliberate indifference to serious medical needs of offenders constitutes the "unnecessary and wanton infliction of pain," proscribed by the *Eighth Amendment*. Deliberate indifference can be "manifested by prison doctors in their response to the [prisoner's] needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."

Our investigations have uncovered extensive evidence that MDOC is deliberately indifferent to the serious medical needs of offenders in the state's custody. MDOC violates the rights of offenders and does not meet the basic requirements of correctional medical care, which results in offenders being subjected to unnecessary and significant pain, suffering, and sometimes death. Among other deficiencies, MDOC does not have sufficient qualified staff at its facilities, resulting in delays in and denials of treatment, medication errors, inadequate procedures for preventing outbreaks of infectious diseases, inadequate responses to such outbreaks, inadequate chronic care, failures to diagnose serious illnesses, failures to adequately respond to emergencies, and improper denial of care at the end of life.

Again, the failure to provide medical care when an offender has a known, serious medical need is deliberate indifference. The government's obligation to provide medical care for those whom it is punishing by incarceration is, again, recognized in *Estelle v. Gamble*. "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, [then] those needs will not be met." In worst cases scenarios, such a failure may actually produce physical "torture or a lingering death." "In less serious cases, denial of medical care may result in long term pain and suffering, which would not further any penological purpose." The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency. "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, proscribed by the *Eighth Amendment*. Furthermore, "this is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs, by prison guards in intentionally denying or delaying access to medical care, or intentionally interfering with the treatment once prescribed." Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under *Section 1983*. Offenders in MDOC custody are routinely denied medical care, or given care that is so cursory or grossly incompetent that it demonstrates deliberate indifference. As a result, offenders die at the hands of the facility itself. We have received numerous complaints surrounding MDOC's lack of adequate medical care from offenders. They are the first to report other offenders' deaths as a result of lack of care and treatment.

A prison system can demonstrate deliberate indifference by failing to provide adequate medication, including pain relief. In our investigations, numerous offenders reported that they have had problems with the receipt of medication. In many cases, offenders reported being given the wrong medication entirely. One offender recalled having been given incorrect medications three times, while another recalled five instances. Also, numerous offenders in various prisons recounted stories of other

EXHIBIT A

offenders who died after being given the wrong medication. In other cases, offenders report not having received all the medications that they were prescribed. Several offenders describe medications running out before the end of the prescription. When this occurs, there is often a lengthy delay before the prescription can be restarted, as the prisoner is required to go through the sick call process, first to the nurse and then to the doctor.

- One offender who is in a wheelchair and has several medical conditions requiring medication reports that he sometimes does not receive his medication because he is unable to make it to pill call without help, and the guards will neither push his wheelchair nor allow anyone else to do so.
- One offender was prescribed a medication for her mental health symptoms and a medication to control the side effects of the first medication; she is routinely denied the side effects medication.
- **Additionally, nearly all offenders interviewed reported that they were not informed of the purpose, side effects, and benefits of medications prescribed to them.**

In some cases, offender's long-term prescriptions are cut off or changed without any explanation or consultation with the prescribing physician. For example, one offender reported that the prescription for pain medication he had for two years for a chronic and painful medical condition was abruptly discontinued without any discussion with or examination by medical staff. Several diabetics have reported that their diabetes medication was recently changed, even though they had not seen a doctor. One of these individuals reported that he now experiences more swings in his blood sugar level, has to urinate more often, and suffers from more headaches. Offenders also report that when they are prescribed medications that should be taken only on an as-needed-basis, they are not allowed to keep the medications on their person. Further, the prescriptions will be cut off if they do not come to pill call to take the medication on a daily basis. Several offenders often claim that even after receiving psychotropic medications, they do not receive periodic checkups with a psychiatrist afterwards. **The only contact that offenders oftentimes have with a mental health professional is when they are exhibiting suicidal ideations or actions.**

# ADA VIOLATIONS

People with disabilities often encounter discrimination throughout the prison system. They are segregated from other prisoners. They are excluded from work release programs solely for their disabilities. Prisoners in wheelchairs are unable to access parts of the prisons, even when barriers could be removed with relative ease and limited expense. **An offender with a hearing impairment recalls being hit by a corrections officer for not responding to an order he could not hear.**

MDOC is systematically violating federal law, including, but not limited to, *Title II of the Americans with Disabilities Act* (Title II or ADA), and Section 504 of the *Rehabilitation Act of 1973* (Section 504 or Rehab Act), by discriminating against offenders with disabilities. Physically inaccessible facilities, lack of an oral method to request medical care, lack of sign language interpreters, and segregating offenders with disabilities are just a few examples of how MDOC is illegally discriminating against offenders with disabilities. The ADA, as amended, provides a "clear and comprehensive national mandate for the elimination of discrimination" against individuals with disabilities. Title II was enacted to broaden the coverage of Section 504, which prohibits discrimination in any programs or activity that receives federal financial assistance, including programs and activities of state and local governments. Title II extends these protections to all states and local government activities, including those that receive no federal funds. Both laws prohibit

EXHIBIT A

public entities from excluding persons with disabilities from the services, programs, activities, or otherwise discrimination against persons with disabilities.



An offender with a disability housed in SMCI.

When enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . segregation, and regulation to lesser services, programs, activities, benefits, jobs, or other opportunities." "State prisons fall squarely within the statutory definition of 'public entity,'" and prisons and offenders are included in its coverage. "Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' offenders." One of the implementing regulations to Title II provides "No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any public entity." This broad prohibition against discrimination is very similar in substance to Section 504.

MDOC continues to discriminate against offenders with disabilities in many ways, including but not limited to, failing to remove architectural barriers, failing to provide even reasonable modifications in policies and procedures, failing to provide auxiliary aids and services necessary for effective communications, improperly segregating offenders with disabilities, and engaging in contractual arrangements that limit access to appropriate healthcare for offenders with disabilities. Guards at some facilities have even informed offenders in wheelchairs that they cannot be pushed by other prisoners. Several of the offenders who have reported this issue have had strokes and have limited use of one hand, making it nearly impossible for them to push their own wheelchairs. This policy excludes offenders who use wheelchairs from the most basic services of the prison system, including medical care, food, and even access to bathroom facilities. Moreover, when a prisoner needs medical care, he or she must complete a written form requesting it. Every MDOC facility has boxes to submit the medical slips. It may seem like a simple process, but for a prisoner with an intellectual disability or vision impairment, filling out a form can be a major obstacle. Prisoners with disabilities

EXHIBIT A

also have reported that they are excluded from work release programs, solely due to their disabilities. These repeated actions by MDOC constitute discrimination against offenders with disabilities in violation of Title II and Section 504.

## MDOC HAS NOT MADE REASONABLE MODIFICATIONS IN POLICIES AND PROCEDURES.

Title II regulations also require MDOC to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." Perhaps, the most glaring MDOC policy that discriminates against offenders with disabilities is the requirement that offenders complete a written form to request medical care, even for emergency medical care. During monitoring visits, DRMS observed that every MDOC facility utilizes boxes to submit written "medical slips." This is not an ideal way of requesting medical care, because there are offenders with vision and/or intellectual disabilities, as well as mental illnesses that may have difficulty completing the necessary forms and paperwork to receive medical care.

Some offenders with disabilities have reported that they are excluded from work release programs solely because of their disability. There are so many offenders who desperately want to work within the facility, but have not been given the opportunity to do so. Generally, work release is considered a critical benefit that allows offenders to develop skills, begin reintegration into society, earn money, and demonstrate parole readiness. Finally, a policy of excluding persons with disabilities clearly violates the ADA and *§ 504 of the Rehabilitation Act*.

Guards at some facilities have informed offenders in wheelchairs that they cannot be pushed by other offenders and that the mobility impaired offender must push his or her own wheelchair. Several of the offenders who have reported this have had strokes, heart attacks, and other issues that may render limited use of one hand, or both, which would make it nearly impossible to push their own wheelchair. As a result, offenders oftentimes miss lunch, dinner, or both; they miss pill call; and they also may miss sick call or any other call that the zones utilize. This is unacceptable.

## MDOC FAILS TO PROVIDE AUXILIARY AIDS AND SERVICES NECESSARY FOR EFFECTIVE COMMUNICATION.

MDOC must provide auxiliary aids and services necessary to achieve an effective communication for offenders with disabilities. Examples of such measures may include large print materials for offenders with low vision or a sign language interpreter for offenders who are deaf or hard of hearing. This has not been the case. In fact, offenders that fall within this category have simply gone without auxiliary aids or accessible communication services.

## MDOC IMPROPERLY SEGREGATES OFFENDERS WITH DISABILITIES.

Sadly, MDOC has a long history of segregating offenders with disabilities. This practice clearly contradicts Title II and its implementing regulations, which specifically require MDOC to "administer services, programs, and activities to [offenders] with disabilities." Regarding prisons specifically, "[p]ublic entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals."

DRMS has found that many offenders have been disproportionally placed in the system. Even more, while there is no legally justifiable reason for MDOC's housing classification, the classification can present security issues for offenders with disabilities. Offenders with disabilities who

EXHIBIT A

**4**
THE NUMBER OF SEIZURES ONE OFFENDER HAD IN ONE EPISODE BECAUSE HE RECIEVED HIS MEDICATION LATE.



**50%**
APPROXIMATE RATE OF STAFF VACANCIES AT MDOC FACILITIES.

**6**
THE NUMBER OF MONTHS ONE OFFENDER HAS GONE WITHOUT A SHOWER BECAUSE THE FACILITIES ARE INACCESSIBLE.

**100%**
OF FACILITIES AT MSP, SMCI, AND CMCF THAT PRESENT BARRIERS AND ACCESSIBLITY ISSUES FOR OFFENDERS WITH DISABILITES.

EXHIBIT A

are housed in lockdown units are subjected to higher degrees of violence. One may question how an offender who uses a wheelchair protects himself (as a minority in a lockdown zone) when he is housed in a building that is and has been completely designated for offenders without mobility impairments.

We are unsure about the answer to that question, as it is one that must be answered by MDOC. However, Title II's implementing regulations specifically prohibit placing offenders with "disabilities in inappropriate security classifications, because no accessible cell or beds are available.

### MDOC HAS FAILED TO REMOVE ARCHITECTURAL BARRIERS AT FACILITIES.

Although MDOC is not generally required to undertake architectural renovations to improve accessibility for facilities built before 1992, it must, however, remove architectural barriers when it can be done with relative ease and at limited expense. Further, MDOC must ensure that it operates "each service, program, or activity, so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by [offenders] with disabilities." It is also discriminatory to deny an offender access to and participation in services, programs, and activities because the facility is not accessible. MDOC consistently houses offenders with mobility impairments in facilities that are not accessible.

**Every Housing Facility at <u>CMCF</u> Presents Architectural Barriers and Accessibility Issues for Offenders with Mobility Impairments:**

The **Reception/Classification Building**, which is considered the facility's mental health observation section, lacks ramping in the shower area. Offenders reported a lack of medical care, advising that, while housed in this particular area, their medical calls are ignored. **One offender advised that he had been waiting for the facility to respond to a medical call for 8 weeks.**

The **1A Yard, A building** houses 180 offenders—some with mobility issues. We observed that the ceilings in the bathroom area were in total need of repair. The offenders housed there have experienced **serious sewage flooding**, due to the facility's severe plumbing issues. Also, we found accessibility issues in the restroom areas: lack of railing around any of the zone's commodes, and a thick barrier protruding in the entryway of the shower. There was no ramp for offenders who use a wheelchair or walk with canes. We also found an abundance of mold growing alongside the facility's walls, where offenders are housed.

The **1A Yard, B Building** also houses 180 offenders, and experiences many of the same issues as the buildings above. This building also has sewage backup, which creates flooding in the restroom areas on a regular basis; there are complaints of no hot water whatsoever, and that **the drinking water is brown**. The vents on the zone are clogged and filled with thick dust. The building also does not have a water fountain, therefore offenders have to drain water from the sink or the shower.

The **1A Yard, C Building**, also houses 180 offenders. We found inoperable sinks, leaving 180 offenders to share two sinks. There were no water fountains, and the ceilings were in great need of repair, especially in the restroom. Again, we received complaints of lack of hot water and sewage buildup that floods the restroom areas.

The **Quick Bed, A Building, B Zone**, was also riddled with flooding. The flooding is so bad that the offenders use their own products in an attempt to stop the flooding—that is, **the offenders are forced to utilize their feminine hygiene products to stop flooding on the zone.**



EXHIBIT A



A wall of feminine hygiene products used by offenders to prevent sewage from leaking into their sleeping quarters at CMCF.

The **Quick Bed, B Building, B Zone**, houses 140 offenders. We observed that some of the offenders used wheelchairs or required mobility assistance. In this building, we found many inoperable commodes, and that the roof was in immediate need of repair. This building, like many of the aforementioned buildings, experiences sewage flooding as well.

The **Quick Bed, B Building, C Zone**, houses 140 offenders in total. There, we found inoperable sinks and toilets, and we found that the ceiling was in great need of repair. We also found that there was a barrier in the entryway of the shower, which causes accessibility issues for offenders with mobility issues.

The **Quick Bed, C Building, D Zone,** houses 140 offenders, and we found that there was no railing around the toilets for offenders, and that there was a barrier in the entryway of the shower, without a ramp. **We found what appeared to be black mold that had fresh painting over it.** Offenders advised that there is almost never a guard in the tower to watch over them, and that when they need a guard for something, they sometimes have to wait for hours before someone responds. We found many offenders with mobility issues that would be better suited if they were moved to a unit equipped for those with disabilities.

The **Women's Maximum Security Unit**, which houses the female death row offenders, had offenders with mobility issues and one offender with a prosthetic leg. They generally complain of cold temperatures on the zone to no avail.

The **720 Medical/Administration Unit** holds a total of 54 offenders and everyone in the building presented some type of physical or mental disability. Many of the offenders used wheelchairs. We found that many offenders complained that the shower floor was slippery, causing them to fall, and that the shower chairs they were given were also slippery. **Also, we found that there were no hand rails in the shower, nor around the restroom commodes.** Additionally, we found mold in

EXHIBIT A

the restroom area. We found there were some offenders in need of shower chairs who have simply gone without. We also received some complaints in regards to pill calls. Due to obstacles, offenders with mobility issues are not able to make pill call or are not able to make it fast enough, and the nurses refuse to bring them their medication. As a result, these offenders miss their medication.

**Every Housing Facility at <u>SMCI</u> Presents Architectural Barriers and Accessibility Issues for Offenders with Mobility Impairments:**

**Area I: Unit 7, Zones A & B** are medium protective custody units, which house a total of 160 offenders each. These units are single man cells with open concept common areas. In this unit, DRMS observed: broken lights, exposed wires and cavities in the walls, inoperable urinals and toilets, mold covering the walls of personal cells, and missing tile in the flooring of the community shower. No rails were noted in the shower area, nor around the commodes in the cells. Also, during this monitoring session, there was no air circulation noted.

In **Area II, Zones A & B** are an open bay concept that utilize bunkbeds for two offenders that are about 3 inches apart from one another. There, we found concrete flooring in the shower that was not non-slip. We also found exposed wires and deep exposed wall cavities. We found inoperable urinals and toilets, such that only 1 out of 4 urinals were working, and only two operable toilets for about 160 adult men. DRMS observed tattered ceilings and flooring in the unit. We found mold in wall crevices, and plug fixtures hanging from the walls. **What was most disturbing is that we found offenders who were sleeping on steel bunkers without a mattress** There were large fans and vents to improve air circulation in the buildings, but they were covered with visibly thick dust particles. There was flooding observed on the floor that was obstructed with towels all over the zone.

**Area II, Unit A1, A Building** holds a total of 200 offenders. This building presented no cameras on the zone and had many of the same issues as the preceding units, such as inoperable sinks and toilets, lack of railing in shower units, lack of railing around commodes, and barriers (steps) leading into the shower. Though these may seem like small inconveniences for that of a normal person, for offenders with limited mobility (such as those using canes, wheelchairs, and/or walkers) **these architectural barriers cause great hardship daily**. In addition, we found that the flooring of the shower was tattered and missing tile, in addition to a missing ceiling over the shower, which exposes wires.

**Medical Services/ Infirmary of Area II** had 10 rooms occupied at the site visit. DRMS' initial observations was that the rooms had exposed wires in wall cavities. Again, we found some offenders had no mattress and were sleeping on steel bunks. We found standard hospital cells and isolation rooms; however, none of the commodes in the offender's room had hand rails for those offenders that presented mobility impairments.

**Maximum Security Unit (MSU)** houses a total of 36 offenders. This unit presented no air or heat, as well as mold and exposed wires in cavities in walls. The ceilings were in total need of repair and there were no ramps noted in the entry way of the shower. We also found mold in individual cells. Offenders in this unit complained of a lack of any outdoor recreation. **They advised that they sit in their cells for the entirety of each day.**

**D Building (of Area I and II)** houses a total of 200 offenders, with 100 on each side. Although newer looking, this unit presented many of the same issues that the former units presented. The unit has no air conditioner. DRMS observed exposed wires in the walls and ceilings, moldy areas on the



EXHIBIT A

zone, and leaks in different areas on the zone. We also found inoperable sinks and toilets. We found offenders with mental and physical disabilities who face difficulty maneuvering throughout the zone.

**E1 Building (Alcohol/Drug/Pre-Release)** houses a total of 200 offenders as well—100 on each side. This unit presented inoperable toilets and urinals, **live wires in the flooring where the offenders must walk to carry out daily functions,** large holes in the ceilings, visible flooding and sewage spillovers, and lack of roofing in the showers.



Leaking ceilings, exposed wires and mold are prevalent within SMCI.

**Unit 8, also known as "general population,"** houses a total of 104 offenders. The glaring issue in this unit is that the ceilings are in dire need of repair. In addition, the ceilings are moldy and pose a great risk of potential harm for offenders that are housed there.

**Unit 9** houses a total of 160 offenders and this building could possibly be the worst of them all. This building has ceilings that were leaking fluids on the offenders' housing areas. DRMS also **discovered what appeared to be severe black mold in the bathroom area**, which poses great risk of potential harm for offenders housed there.

**Building 12** houses a total of 160 offenders, some having mobility impairments as the result of a disability. Those offenders with mental and physical disabilities face daily difficulties maneuvering throughout the zone.

**Every Housing Facility at <u>MSP</u> Presents Architectural Barriers and Accessibility Issues for Offenders with Mobility Impairments:**

**Building 28**, which houses a total of 189 offenders, some of whom have physical disabilities. At Building 28, offenders with mobility impairments have issues with the inaccessible shower. No rails were noted in the shower area, nor around the commodes in the cells. To make matters worse, an

EXHIBIT A

offender must traverse a step to enter the shower, which makes it extremely difficult, if not physically impossible, to enter the shower and use the shower independently. **In addition to observing no water fountains or drinking water for offenders, DRMS also observed that offenders with disabilities find it difficult to eat in the dining hall as the dining hall is inaccessible to them.**

In **Building 29**, we found that all units had accessibility issues and were in violation of the ADA. While, at the time of monitoring, some units did not present offenders with mobility issues, there were some that did, such as in 29B, 29F, and 29H. There, **we found offenders who use wheelchairs, canes, and walkers, who reported difficulty with going to and from the shower, slipping in the shower, getting on and off the commode, commuting to the dining hall (when allowed), as well as responding to pill calls.** Specifically, in building 29F, which is home to approximately 128 offenders, DRMS found trash sprawled everywhere on the floor, buckets set up around the zone to hold incoming water from the roof, inoperable sinks and toilets in individual cells, and again, no railing around the commodes, nor the showers. There was no non-slip flooring in the shower, and no shower chairs available for offenders that required or needed them. We have received reports that offenders are forced to share shower chairs because the facility refuses to provide offenders with shower chairs of their own. Furthermore, offenders that have limited mobility are again required to traverse a step leading into the shower area, which acts as a barrier.

**Building 30**, also known as the Alcohol and Drug Program, holds a total of 216 offenders with 108 on each zone (A & B). This building presents many of the same issues as the preceding units, such as inoperable sinks and toilets, lack of railing in shower units, lack of railing around commodes, and steps leading into the shower. Though these may seem like small inconveniences for that of a normal person, however, for offenders with limited mobility (using canes, wheelchairs, and/or walkers), these architectural barriers cause great hardship every day. In addition, we found that the flooring of the shower was tattered and missing tile, and there is missing ceiling over the shower, which exposes wires. Two offenders who use wheelchairs are housed in the building, and both complained of the thick barriers in the entryway of the shower. **One of these offenders advised that he had not showered since he had been transferred to MSP (well over six months at the time) because he could not get in with his wheelchair and had no shower chair.** He advised that he resorts to taking sponge baths instead. This is unacceptable and is in violation of the ADA.

In **Building 31**, which is generally known as the "disability building," there are four units, which house around 70 offenders each. This building generally has more ADA accommodations for offenders with disabilities. However, there are still some needed accessibility renovations that are cost efficient, would not present difficulty, nor be an undue burden on the facility. Foremost, due to the fact that there are many more offenders classified as having a disability/or needing mobility assistance, there is not enough room to accommodate these offenders. There are offenders with disabilities that should be housed at Building 31, but are not, because there is not enough room. Therefore, only offenders with the most complex disabilities are housed in Building 31, which leaves some offenders to be housed in other buildings without ADA accommodations. **Although Building 31 is designated as the disability building, there is only one accessible bathroom on each zone.** The other commodes are regular toilets (without hand rails). There needs to be more accessible bathrooms to accommodate the needs of offenders with disabilities who can only utilize those facilities. In addition, there are urinals that are inoperable and the showers lack nonslip flooring.

EXHIBIT A



An inaccessible, inoperable toilet in MSP.

In **Building 42**, known as "the hospital," there are four zones. At the hospital, all offenders are undergoing treatment for various disabilities, injuries, and/or illnesses. **Therefore, one would suspect that accessible bathrooms would be present in single cells, but surprisingly, they were not.** We found standard hospital cells and isolation rooms; however, none of the commodes in the offender's room had hand rails. For each zone, there was only one bathroom at the entrance of the hall that was designated as accessible. This is unacceptable and does not suffice because an offender needing an accessible bathroom must leave his hospital room and walk all the way to the end of the hall to relieve himself. In addition, because there is only one accessible bathroom, the offender, more than likely, will have to wait. The hospital can hold up to 44 offenders on each zone.

Other issues that were documented while monitoring MSP housing facilities, but not mentioned previously, were showers with controls being placed at the very top near the shower head, which is not ADA-compliant, and the proximity of offender's beds. The beds are so close together that some of the wheelchairs cannot maneuver between the beds.

We are advocating for those offenders with disabilities to be placed in locations on the MSP campus that are accessible for them. MDOC cannot house offenders with mobility impairments in locations that are not accessible to them. During DRMS monitoring inspections, wardens and administrators of the facility indicated that offenders with disabilities are not housed in building that are not accessible for them. However, those assertions were repeatedly belied by the presence of offenders with disabilities housed in inaccessible buildings. Additionally, offenders themselves confirmed that they were housed in these buildings.

EXHIBIT A

# CONCLUSION

Federal law and the *U.S. Constitution* are clear about the treatment of offenders. The conditions that Disability Rights Mississippi found within MDOC facilities demonstrate a blatant disregard for the law that leaves offenders confined to dangerous and discriminatory facilities, which also places their health and lives at a deadly risk. The offenders mentioned in this report were not sentenced to abuse nor neglect. They were not sentenced to suffering from untreated infectious diseases. They were not sentenced to daily humiliation and hardships. However, this is the reality for individuals in MDOC's custody. It is a prison system that not only punishes people, but banishes their existing humanity. No statutory penalty can justify the conditions that these offenders live in, nor the lives that these conditions have already destroyed. Mississippi has an obligation to ensure its prison system does not violate the rights of offenders with disabilities. It must ensure that offenders receive constitutionally adequate medical and mental health care. The state of Mississippi must develop and implement a plan to meet its constitutional, statutory, and moral obligations to offenders. This plan should include efforts to:

- Maximize medical and mental health staff to ensure that offenders receive the care they need in a timely manner.
- Increase custody staff to ensure there are sufficient officers to monitor offenders and the zones.
- Eliminate architectural barriers in all buildings where offender with disabilities are housed.
- Ensure that appropriate assistance devices, communication methods, and services for offenders with disabilities are available.
- Eliminate policies and procedures that discriminate against offenders with disabilities.
- Establish an Americans with Disabilities Act (ADA) grievance procedure at each facility. This would allow offenders with disabilities to make direct contact with an ADA state official or an ADA Coordinator at/for the facility.

If the state of Mississippi is truly dedicated to justice and human rights, it will not disregard the blatant injustices that occur daily behind its prison walls. It would also not be slow to act or slow to provide remedies for redress for offenders. The time is **NOW** for Mississippi officials to uphold their legal obligations and address the correctional failures of the state, as it is long overdue.



*For more photos from inside Mississippi's prisons, visit* **drms.ms/prison**.

EXHIBIT A



The mission of Disability Rights Mississippi is to promote, protect and advocate for the legal and human rights of all people with disabilities, and to assist them with full inclusion in home, community, education and employment.

EXHIBIT A

# EXHIBIT B

EXHIBIT A



July 12, 2021
*Via United States Mail*

Governor Tate Reeves
Post Office Box 139
Jackson, Mississippi 39205

Commissioner Burl Cain
Mississippi Department of Corrections
301 North Lamar Street
Jackson, Mississippi 39201

Lt. Governor Delbert Hosemann
Post Office Box 1018
Jackson, Mississippi 39215

**RE:   DRMS' MONITORING & INVESTIGATION OF MISSISSIPPI DEPARTMENT OF CORRECTIONS ON BEHALF OF OFFENDERS WITH DISABILITIES**

To Whom It May Concern:

Since 1982, Disability Rights ("DRMS") has served as the federally mandated protection and advocacy ("P&A") agency for the state of Mississippi. The P&A system is a national network of disability rights agencies tasked with investigating and monitoring abuse and neglect as well as providing legal representation and advocacy services to people with disabilities. To fulfill these duties, P&A agencies are given extensive and unique access[i] to:

- Investigate incidents of abuse and neglect[ii]
- Provide information, referrals, and training about the rights of people with disabilities and about DRMS services[iii];
- Monitor service provider and program compliance with respect to the rights and safety of residents[iv]; and
- Pursue administrative, legal and other appropriate remedies to ensure the protection of the rights of individuals with disabilities[v].

For the last two years, DRMS has conducted monitoring and investigations of the Mississippi Department of Corrections ("MDOC") utilizing its access authority through Protection & Advocacy for Persons with Developmental Disabilities ("PADD"), Protection and Advocacy for Individuals with Mental Illness

EXHIBIT A

("PAIMI"), and Protection and Advocacy for Individuals Rights ("PAIR").   Our monitoring has taken place in several MDOC facilities, but with specific focus of MDOC's most populated facilities -- Mississippi State Penitentiary ("MSP"), South Mississippi Correctional Institution ("SMCI"), and Central Mississippi Correctional Facility ("CMCF").   Our monitoring and advocacy work was culminated in a publicly released report which was provided to your offices as well as distributed to the entirety of the Mississippi Legislature. To date, we have not received any response to the allegations or concerns addressed in this report. Nonetheless, I have included another copy of this report with this correspondence for your convenience.

The short and simple summary: **MDOC is subjecting offenders with disabilities to cruel and inhumane treatment and blatantly violating human rights through a lack of medical care, lack of mental health care, and significant and ongoing violations of the Americans with Disabilities Act ("ADA").**   These individuals -- DRMS clients - are incarcerated in MDOC facilities and are entirely dependent upon MDOC administration, its medical contractor, VitalCore Health Strategies ("VitalCore"), and MDOC staff.   Yet the system of care provided by MDOC and its staff and contractors is grossly inadequate and subjects all offenders to a substantial risk of serious harm, including unnecessary pain, loss of function, injury and death.

Due to this deliberate indifference to the obvious medical needs of the persons in their custody, offenders go for months or years without appropriate diagnoses of medical conditions. Numerous offenders have died from a failure to treat medical conditions from cancer, fluid retention, and other illnesses. Others have required emergency surgery or lost the use of legs, arms or eyes, after having been left to suffer with untreated symptoms for lengthy periods. Offenders with mental illnesses or serious psychological problems are entirely denied mental health care or provided only with medication with little to no medication management, follow-up, or concern for side effects.   Offenders with a history of self-harm are ignored and/or placed in solitary confinement as a means of treatment/punishment for a mental health illness.   Offenders who do not want to take psychiatric medications, often because they are experiencing serious side effects, are forced to take the medication without any regard for due process. If they refuse, they may be beaten, placed in segregation, or denied any medical treatment and/or medication, or all of these. Even when there is a process to determine whether the offender is sufficiently ill and dangerous to warrant involuntary medication, the process falls far short of what due process requires.

Offenders with physical or mental disabilities face discriminatory and dangerous circumstances throughout the MDOC system. They are housed in facilities that cannot accommodate them. They are often housed in


EXHIBIT A

prisons or housing units for offenders with higher security classifications than their own for no reason other than their disabilities. They are not provided with necessary assistive services or devices, such as functioning wheelchairs, shower chairs, ramps, or forms that they can read. They are punished for things they cannot do or do not know how to do because of their disabilities.   Additionally, some offenders are attacked and bullied because of his or her disability and the MDOC staff do nothing to intervene.

## MDOC HAS SYSTEMICALLY REFUSED TO PROVIDE ADEQUATE MENTAL HEALTH CARE

MDOC and its staff/contractors fail to provide constitutionally adequate mental health care in a number of ways. Their mental health care delivery system is severely understaffed, and lacks adequate personnel with sufficient expertise to properly treat the individuals within its care. They further fail to identify, treat and medicate individuals with mental illness. Additionally, these systematic failures rise to the level of causing significant injuries and the unnecessary and wanton infliction of pain. Each of these deficiencies, in isolation and in conjunction, result in a violation of the Eighth Amendment.

Further, MDOC has a policy and practice of under-identifying and/or failing to identify mentally ill offenders and understating the acuity of offenders' mental illness upon admission and through the duration of an offender's sentence. As a result, mentally ill offenders go untreated and severely mentally ill offenders receive a far lower level of treatment than they need. MDOC routinely and systematically fails to prescribe, provide and manage necessary psychiatric medications. The agency has designated a total of 3,059 offenders as having a code of MH-1 or greater. Only 2,209, or 8.9% of the MDOC population actually receive psychotropic medication. The average monthly expenditure for psychiatric medications for offenders in the MDOC custody has significantly decreased despite the rise in offenders with mental health illnesses.

Solitary confinement and/or "isolated residency" in many instances has also been used to house offenders who suffer from severe mental health illnesses and disorders.   This housing tactic has been used to house offenders for thirty (30) days or more to punish offenders for refusal to take medication related to their mental health as the side effects from their consumption have had a drastic impact on the offenders' quality of life.   Even while in such living arrangements, offenders have been denied the opportunity to shower, eat, and consult with a mental health professional. Many times, while in confinement, they are not provided their medication.



EXHIBIT A

## MDOC HAS SYSTEMICALLY FAILED TO COMPLY WITH THE ADA AND SIMILAR LAWS

MDOC is fully aware that almost none of its facilities are in compliance with the ADA regulations and requirements.  Despite this knowledge, MDOC discriminates against offenders with disabilities in numerous ways, including, but not limited to, failing to remove architectural barriers, failing to provide reasonable modifications in policies and procedures, failing to provide auxiliary aids and services necessary for effective communication, improperly segregating offenders with disabilities, engaging in contractual arrangements that limit access to appropriate health care for offenders with disabilities. Further, the constitutional violations alleged with regard to the provision of mental health care, including both the denial of care and involuntary medication without due process, also violate the ADA.

With only one exception, every single facility operated by MDOC contains architectural barriers for offenders with disabilities.  These are not just minor barriers – there are significant barriers to restrooms and common areas in housing units which often confines an offender with a mobility disability to their beds, hoping they receive some assistance from a fellow offender.

MDOC's discriminatory policy requiring offenders to complete a written form to request medical care is inadequate. Some offenders with vision or intellectual disabilities cannot complete the necessary forms to receive medical care. There are no systems in place to enable offenders who cannot read due to vision or intellectual disabilities to request medical care.   Across its facilities, MDOC has a disturbing pattern of discriminatory practices from everything to housing to access to auxiliary aids to access to programs (when/if available) when it comes to its offenders with disabilities.

## MDOC HAS ROUTINELY AND SYSTEMICALLY FAILED TO PROVIDE ADEQUATE HEALTH CARE

MDOC has a policy and practice of failing to provide offenders with adequate health care, and are deliberately indifferent to the fact that the systemic failure to do so results in significant injury and a substantial risk of serious harm.   They have failed to provide adequate care in approving medications, equipment, and treatment for those who are in their custody.   Their systemic habits of ignoring sick calls and delaying outside appointments and ay follow up examinations have resulted in the deaths of several MDOC offenders.


EXHIBIT A

Further, MDOC has a policy and practice of not providing adequate medical staff to address the serious medical needs of offenders in MDOC custody. MDOC put out a request for proposal for the medical care contract for the prisons that included a listing of minimum staffing requirements that set the level of staffing at each facility far below what is needed to provide adequate care. Further, the request for proposal was explicit in valuing cost containment far more than adequacy of care. The contract ultimately awarded reflected the importance of cost containment and provides inadequate staffing throughout the MDOC system.

MDOC has a policy and practice of denying medical care to offenders with serious medical conditions, or providing such offenders with care that is so cursory or grossly incompetent that it amounts to a denial of care. Such indifference has contributed to numerous offender deaths, serious harm & injury, and worsening medical status due to delay of medical care by MDOC staff and VitalCore. Moreover, there is an utter and complete lack of emergent medical care and such poor response typically results in a substantial increased risk of serious harm, loss of function, or loss of life. MDOC has a policy and practice of allowing correctional officers to deny or delay access to medical care, whether by individual officer's affirmative actions or the systemic understaffing of custodial staff who are necessary to offenders' access to treatment. Much of MDOC staff are not adequately trained on how to handle health care emergencies, and as a result of this failure to respond properly and timely to emergencies, offenders suffer avoidable harm and injuries, including unnecessary deaths. Correctional staff make critical initial decisions about the medical care needed. Understaffing of correctional staff leads to offenders missing off-site medical appointments and offenders in segregation not receiving medical treatment. There are many instances in MDOC facilities where correctional officers have influenced whether or not an offender can go to seek medical treatment at all. Correctional officers have also retaliated against some offenders due to their medical requests and their filing of grievances.

MDOC has systemically failed to adequately provide and manage medication, provide medical supplies, and devices to offenders with disabilities. Medication management is inadequate at best and non-existent in many cases. DRMS has noted issues with medication management – everything from errors in dosage to errors in providing the correct medication to complete failure to provide medication for days at a time.


EXHIBIT A

## <u>MDOC ROUTINELY RETATLIATES AGAINST OFFENDERS FOR EXHAUSTING THEIR ADMINISTRATIVE REMEDIES</u>

MDOC has established a policy or custom that permits MDOC employees and contractors to engage in retaliatory action against offenders who exercise their right to communicate with counsel and file complaints regarding conditions of confinement. MDOC and its staff continuous act recklessly and with deliberate indifference with regard to permitting MDOC employees and contractors to engage in retaliatory action against offenders. Pursuant to the Prison Litigation Reform Act[vi], offenders are required to resolve their complaints through the facility's grievance process and exhausting all administrative appeals prior to pursuing any legal action on an individual basis. MDOC significantly prohibits this from occurring in many ways. DRMS has witnessed the complete absence of a receptacle for grievances in housing units and refusal to provide a grievance form or any type of paper/writing utensil. It has been reported that, when there is no receptacle for their grievances, MDOC staff agrees to submit it for the offender; however, the offender never receives a response of any kind.

It should be noted that, while MDOC is fully aware of the serious nature of the federal constitutional deprivations and statutory violations to which offenders with disabilities are subjected, Commissioner Cain, in his official capacity, has reported to several news outlets and public officials that the conditions of MSP have been rectified/corrected and that no offenders are staying in any condemned zones and/or units. This is completely false and misleading as DRMS is consistently and routinely in these facilities following up on Commissioner Cain's claims.

DRMS intends to pursue legal action in order protect and advocate for the rights and interests of offenders in MDOC custody who are persons with mental illness and persons with mental or physical disabilities. DRMS has spent significant time and resources advocating on behalf of offenders with disabilities in MDOC custody, monitoring and investigating the treatment and accommodation of offenders with disabilities in MDOC custody. DRMS' efforts and expenditures of resources are necessitated by the MDOC policies and practices. DRMS has made every effort to inform MDOC and its staff each and every time there was an issue that should be addressed. More often than not, such notice was met with silence or empty assurances. Pursuant to 42 U.S.C. § 1983, the Eighth & Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, and §504 to of the Rehabilitation Act of 1973, DRMS intends to seek remedy to these cruel and inhumane conditions and treatment of the offenders with disabilities in the custody of the Mississippi Department of Corrections. While it is DRMS' position that this state has been on notice of



# EXHIBIT A

these issues for decades, we intend to put this state and its leaders on notice that DRMS intends to pursue this action immediately.

Sincerely,

Polly Tribble
Executive Director

Greta Kemp Martin
Litigation Director

cc:

Courtney Cockrell, Deputy General Counsel
Mississippi Department of Corrections

Dennis Gregory, Chief Medical Officer
Mississippi Department of Corrections

VitalCore Health Strategies

Honorable Juan Barnett, Chair
Mississippi Senate – Corrections Committee

Honorable Daniel H. Sparks, Vice-Chairman
Mississippi Senate – Corrections Committee

Honorable Kevin Horan, Chair
Mississippi House of Representatives – Corrections Committee

Honorable Carl Mickens, Vice-Chairman
Mississippi House of Representatives – Corrections Committee

---

[i] The authority was first codified through the passage of the Protection & Advocacy for People with Developmental Disabilities (PADD) Act, 42 USC 15043(a)(2)(B).   Over time, Congress extended the protections of the PADD Act, incorporating them y reference into legislation protecting persons with other forms of disabilities. This includes both the Protection & Advocacy for Individual Rights (PAIR) Act, 29 USC 794(e)(f)(1), and the Protection and Advocacy for Individuals with Traumatic Brain Injury (PATBI) Act. 42 USC 300d-53(eff. April 28,2008). Similarly, Congress expanded the P&A system through passage of the Protection & Advocacy for Individuals with Mental Illness (PAIMI) Act 42 CFR 51.42(c)(2) and the Protection & Advocacy for Beneficiaries of Social Security (PABSS) Ticket to Work and Work Incentives Improvement Act of 1999, as amended (TWWIIA) 42, USC 1320b-21.
[ii] 42 USC 15043(a)(2)(B) (PADD); 45 CFR 1326.27 (b)(2) (PADD); 42 USC 10801(b)(2)(B) (PAIMI)
[iii] 42 USC 15043(a)(2)(A)(ii) (PADD); 42 USC 10801 (b)(2)(A) (protection and advocacy as PAIMI duty); 29 USC 794e(f)(1)    (PAIR authority, generally the same as PADD and PAIMI authority).
[iv] 45 CFR 1322.27(c)(2)(ii)
[v] 42 USC 15043(A)(2)(A)(i)    (PADD); 42 USC 10801(b)(2)(B); 42 USC 10807(a)    (PAIMI); 29 USC 794e(f)(3)    (PAIR).
[vi] 42 USC 1997e(a)


EXHIBIT A

## CERTIFICATE OF SERVICE

I, undersigned counsel of record, do hereby certify that a true and correct copy of the foregoing has been filed with this Court's electronic filing system which automatically sends notification to all attorneys of record.

DATED: February 2, 2024

/s/ Greta K Martin

Greta Kemp Martin, MSB#103672
5 Old River Place, Suite 101
Jackson, Mississippi 39202
Telephone:  (601) 968-0600
Facsimile:  (601) 968-0665
gmartin@drms.ms

EXHIBIT A