## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| **PERVIS EVERETT, TONISHA JOHNSON, THALIA OUTLAW, LARRY ALLEN, TERRY LATTIMORE, DERRICK GUYTON, WILLIE BRENT, ERNEST LEFFEW, THOMAS ALSOBROOKS** on behalf of themselves and others similarly situated**, and DISABILITY RIGHTS MISSISSIPPI** | **PLAINTIFFS** |
| **VS.** | **CIVIL ACTION NO. 3:21-cv-516-CWR-LGI** |
| **MISSISSIPPI DEPARTMENT OF CORRECTIONS, NATHAN "BURL" CAIN,** in his official capacity as Commissioner of the Mississippi Department of Corrections, **JEWORSKI MALLET,** in his official capacity as Deputy Commissioner of Institutions, **TIMOTHY DONOVAN,** in his official capacity as Interim Chief Medical Officer, **VITALCORE HEALTH STRATEGIES, LLC, JOHN & JANE DOE DEFENDANTS,** and **XYZ CORPORATIONS** | **DEFENDANTS** |

## SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................1

II.     JURISDICTION.................................................................................................4

III.    VENUE ...........................................................................................................4

IV.     PARTIES .........................................................................................................5

        A.      PLAINTIFFS.........................................................................................5
        B.      DEFENDANTS .....................................................................................10

V.      DEFINITIONS................................................................................................13

VI.     FACTS...........................................................................................................15

        A.      DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL CARE..............16
        B.      DEFENDANTS FAIL TO PROVIDE ADEQUATE PROCEDURES TO
                REQUEST AND RESPOND TO MEDICAL CARE NEEDS ...............................17
        C.      DEFENDANTS FAIL TO REFER, ENSURE, AND DELIVER HIGHER
                LEVELS OF CARE .................................................................................19
        D.      DEFENDANTS FAIL TO PROVIDE EMERGENT MEDICAL CARE .............21
        E.      DEFENDANTS CONSISTENTLY DENY BASIC MEDICAL CARE,
                MEDICATIONS, MEDICAL SUPPLIES, DURABLE MEDICAL EQUIPMENT,
                AND ASSISTIVE DEVICES .....................................................................23
        F.      DEFENDANTS FAIL TO PROVIDE ADEQUATE HEALTHCARE STAFF ..25
        G.      DEFENDANTS HAVE SYSTEMICALLY DISCRIMINATED AGAINST
                PEOPLE WITH DISABILITIES BY FAILING TO PROVIDE REASONABLE
                ACCOMODATIONS.................................................................................27

VII.    CLASS ACTION ALLEGATIONS .......................................................................30

        A.      PLAINTIFF CLASS................................................................................30
        B.      SUBCLASS OF PEOPLE WITH CHRONIC CONDITIONS ("CHRONIC
                CONDITION SUBLCASS")......................................................................32
        C.      SUBCLASS OF PEOPLE WITH PHYSICAL DISABILITIES ("PHYSICAL
                DISABILITIES SUBCLASS").....................................................................34

VIII.   DRMS'S ASSOCIATIONAL STANDING ............................................................36

IX.     CLAIMS FOR RELIEF.....................................................................................38

     A.     FIRST CAUSE OF ACTION: INADEQUATE MEDICAL CARE..........................38

     B.     SECOND CAUSE OF ACTION: VIOLATION OF RIGHTS OF PEOPLE
           WITH DISABILITIES ...........................................................................................38

**X.**     **PRAYER FOR RELIEF................................................................................................39**

# I.    PRELIMINARY STATEMENT

1.    This class action is brought by individuals who are currently in custody with the Mississippi Department of Corrections ("MDOC").  The above-named Plaintiffs bring this case to remedy (a) Defendants' failure to provide adequate medical care to persons in the custody of MDOC; and (b) Defendants' failure to provide people with disabilities with reasonable accommodations in the form of medical supplies, medical equipment, and assistive devices to which they are entitled under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.  Plaintiffs seek declaratory and injunctive relief for the inhumane and discriminatory practices and conditions they face every day in MDOC custody.

2.    MDOC is responsible for many different correctional facilities throughout the State of Mississippi, which include seven state facilities, 15 regional facilities, and two private facilities.[1]  This class action focuses on the unlawful policies and practices of the seven state facilities: Central Mississippi Correctional Facility[2] ("Central"), Delta Correctional Facility[3] ("Delta"), Marshall County Correctional Facility[4] ("Marshall"), Mississippi Correctional Institute for Women[5] ("MCIW"), Mississippi State Penitentiary[6] ("Parchman"), South

---

[1] This information is based on MDOC's "Facilities" webpage, available at: https://www.mdoc.ms.gov/facilities (last accessed Jan. 29, 2024).

[2] Central Mississippi Correctional Facility is located in Pearl, Mississippi.  This facility is overseen by Superintendent John Hunt and houses 2,871 people as of January 9, 2024 according to MDOC's Daily Inmate Population data for January 2024, available at https://www.mdoc.ms.gov/sites/default/files/Daily_Inmate_Population/01-2024%20Daily%20Inmate%20Population.pdf (last accessed Jan. 30, 2024) [hereinafter January 2024 MDOC Population Data].

[3] Delta Correctional Facility is located in Greenwood, Mississippi.  This facility is overseen by Warden Susan Swindle and houses 321 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[4] Marshall County Correctional Facility is located in Holly Springs, Mississippi.  The facility is overseen by Warden Chris Loden and houses 838 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[5] Mississippi Correctional Institute for Women is located in Pearl, Mississippi.  This facility is overseen by Superintendent Tereda Hairston.

[6] Mississippi State Penitentiary, also known as "Parchman," is located in Parchman, Mississippi.  This facility is overseen by Superintendent Marc McClure and houses 2,490 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

Mississippi Correctional Institution[7] ("South"), and Walnut Grove Correctional Facility[8] ("Walnut Grove").

3.      MDOC facilities have been underfunded and understaffed for decades, resulting in horrific conditions, increasing and deadly violence, and an environment that in no way is conducive to rehabilitation.  The conditions at these facilities are so severe and barbaric that individuals in these facilities are faced with imminent risks of substantial harm daily in violation of their constitutional rights.

4.      The named Plaintiffs in this class action, who are in MDOC custody, are entirely dependent on MDOC, Commissioner Nathan "Burl" Cain, Deputy Commissioner of Institutions Jeworski Mallet, Interim Chief Medical Officer Timothy Donovan, and Vitalcore Health Strategies, LLC (collectively, "Defendants") for day-to-day medical care.  Yet, the system of care provided by Defendants is grossly inadequate and subjects all individuals to a substantial risk of serious harm, including, but not limited to, unnecessary pain, loss of function, injury, and even death.

5.      Disability Rights Mississippi ("DRMS") is the designated Protection and Advocacy ("P&A") agency for the State of Mississippi and the P&A Plaintiff in this action.  The P&A system is a national network of disability rights agencies investigating abuse and neglect and providing legal representation and other advocacy services to people with disabilities through extensive authority provided by Congress.[9]  As Mississippi's P&A, DRMS may investigate incidents of

---

[7] South Mississippi Correctional Institution is located in Leakesville, Mississippi.  This facility is overseen by Superintendent Brand Huffman and houses 2,750 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[8] Walnut Grove Correctional Facility is located in Walnut Grove, Mississippi.  This facility is overseen by Interim Superintendent Christopher Dykes and houses 363 people as of January 9, 2024 according to the January 2024 MDOC Population Data.

[9] The authority was first codified through the passage of the Protection and Advocacy for People with Developmental Disabilities (PADD) Act, 42 U.S.C. § 15043(a)(2)(B).  Over time, Congress extended the protections of the PADD Act,

abuse and neglect, provide resources and referrals, monitor service providers[10] with respect to safeguarding the rights of people with disabilities, and pursue any and all administrative, legal, and other remedies on behalf of the individuals that DRMS is tasked with protecting.

6.    DRMS is tasked with protecting individuals who have a qualifying disability under the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134.

7.    Due to Defendants' deliberate indifference to the obvious medical needs of the persons in their custody, Plaintiffs and others similarly situated go extended periods of time without appropriate diagnoses, treatment, or care of medical conditions—both those existing prior to incarceration and those developed while in MDOC custody.  Numerous individuals have died from a failure to treat certain medical conditions due to the negligence and inexperience of MDOC staff.  Many individuals have required emergency surgery or lost the use of limbs after having been left to live with untreated symptoms for lengthy periods of time.

8.    People with physical disabilities face discriminatory, dangerous, and even deadly circumstances while incarcerated with MDOC.  They are housed in facilities with an utter lack of accommodations and are denied basic human needs.  Plaintiffs and those similarly situated are not provided with necessary assistive devices, such as functioning wheelchairs or shower chairs.  They are punished for things they cannot do or do not know how to do because of their disabilities.

---

incorporating them by reference into legislation protecting persons with other forms of disabilities, which includes both the Protection and Advocacy for Individual Rights (PAIR) Act, 29 U.S.C. § 794(e)(f)(1), and the Protection and Advocacy for Individuals with Traumatic Brain Injury (PATBI) Act, 42 U.S.C. § 300d-53 (eff. April 28, 2008).  Similarly, Congress expanded the P&A system through the passage of the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, 42 C.F.R. § 51.42(c)(2) and the Protection and Advocacy for Beneficiaries of Social Security (PABSS) Ticket to Work and Work Incentives Improvement Act of 1999, as amended (TWWIIA) 42 U.S.C. § 1320b-21.

[10] 45 C.F.R. § 1386.19 (PADD: 45 C.F.R. § 1326.27(b)(2) (PADD)); 42 C.F.R. § 51.2 (PAIMI: "Service provider includes any public or private residential setting that provides overnight care accompanied by treatment services.").

9.    Defendants are solely responsible for the horrific and dehumanizing conditions in these facilities—conditions that have been repeatedly reported to them.  Nothing has been done and the people incarcerated in these facilities continue to suffer, especially those with disabilities.  Incarceration is intended to be punitive; however, denying those incarcerated basic human rights, and even worse, the opportunity to utilize incarceration as rehabilitation is grossly negligent, inhumane, and cruel.

10.   Accordingly, Plaintiffs respectfully request that this Court enter its order providing the declaratory and injunctive relief requested herein.

## II.    JURISDICTION

11.   The claims alleged herein arise under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution; the Americans with Disabilities Act, 42 U.S.C. § 1231, *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

12.   The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; 29 U.S.C. § 794a; and 42 U.S.C. §§ 1983 and 12133.

## III.    VENUE

13.   Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. § 1391 as Defendants are subject to this Court's jurisdiction given the location of their principal places of business.  Defendants oversee all facilities across the State of Mississippi from their primary office located at 301 North Lamar Street in Jackson, Mississippi.  Defendant VitalCore ("VitalCore") is a limited liability company and registered to conduct business in the State of Mississippi.  VitalCore provides contracted medical services to MDOC facilities.

# IV.   PARTIES[11]

## A.   PLAINTIFFS

14.   **PERVIS EVERETT** (*MDOC No. 90583*) is currently being held at South and has been in MDOC custody since June 2018.[12]  Plaintiff Everett suffers from an enlarged prostate and hypertension, compounded by the debilitating effects of glaucoma that have resulted in blindness in one eye and substantial vision impairment in the other.  Despite his persistent and numerous requests for medical attention, Plaintiff Everett has been subjected to inadequate and limited treatment, leading to a rapid deterioration in his overall health.  Upon his entry into MDOC custody in 2018, specialty care physicians addressed his optometry and urology concerns.  However, the Defendants have since failed to uphold their obligation to provide ongoing monitoring, follow-up care, and sustained specialty interventions, exacerbating the adverse impact on Plaintiff Everett's health and well-being.  Plaintiff Everett has exhausted all available administrative remedies.

15.   **TONISHA JOHNSON** (*MDOC No. 205762*) is currently being held at MCIW and has been in MDOC custody since October 2016.[13]  Plaintiff Johnson has endured incarceration across various facilities within MDOC, including, but not limited to, Central, all of which have exposed her to consistently subpar medical care.  During her incarceration, Plaintiff Johnson faced the unique challenge of giving birth to a child in an MDOC facility, subsequently leading to health complications in the form of uterine prolapse.  Despite undergoing surgery in 2022 to address this condition, Defendants have consistently failed to provide essential follow-up

---

[11] Information for each Plaintiff is based on information known to DRMS as of date of filing.  Each of these individuals were discovered through DRMS monitoring of the facility where they are currently housed.  DRMS also confirmed this information through the MDOC Inmate Search available on its website.

[12] Plaintiff Everett is currently set for release in November 2067.

[13] Plaintiff Johnson is currently set for release in July 2035.

care and monitoring.  The repercussions of this negligence have manifested in additional medical complications, necessitating the removal of a foreign object inadvertently left in her body during surgery.  Moreover, Plaintiff Johnson has been denied critical medical supplies, such as undergarments, essential for managing the side effects of her diagnosis, particularly excessive vaginal discharge.  The refusal to consistently furnish the necessary durable medical equipment, including a prescribed medical chair for showering, further exacerbates the challenges she faces in maintaining her health and well-being while incarcerated.  Plaintiff Johnson has exhausted all available administrative remedies.

16.     **THALIA OUTLAW** (*MDOC No. R7934*) is currently being held at Delta and has been in MDOC custody since March 1999.[14]  Plaintiff Outlaw's experience within various MDOC facilities, including Central, has been plagued by consistently inadequate medical care.  Managing Type 2 Diabetes, high blood pressure, and vertigo, she grapples with persistent symptoms, including enduring recurrent episodes of blood in her urine.  Despite being diagnosed while in MDOC custody, Plaintiff Outlaw has not been provided ongoing medical attention for her disabilities.  Her efforts to seek redress through "sick calls" have been met with repeated disregard, exacerbating the deterioration of her health.  Furthermore, the administration, renewal, and timely refills of her medications have proven unreliable, further compromising her well-being.  Plaintiff Outlaw has exhausted all available administrative remedies.

17.     **LARRY ALLEN** (*MDOC No. 179184*) is currently being held at South and has been in MDOC custody since August 2023.[15]  Plaintiff Allen has experienced substandard medical

---

[14] Plaintiff Outlaw is currently serving a life sentence which means that she will depend upon Defendants for basic human needs and care for the remainder of her life.

[15] Plaintiff Allen is currently set for release in April 2030.

care during his incarceration across various MDOC facilities, including, but not limited to, Parchman.  Compounding his challenges, Plaintiff Allen, who relies on a prosthetic leg, has faced persistent denial of essential medical supplies crucial for maintaining his prosthetic functionality.  Despite multiple requests for these devices, or, as an alternative, a wheelchair that would alleviate the burden of managing an unmaintainable prosthetic, Plaintiff Allen's pleas have been met with refusal, exacerbating the limitations imposed on his mobility and overall well-being.  Plaintiff Allen has exhausted all available administrative remedies.

18.     **TERRY LATTIMORE** (*MDOC No. 16811*) is currently being held at Central and has been in MDOC custody since September 2002.[16]  Plaintiff Lattimore has been incarcerated in and subject to inadequate medical care at MDOC multiple facilities, including, but not limited to, Walnut Grove.  During his incarceration, he experienced a heart attack, and the subsequent lack of appropriate treatment, monitoring, and ongoing care has precipitated a myriad of medical challenges and a decline in his overall health.  Diagnosed with hyperlipidemia, diabetes, hypertension, and asthma while in custody, Plaintiff Lattimore continues to face inadequate care for these chronic conditions.  The administration, renewal, and timely refills of his medications prove unreliable, further jeopardizing Plaintiff's health.  The shortcomings in medical attention underscore the urgent need for legal intervention to address the systematic failures that compromise Plaintiff Lattimore's well-being while incarcerated.  Plaintiff Lattimore has exhausted all available administrative remedies.

19.     **DERRICK GUYTON** (*MDOC No. 46245*) is currently being held at Parchman and has been in MDOC custody since February 1999.[17]  Plaintiff Guyton has faced inadequate

---

[16] Plaintiff Lattimore is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.

[17] Plaintiff Guyton is currently serving a life sentence which means that he will depend upon Defendants for basic human needs and care for the remainder of his life.

medical care throughout his incarceration within various MDOC facilities, including Walnut Grove. Struggling with multiple sclerosis, a seizure disorder, and hypertension, his mobility is severely limited, exacerbated by the challenge of a missing limb. The absence of support leaves him without assistance for essential daily activities such as getting out of bed, showering, and using the toilet or changing his diaper. These tasks necessitate the aid of another individual, highlighting the critical need for consistent and reliable care. The complete lack of monitoring and ongoing attention to Plaintiff Guyton's needs while confined to his bed in May 2021 resulted in a severe bed sore, underscoring the pressing need for legal intervention to rectify the persistent failures in providing adequate medical care during his incarceration. Plaintiff Guyton has exhausted all available administrative remedies.

20. **WILLIE BRENT** (*MDOC No. 72777*) is currently being held at Central and has been in MDOC custody since August 2021.[18] Plaintiff Brent contends with the challenges of kidney failure, having been a dialysis patient before his incarceration. Despite his urgent need for continued dialysis treatment, multiple "sick calls" addressing the Defendants' failure to provide such treatment have gone unanswered. Plaintiff Brent, in expressing his increasing concerns, emphasizes the gravity of the situation, citing instances, where others who required this treatment have died as a result of being denied or withheld dialysis. Plaintiff Brent has exhausted all available administrative remedies.

21. **ERNEST LEFFEW** (*MDOC No. 186927*) is currently being held at Parchman and has been in MDOC custody since November 2017.[19] Plaintiff Leffew has experienced inadequate medical care across several MDOC facilities, including, but not limited, to South. Afflicted with Crohn's Disease, he suffers from a range of symptoms, notably gastrointestinal issues

---

[18] Plaintiff Brent is currently set for release in January 2044.

[19] Plaintiff Leffew is currently set for release in May 2040.

and rapid weight loss, which remain unmonitored and untreated. While receiving limited specialty care, Plaintiff Leffew has been deprived of consistent follow-up care and ongoing monitoring, exacerbating the challenges posed by his condition. Additionally, despite prescriptions from both his specialty care physician and the facility's medical provider, nutritional supplementation drinks crucial for his well-being have not been provided. These persistent lapses underscore the urgent need for legal intervention to rectify systemic deficiencies in Plaintiff Leffew's medical care, ensuring he receives the necessary attention and treatments essential for managing Crohn's Disease. Plaintiff Leffew has exhausted all available administrative remedies.

22.     **THOMAS ALSOBROOKS** (*MDOC No. 235953*) is currently being held at Parchman and has been in MDOC custody since February 2022.[20] Plaintiff Alsobrooks has experienced inadequate medical care across various MDOC facilities, including, but not limited to, South. Afflicted with upper gastrointestinal issues, he suffers from symptoms such as bleeding in the stomach, excessive vomiting of blood, and fainting. Moreover, even in emergent situations, such as fainting in the shower following a bout of vomiting blood, facility staff have wholly ignored these critical incidents. Despite numerous "sick calls" addressing these pressing health concerns, Plaintiff Alsobrooks' efforts have largely been unanswered. This pattern of disregard for his urgent medical needs underscores a systemic failure, emphasizing the pressing need for legal intervention to secure appropriate and timely medical attention for his serious upper gastrointestinal issues. Plaintiff Alsobrooks has exhausted all available administrative remedies.

---

[20] Plaintiff Alsobrooks is currently set for release in August 2036.

23.    **DISABILITY RIGHTS MISSISSIPPI** ("DRMS") is designated as the State of
Mississippi's authorized P&A. It is an agency created under federal laws and designed to
protect people with disabilities. DRMS has statutory authority to pursue legal and other
appropriate remedies to ensure the protection of persons with mental illnesses,
developmental disabilities, and other disabilities who are or will be receiving care and
treatment in the State of Mississippi. 42 U.S.C. § 10801 *et seq.*; 42 U.S.C. § 15001 *et seq.*; 29
U.S.C. § 794e. DRMS is pursuing this action to protect and advocate for the rights and
interests of individuals in MDOC custody who are persons with physical disabilities. Prior
to commencement of this lawsuit, DRMS spent significant time and resources advocating on
behalf of people with disabilities in MDOC custody, and monitoring and investigating the
treatment and accommodation of people with disabilities in MDOC custody. DMRS's pre-
litigation efforts and expenditures of resources were necessitated by the MDOC policies and
practices challenged, which serve to frustrate and perceptibly impair DMRS's advocacy
efforts and its ability to accomplish the statutory purposes for which it was created.

B.    **DEFENDANTS**

24.    **MISSISSIPPI DEPARTMENT OF CORRECTIONS** ("MDOC") is the state agency
that is tasked with the management and oversight of Mississippi's correctional facilities.
Headquartered in Jackson, Mississippi, Defendant MDOC has several area locations across
Mississippi's 82 counties. The agency attempts to maintain seven state facilities, 15 regional
facilities, and two private facilities.[21] This class action focuses on the unlawful policies and
practices of the seven state facilities: Central Mississippi Correctional Facility, Delta
Correctional Facility, Marshall County Correctional Facility, Mississippi Correctional Institute

---

[21] This information is based on MDOC's "Facilities" webpage, available at: https://www.mdoc.ms.gov/facilities (last accessed Jan. 29, 2024).

for Women, Mississippi State Penitentiary, South Mississippi Correctional Institution, and Walnut Grove Correctional Facility.

25.     **NATHAN "BURL" CAIN** ("Cain") is the appointed Commissioner of the Mississippi Department of Corrections. In his official capacity, Defendant Cain is responsible for overseeing all aspects of Mississippi's correctional system as well as ensuring that all facilities under the control of MDOC operate in compliance with state and federal laws. Defendant Cain authorizes or ratifies the policy and practice of subjecting people to a substantial risk of serious harm and discrimination based on disability. Since his time as Commissioner, Defendant Cain has been made aware of the issues at MDOC facilities and has had direct knowledge of the harrowing circumstances in these facilities. However, Defendant Cain has failed to take corrective and/or preventative action. Moreover, Defendant Cain has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his direct control. Defendant Cain is being sued in his official capacity and, at all times relevant, has acted under the color of state law.

26.     **JEWORSKI MALLETT** ("Mallett") is the Deputy Commissioner for Institutions at MDOC. He is responsible, along with Defendant Cain, for the daily operation and administration of all MDOC facilities. Defendant Mallet authorizes or ratifies the policy and practice of subjecting people to a substantial risk of serious harm and discrimination based on disability. Defendant Mallett has been aware of the dire circumstances at MDOC facilities but has failed to take reasonable measures to remedy these conditions and abate the risks associated with the same. Moreover, Defendant Mallett has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his control/direction. Defendant Mallett is being sued in his official capacity and, at all times relevant, has acted under the color of state law.

27.     **TIMOTHY DONOVAN** ("Donovan") is the Interim Chief Medical Officer at MDOC and is the senior medical official within the agency.  Defendant Donovan authorizes or ratifies the policy and practice of subjecting people to a substantial risk of serious harm and discrimination based on disability.  In this role, Defendant Donovan is responsible for approving all MDOC policies related to healthcare, overseeing specialty care provided to individuals, investigating, and responding to complaints regarding medical care, and reviewing summaries of deaths that occur.  Defendant Donovan is also responsible for the oversight of VitalCore to ensure its compliance with its contractual and other obligations to MDOC and its facilities.  Upon information and belief, Defendant Donovan has direct knowledge of the systemic failure by both MDOC and its medical provider, VitalCore, to provide adequate medical care to individuals incarcerated in MDOC facilities.  Defendant Donovan has substantially failed to take reasonable measures to remedy these issues and abate substantial risks of the same.  Moreover, Defendant Donovan has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under his care and the care of his medical staff.  Defendant Donovan is being sued in his official capacity and, at all times relevant, has acted under the color of state law.

28.     **VITALCORE HEALTH STRATEGIES, LLC** ("VitalCore") is a limited liability company doing business in, and in good standing with, the State of Mississippi and may be served with process through its Registered Agent, C. T. Corporation System at 645 Lakeland Drive, Suite 101, Flowood, Mississippi 39232.  Defendant VitalCore has contracted with MDOC to provide medical, dental, and mental health care services to individuals in MDOC custody at its facilities and, at all times relevant hereto, was acting under color of state law.  Upon information and belief, Defendant VitalCore has direct knowledge of the systemic failures by Defendant MDOC and its staff—including those that are staffed by and through

Defendant VitalCore themselves. Defendant VitalCore and its staff have substantially failed to take reasonable measures to remedy these issues and abate substantial risks of the same. Moreover, Defendant VitalCore has shown deliberate indifference to the health, well-being, and care (or lack thereof) of the individuals under their care and the care of their staff.

29.    **JOHN AND JANE DOE DEFENDANTS** are individual defendants who, acting in their official capacity or under color of state law, are responsible, in whole or in part, for conditions at MDOC facilities as set forth in this Complaint, but who are presently unknown. Plaintiffs expressly reserve the right to substitute persons as Defendants in place of John and Jane Doe Defendants, if and when their identities are uncovered in this matter.

30.    **XYZ CORPORATIONS** are entities, acting under color of state law, with responsibility, in whole or in part, for the conditions at MDOC facilities as outlined in this Complaint, but which are presently unknown to the Plaintiffs. Plaintiffs expressly reserve their right to substitute such entities in place of XYZ Corporations, if and when their identities are uncovered in this matter.

## V.    DEFINITIONS

31.    The following terms used herein shall have the meaning given to them in the definitions below, regardless of whether the terms are capitalized in this Complaint:

a.    <u>Chronic Condition</u>: A physiological disease that persists over an extended period of time and requires periodic medical care and treatment (including, but not limited to, diabetes, hypertension, asthma, HIV, and seizures). It does not refer to mental illness or mental health conditions.

b.    <u>Physical Disability</u>: Any physiological disorder or condition, disfigurement, or anatomical loss that affects one or more bodily systems (including, but not limited to,

neurological, musculoskeletal, respiratory, reproductive, cardiovascular, or endocrine systems).  It does not refer to vision, auditory, learning, cognitive, developmental, intellectual, mental health, autism spectrum, or speech disorders or conditions.

c.      <u>Assistive Devices</u>: Any medical equipment, including, but not limited to, wheelchairs, medical chairs, canes, crutches, walkers, prosthetic devices, and orthopedic braces, that ensures people with physical disabilities can perform major life activities and/or access prison programs and services.  They can also include durable medical equipment.

d.      <u>Medical Supplies</u>: Any supplies that provide therapeutic benefits to treat, manage, or accommodate medical conditions or physical disabilities.

e.      <u>Durable Medical Equipment</u>: Equipment that is considered medically necessary as prescribed by a physician for use in a patient's home.  It can also include any equipment that can withstand repeated use when used for a medical reason.  *See, e.g.*, Durable Medical Equipment Reference List, Centers for Medicare & Medicaid Servs., https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=190 (last visited Feb. 1, 2024).

f.      <u>Reasonable Accommodation</u>: Any modification to a policy or procedure that enables a person with a physical disability to fully and equally participate in programs, activities, services, and/or benefit.

## VI.   FACTS

***"Cast into hell we look upward for a way out"[22]***
*— **From the poem "Humbled" by Stephen, an adult incarcerated writer in***
***Mississippi State Penitentiary***

32.    The above refrain from a poem by an individual named Stephen is certainly fitting for the horrors that can be found in facilities under the management of Defendants.  MDOC has long suffered from staffing shortages, inexperience (from leadership to administration to day-to-day staff), and corruption, putting its facilities in a continuous and dangerous state of flux. This dire situation has built, much like a pressure cooker, over several years while Mississippi leaders covered their eyes from the inevitable series of terrible events that began to take place at the end of 2019.

33.    Riots erupted at Parchman and multiple deaths began to occur there as well as at South and other regional facilities.  As 2020 began, an unprecedented number of deaths took place in MDOC facilities.  Mississippi prisons were splashed into the national spotlight as videos of the violence were released through contraband cell phones, depicting what could be mistaken as war zones.  Unrest continued throughout 2020.

34.    In response, DRMS, through access authority under PAIMI, PADD, and PAIR, ramped up its facility monitoring at multiple MDOC facilities.

35.    DRMS began receiving complaints daily from individuals, their families, and even their attorneys.  Many mentioned the horrific violence that had shaken the facilities over the past year.  However, it became clear that there were bigger systemic issues plaguing those in MDOC custody: lack of medical care and significant accommodation issues for those with disabilities.

---

[22] Featured in *Mississippi Prison Writing* (2021), Vox Publications.

36.    Following many months of extensive monitoring, DRMS issued a public report entitled *Cruel and Unusual Punishment in Mississippi Prisons: A Tale of Abuse, Discrimination, and Undue Death Sentences* in January 2021.[23]  Copies were delivered to Defendants as well as state leadership and members of the Mississippi Legislature.  There was no response.

37.    DRMS continued to monitor MDOC and the situation in its facilities which only became worse.  Throughout its monitoring, DRMS conducted multiple death investigations.  It was reported to DRMS, through its clients, that people were experiencing retaliation for speaking with DRMS's prison team and they were being blocked from filing grievances as DRMS had advised them to do.

38.    Defendants, fueled by a dysfunctional Mississippi Legislature and inept state leadership, have continued to discriminate against people with disabilities and willfully and with deliberate indifference ignore the problems with MDOC and its facilities.

39.    As a final effort, DRMS issued a letter[24] to Defendants and others in Mississippi leadership, requesting them to address the issues they have repeatedly been made aware of.  Again, there has been no response.  All the while, people in Defendants' custody continue to needlessly suffer and even die.

## A.    DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL CARE

40.    Defendants, through a consistent pattern and practice, have demonstrated a policy of willful neglect in delivering sufficient healthcare to individuals within their custody. This deliberate indifference is evident in their systemic failure to provide adequate medical care, thereby

---

[23] A copy of the report is attached hereto as **Exhibit A**.

[24] A copy of the correspondence is attached hereto as **Exhibit B**.

exposing those under their jurisdiction to a substantial risk of serious harm and resulting in significant injuries.

41.    The callous disregard for the well-being of individuals within the correctional system, as evidenced by this pervasive policy and practice, underscores a systemic flaw that extends beyond isolated incidents.

42.    The Defendants' deliberate indifference to the potential consequences of their actions highlights a critical need for legal intervention to rectify the ongoing injustice and secure the right to proper medical care for all individuals under their care.

43.    The State of Mississippi allocates substantial financial resources, amounting to hundreds of thousands of dollars, to VitalCore for the purported provision of medical care within MDOC facilities.

44.    Despite this significant investment, the outcome remains questionable, at best.  Plaintiffs and those in similar circumstances consistently encounter the denial of healthcare within a bureaucratic system that is not only inaccessible but also marked by pervasive incompetence.

45.    The financial commitment to VitalCore does not translate into the expected standard of care for individuals within the correctional system. Instead, the bureaucratic hurdles and systemic incompetence contribute to a disturbing trend of denied healthcare, necessitating legal scrutiny and intervention to rectify these systemic deficiencies and ensure that funds allocated for medical care are effectively utilized to meet the critical needs of those under MDOC's jurisdiction.

B.    **DEFENDANTS FAIL TO PROVIDE ADEQUATE PROCEDURES TO REQUEST AND RESPOND TO MEDICAL CARE NEEDS**

46.    Defendants have failed to provide adequate procedures to approve medication, assistive devices, durable medical equipment, and treatment for those who are in their custody.  Their

practice of ignoring and/or refusing "sick calls" and administrative remedy program requests, which are equivalent to a medical request an individual must complete to receive medical treatment, and delaying outside appointments and follow-up examinations have resulted in worsening health conditions, further injury/sickness, and even deaths.

47.   Individuals are oftentimes unable to procure the necessary forms to make a "sick call," and even if they can obtain the form, they are at the mercy of a passing guard or nurse to take the form and deposit it in the proper locations.

48.   If they can complete the process of getting a "sick call" made, they are required to make a payment to submit a medical request, rendering those without funds unable to seek crucial medical assistance.

49.   Additionally, the system often imposes charges on individuals, regardless of whether they receive a response to their medical request, exacerbating the financial burden placed on those already grappling with limited resources.

50.   The imposition of fees without commensurate services received further underscores the urgent need for legal intervention to rectify these inequities within the MDOC healthcare system.

51.   Plaintiffs and those similarly situated may be eventually transported to medical, or maybe not, but they are still charged for the service and receive minimal or subpar care.

52.   The provision of medical care consistently faces unwarranted delays, stretching for weeks on end, and is frequently labeled as "refused" without any subsequent explanation or follow-up. This recurrent pattern not only compromises the timely delivery of necessary medical attention but also leaves individuals in the dark regarding the reasons behind the refusal.

53.     The systemic issues contributing to these prolonged delays and inadequate explanations demand immediate legal attention to ensure individuals receive the prompt and just medical care to which they are entitled.

54.     The current procedures in place for responding to medical requests are grossly inadequate, creating a situation where timely and appropriate medical care is denied or substantially delayed.

55.     A critical factor contributing to this deficiency is the absence of qualified personnel tasked with the responsibility of promptly reviewing and triaging medical requests.

56.     Defendants, by failing to ensure the presence of individuals with the requisite expertise, have systematically failed to provide adequate and timely healthcare.  Furthermore, Defendants have neglected their duty to implement proper triage procedures, thorough examinations, and the performance of necessary diagnostic testing and medical services.  This neglect extends to the provision of follow-up care and monitoring over an unreasonably prolonged period, exacerbating the potential harm to individuals seeking essential medical attention.

57.     The consequential impact of these systemic failures constitutes a violation of the duty owed to the Plaintiffs and those similarly situated.

C.     **DEFENDANTS FAIL TO REFER, ENSURE, AND DELIVER HIGHER LEVELS OF CARE**

58.     Defendants' actions have resulted in substantial delays in the diagnosis or identification of medical concerns and illnesses, leading to unwarranted pain, prolonged suffering, increased disability, and, in extreme cases, tragic fatalities.

59.     The systemic failure to expedite necessary medical assessments and interventions contributes to avoidable anguish and harm experienced by individuals under their care.  This egregious pattern underscores a critical need for legal intervention to rectify the ongoing lapses in the

correctional healthcare system and prevent further instances of unnecessary suffering and loss of life.

60.   Plaintiffs and those similarly situated have made numerous requests for medical treatment which were met with delay, denial, or refusal of appropriate triage, examination, monitoring, diagnostic, and follow-up for lengthy periods.  As such, when they are finally seen by medical staff, they are met with extensive illnesses that, had they been identified earlier, would have been easier to treat.

61.   Defendants' blatant disregard for the medical needs of Plaintiffs and those in similar circumstances has led to a distressing outcome: individuals are being permitted to undergo severe medical deterioration.

62.   This callous neglect of their well-being not only compromises the health and quality of life for the affected individuals but also points to a systemic failure in ensuring timely and appropriate medical care within the correctional system.

63.   Legal intervention is imperative to address these severe consequences and hold the Defendants accountable for the preventable medical deterioration experienced by Plaintiffs and others similarly situated.

64.   The delayed diagnosis by Defendant MDOC has tragically resulted in the death of several individuals, exemplified by the death of S.W.  Despite making multiple "sick calls" detailing distressing symptoms such as blood in her urine and bowel movements, S.W.'s pleas for medical treatment went unanswered for months.  In the week leading up to her death, she experienced shortness of breath, fainted in the shower, and had to borrow a wheelchair to move around.  While she was finally taken to the emergency room at the eleventh hour, S.W. ultimately succumbed to her symptoms.  This heartbreaking incident exemplifies the severe

consequences of delayed medical intervention within the correctional system and underscores the critical need for legal intervention to prevent further instances of preventable loss of life.

65.    Defendants have demonstrated a gross lack of care for people with chronic conditions, specifically regarding in-patient care, individualized treatment plans, and referrals for specialty care.

66.    Defendants, in violation of their duty to provide adequate medical care to incarcerated individuals, have failed to address the unique needs of those with chronic conditions.  The absence of sufficient attention to in-patient care has resulted in inadequate treatment and support for individuals requiring more intensive medical intervention.

67.    Furthermore, Defendants have neglected to implement individualized care plans tailored to the specific health requirements of those with chronic conditions, denying them the necessary personalized attention critical for managing and improving their health.

68.    Additionally, the failure to facilitate timely and appropriate referrals for specialty care further compounds the deficiencies in the overall healthcare provided at Defendants' facilities.  These systemic shortcomings not only breach the duty owed to incarcerated individuals but also constitute a violation of their constitutional rights to adequate medical care.

## D.    DEFENDANTS FAIL TO PROVIDE EMERGENT MEDICAL CARE

69.    Emergent medical care is non-existent in MDOC facilities.

70.    The insufficiency and/or lack of emergent medical care has been attributed to worsening conditions, symptoms, injury, pain, loss of functions, and/or death of individuals.

71.    More concerning, Plaintiffs and those similarly situated have reported that correctional officers are given the authority to deny or delay access to medical care—whether by an

individual officer's affirmative actions or the systemic understaffing of custodial staff who are necessary to the individuals' access to treatment.

72.    Correctional officers who are positioned on the residential units and manage the day-to-day activities of the Plaintiffs and those similarly situated are not adequately trained on how to handle health care emergencies.  As a result, Plaintiffs and those similarly situated suffer avoidable harm and injuries, including unnecessary deaths, as unqualified correctional staff oftentimes make critical initial decisions about the medical care needed.

73.    There are many instances in MDOC facilities where correctional officers have influenced whether an individual can go to seek medical treatment at all.

74.    Defendants have systematically failed to provide adequate emergent care, allowing correctional officers an unreasonable level of authority in determining whether an individual receives urgently needed emergency care.  This overreliance on correctional officers to make critical healthcare decisions has resulted in a negligent system that places individuals at risk by permitting non-medical personnel to exercise undue control over matters of life and death.

75.    Furthermore, even in instances where an overseeing officer authorizes emergent care, Defendants fail to uphold an acceptable standard, neglecting to ensure the provision and maintenance of quality emergency healthcare, further breaching its duty by inadequately staffing medical facilities.

76.    Defendants have wholly failed to establish and maintain a system that guarantees prompt, quality, and medically appropriate emergency care for all incarcerated individuals under its care.

77.    These systemic failures compromise the constitutional rights of those within the prison system, warranting legal intervention to address and rectify these grave lapses in the provision of emergency medical care.

E.  **DEFENDANTS CONSISTENTLY DENY BASIC MEDICAL CARE, MEDICATIONS, MEDICAL SUPPLIES, DURABLE MEDICAL EQUIPMENT, AND ASSISTIVE DEVICES**

78.  Defendants consistently withhold prescribed medications from individuals in their custody, as recommended by medical staff, and neglect to fulfill even the most fundamental medical needs and care for those under MDOC jurisdiction.

79.  This recurrent pattern of denial not only jeopardizes the health and well-being of individuals within the correctional system but also underscores a systemic failure in the provision of essential medical services.

80.  Legal intervention is imperative to address and rectify these repeated instances of denied medications and insufficient medical care, ensuring the constitutional rights and health of those in MDOC custody are adequately protected.

81.  The routine skipping of "pill call" for various reasons results in Plaintiffs and individuals in similar circumstances being deprived of their daily medication crucial for managing medical conditions like diabetes, high blood pressure, and others.

82.  This systematic failure jeopardizes the health and well-being of those in custody, emphasizing the urgent need for legal intervention to address and rectify these lapses in the correctional healthcare system.

83.  The responses to "sick calls" made by Plaintiffs and individuals in comparable situations exhibit inconsistency and variance based on the facility in which they are housed. This lack of uniformity in addressing health-related requests further underscores systemic issues within the correctional system, warranting legal scrutiny and intervention to ensure equitable and standardized access to medical care for all individuals, regardless of their housing location.

84.  An example is that of S.W., a former client of DRMS who has since passed away and was housed at Central. In her unit, the sole avenue for requesting medical treatment relied on

guards calling a nurse.  Shockingly, the tower log for the week of S.W.'s death revealed that, despite numerous pleas for medical assistance, the guards summoned a nurse only twice. S.W., grappling with extreme pain, fervently sought medical help, and had to depend on others in her unit to convey her requests.  Regrettably, many of these pleas were left unaddressed, and when responses did occur, they were tragically delayed, ultimately proving too late.

85.    Plaintiffs and those similarly situated consistently face denial of the vital medications essential for managing conditions like high blood pressure, diabetes, and other disability-related illnesses that are otherwise controllable with medication.

86.    This systematic denial not only jeopardizes the health and well-being of those in custody but also emphasizes the urgent need for legal intervention to rectify and address these pervasive lapses in the provision of necessary medical care within the correctional system.

87.    Defendants routinely reject the requests of Plaintiffs and others in similar circumstances who urgently require specific medical supplies, durable medical equipment, and assistive devices. Consequently, individuals among the Plaintiffs and those facing analogous challenges are consistently compelled to reuse catheters, bandages, feeding tubes, and various medical supplies after being denied access to new, clean materials on a consistent basis.

88.    This unsanitary and perilous practice of recycling medical supplies poses a significant threat to both the individuals utilizing these materials and their co-residents within the same unit.

89.    Furthermore, Defendants neglect to provide adequate care for people with chronic conditions, overlooking the provision of treatment plans, continued monitoring, diagnostic services, necessary hospitalization, and follow-up treatments.

90.    Defendants consistently neglect to ensure timely referrals for necessary specialty care. Even when referrals are made, they often limit them to singular visits, lacking any scheduled follow-up care with the specialty care provider.

91.    Furthermore, the orders, additional treatments, which may include surgeries, and prescriptions provided by specialty care providers are routinely ignored or abruptly halted shortly after the initial care is administered.

92.    This pattern of neglect and discontinuity in specialty care undermines the overall effectiveness of medical interventions, leaving individuals without the essential follow-up and ongoing support required for their health conditions.

93.    The pervasive failures in meeting these essential healthcare needs underscore the urgent need for legal intervention to safeguard the well-being of those in custody.

## F.    DEFENDANTS FAIL TO PROVIDE ADEQUATE HEALTHCARE STAFF

94.    Defendants persistently and knowingly fall short in ensuring an adequate number of healthcare staff at MDOC facilities.

95.    This chronic understaffing of correctional personnel results in individuals missing off-site medical appointments and being deprived of essential medical treatment.

96.    The deliberate negligence in addressing staffing needs not only compromises the overall healthcare infrastructure within the correctional system but also directly impacts the timely and necessary medical care that individuals under MDOC jurisdiction are entitled to receive.

97.    Legal intervention is imperative to rectify these systemic deficiencies and guarantee the provision of adequate healthcare staffing for the well-being of those in custody.

98.    MDOC facilities grapple with perilously inadequate staffing levels, marked by incompetence and corruption among employees, posing a severe threat to the safety of individuals under MDOC care and custody.

99.    This issue is particularly pronounced for people with disabilities, who face heightened vulnerabilities within this compromised system.  The prevalence of deficient staffing, incompetency, and corruption not only jeopardizes the overall security within MDOC facilities but also exacerbates the risks and challenges faced by those with disabilities.

100.   Plaintiffs and those similarly situated are often without their medication as MDOC staff nurses will not bring their medications ("pill call") to the units if there is no guard present. Instead of attempting to find a guard to escort them or establish regular "pill call" times to ensure the security they need is present, "pill call" is simply skipped, sometimes for days and weeks.

101.   In the pursuit of a new medical provider, Defendants Cain and MDOC issued a Request for Proposal ("RFP") for the medical care contract, outlining minimal staffing requirements that fell significantly below the necessary levels for providing adequate care at each facility. Furthermore, the RFP explicitly prioritized cost containment over the adequacy of care.

102.   The contract subsequently awarded underscores the emphasis on cost containment, resulting in inadequate staffing levels across the entire MDOC system.  This prioritization compromises the quality of care and raises concerns about the well-being and safety of individuals within the correctional system.

103.   Currently, Defendant MDOC has a contractual relationship with Defendant VitalCore, which was entered into in October 2020.  This contract addresses the number of medical staff to be placed at each MDOC facility.  To date, the medical staff of each facility remains grossly

inadequate, not meeting the required contractual terms as outlined by the most recent contract signed between the parties.

104.    Plaintiffs and those facing similar circumstances consistently report that their ignored "sick calls" are frequently ascribed to a shortage of available staff to attend to their medical needs. Moreover, instances of missed "pill calls" are often attributed to the unavailability of a nurse or medical staff to administer their required medications.  This is exacerbated if there is an ongoing security issue occurring at the time of "pill call."

105.    Plaintiffs are routinely transported to receive medical care yet find themselves left unexamined.  After enduring prolonged waits, they are sent back to their cells without the opportunity to consult with a healthcare provider.

106.    Even if an examination takes place, resulting in a diagnosis, Plaintiffs rarely, if ever, receive any follow-up care.  This consistent pattern of inadequate medical attention underscores the urgent need for legal intervention to address the systemic deficiencies in providing timely and thorough healthcare for individuals within the correctional system.

**G.    DEFENDANTS HAVE SYSTEMICALLY DISCRIMINATED AGAINST PEOPLE WITH DISABILITIES BY FAILING TO PROVIDE REASONABLE ACCOMODATIONS**

107.    Defendants exhibit a discriminatory practice of neglecting to implement a system that ensures reasonable accommodations for people with physical disabilities qualifying under the Americans with Disabilities Act.

108.    This failure to prioritize accessibility not only violates the rights of people with disabilities but also underscores a systemic disregard for the necessary measures to provide equal opportunities and support within the correctional system.

109.    Legal intervention is imperative to rectify these discriminatory practices and guarantee the implementation of fair and inclusive policies in line with standards under the Americans with Disabilities Act.

110.    People with physical disabilities who depend on mobility devices for their day-to-day lives face persistent denial of such essential devices by Defendants.

111.    For instance, Plaintiffs and those in similar situations with prosthetic limbs often find themselves compelled to use wheelchairs due to Defendants' refusal to supply the necessary materials for prosthetic maintenance.

112.    Furthermore, individuals in need of canes, braces, special orthopedic shoes, or wheelchairs are left bedridden or dependent on the goodwill of their bunkmates to navigate the facility. This systematic failure to provide necessary mobility aids not only infringes upon the rights of people with disabilities but also exacerbates the challenges they face in maintaining a semblance of independence within the correctional system.

113.    Legal intervention is crucial to rectify these ongoing violations and ensure that people with physical disabilities receive the necessary accommodations to lead a dignified and functional daily life.

114.    Plaintiffs and those similarly situated who are reliant on wheelchairs frequently endure transportation in vehicles ill-equipped for wheelchair accessibility.  These individuals are compelled to either ride in the center aisle, relying on their wheelchair brakes for safety, or reluctantly sign a refusal for treatment simply because Defendants lack the proper means to transport them to necessary medical appointments.

115. This blatant oversight in providing accessible transportation not only undermines the safety and well-being of those in need but also highlights a systemic failure in accommodating people with mobility challenges within the correctional system.

116. Requests for assistive devices and durable medical equipment are often ignored. However, when they are finally addressed, individuals are given devices and equipment that do not work or immediately requires repair.

117. Defendants have consistently failed to furnish individuals with the necessary medical supplies prescribed by physicians for their specific medical conditions.

118. An egregious example of this failure is evident in the case of D.R., a person incarcerated at Parchman, who requires the use of diapers and wipes due to medical necessity. Despite a physician's prescription, the Defendants have systematically neglected to provide these essential supplies, compelling the individual to reuse their limited resources and endure the unsanitary and degrading practice of wearing soiled supplies for extended periods, often lasting weeks at a time.

119. This type of denial is not an uncommon practice. Refusal to provide medically prescribed supplies not only violates the individual's right to receive necessary medical care but also subjects them to unnecessary physical and emotional distress.

120. Defendants have consistently failed to afford people with disabilities equal access to the limited programs offered by MDOC, particularly work release programs. This exclusion is solely based on their disabilities, constituting a discriminatory practice that denies people with disabilities the opportunity to participate in essential programs crucial for rehabilitation and successful reintegration into society. Such discriminatory practices infringe upon the rights

of people with disabilities, violating the principles of equal protection and necessitating legal intervention to rectify these systemic disparities.

## VII. CLASS ACTION ALLEGATIONS

### A. PLAINTIFF CLASS

121.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2).

122.    Plaintiffs seek to represent a class consisting of all people in MDOC custody who are, or will be in the future, housed in Central Mississippi Correctional Facility, Delta Correctional Facility, Marshall County Correctional Facility, Mississippi Correctional Institute for Women, Mississippi State Penitentiary, South Mississippi Correctional Institution, and Walnut Grove Correctional Facility.

123.    **Numerosity, Fed. R. Civ. P. 23(a)(1).**  There are approximately 9,633 people in MDOC custody housed in Central Mississippi Correctional Facility, Delta Correctional Facility, Marshall County Correctional Facility, Mississippi Correctional Institute for Women, Mississippi State Penitentiary, South Mississippi Correctional Institution, and Walnut Grove Correctional Facility.[25]  The members in the Plaintiff Class are so numerous and membership is too fluid to permit joinder of all members.  All class members are subject to the horrific conditions and unlawful actions of Defendants as described herein.

124.    **Commonality, Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all class members and all Defendants.  Common questions include, without limitation: whether systemically inadequate medical care violates the Eighth Amendment to the U.S. Constitution; whether policies, procedures, and practices of Defendants reflect deliberate indifference to

---

[25] This data is current as of January 9, 2024 according to the January 2024 MDOC Population Data.

the medical needs of the Plaintiff Class such that Defendants have violated the Eighth Amendment to the U.S. Constitution; and whether policies, practices, and procedures of Defendants violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

125.    **Typicality, Fed. R. Civ. P. 23(a)(3).**  The claims of the named Plaintiffs are typical of those of the Plaintiff Class as the named Plaintiffs' claims arise from the same policies, practices, or courses of conduct as those of the Plaintiff Class.  The named Plaintiffs' claims are based on the same theory of law as the class's claims.

126.    **Adequacy, Fed. R. Civ. P. 23(a)(4).**  The named Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff Class.  The named Plaintiffs do not have any interests antagonistic to the Plaintiff Class.  The named Plaintiffs, as well as the members of the Plaintiff Class, seek to enjoin the unlawful acts and omissions of Defendants.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

127.    **Fed. R. Civ. P. 23(b)(1)(A) and (B).**  This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B) because the number of members in the Plaintiff Class is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

128.    **Fed. R. Civ. P. 23(b)(2).**  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) as Defendant MDOC's policies, practices, actions, and omissions that form

the basis of this Complaint are common to and apply generally to all members of the Plaintiff Class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff Class.  All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central office of MDOC by Defendants.  Health care services are provided pursuant to a contract with a health authority and/or medical vendor with policies and practices that are centrally promulgated, disseminated, overseen, and enforced by the health authority and/or medical vendor and by Defendants.  Defendants have acted or refused to act on grounds that apply generally to the Plaintiff Class so that final injunctive relief or corresponding declaratory relief is appropriate and will apply to all members of the Plaintiff Class.

**B.**  **SUBCLASS OF PEOPLE WITH CHRONIC CONDITIONS ("CHRONIC CONDITION SUBLCASS")**

129.  Plaintiffs Pervis Everett, Thalia Outlaw, Terry Lattimore, Derrick Guyton, and Willie Brent bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2).

130.  Plaintiffs seek to represent a subclass consisting of all people who are currently in MDOC custody, or will be in the future, with a chronic condition.[26]

131.  **Numerosity, Fed. R. Civ. P. 23(a)(1).**  The members in the Chronic Condition Subclass are so numerous and membership is too fluid to permit joinder of all members.  Due to Defendants' policies and practices, all members of the subclass are at substantial risk of serious harm.

---

[26] *See* "Chronic Condition," *supra* Section V. Definitions.

132.   **Commonality, Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Chronic Condition Subclass and all Defendants.  Common questions include, without limitation: whether systemically inadequate medical care violates the Eighth Amendment to the U.S. Constitution; and whether policies, procedures, and practices of Defendants regarding people with chronic conditions reflect deliberate indifference to the medical needs of the Chronic Condition Subclass such that Defendants have violated the Eighth Amendment to the U.S. Constitution.

133.    **Typicality, Fed. R. Civ. P. 23(a)(3).**  The claims of the named Plaintiffs are typical of those of the Chronic Condition Subclass as the named Plaintiffs' claims arise from the same policies, practices, or courses of conduct as those of the Chronic Condition Subclass.  The named Plaintiffs' claims are based on the same theory of law as the subclass's claims.

134.   **Adequacy, Fed. R. Civ. P. 23(a)(4).**  The named Plaintiffs are capable of fairly and adequately protecting the interests of the Chronic Condition Subclass.  The named Plaintiffs do not have any interests antagonistic to the Chronic Condition Subclass.  The named Plaintiffs, as well as the members of the Chronic Condition Subclass, seek to enjoin the unlawful acts and omissions of Defendants.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

135.   **Fed. R. Civ. P. 23(b)(1)(A) and (B).**  This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B) because the number of members in the Chronic Condition Subclass is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as

a practical matter, would substantially impair the ability of other members to protect their interests.

136.    **Fed. R. Civ. P. 23(b)(2).**  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) as Defendant MDOC's policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of the Chronic Condition Subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.  All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central office of MDOC by Defendants. Health care services are provided pursuant to a contract with a health authority and/or medical vendor with policies and practices that are centrally promulgated, disseminated, overseen, and enforced by the health authority and/or medical vendor and by Defendants. Defendants have acted or refused to act on grounds that apply generally to the Chronic Condition Subclass so that final injunctive relief or corresponding declaratory relief is appropriate and will apply to all members of the subclass.

## C.    SUBCLASS OF PEOPLE WITH PHYSICAL DISABILITIES ("PHYSICAL DISABILITIES SUBCLASS")

137.    Plaintiffs Larry Allen and Derrick Guyton bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2).

138.    Plaintiffs seek to represent a subclass consisting of all people who are currently in MDOC custody, or will be in the future, with a physical disability[27] that qualifies as a "disability" as defined under the Americans with Disability Act, 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

---

[27] *See* "Physical Disability," *supra* Section V. Definitions.

139. **Numerosity, Fed. R. Civ. P. 23(a)(1).** The members in the Physical Disabilities Subclass are so numerous and membership is too fluid to permit joinder of all members. Due to Defendants' policies and practices, all members of the subclass are at substantial risk of serious harm.

140. **Commonality, Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Physical Disabilities Subclass and all Defendants. Common questions include, without limitation: whether systemically inadequate medical care violates the Eighth Amendment to the U.S. Constitution; whether policies, procedures, and practices of Defendants regarding people with physical disabilities reflect deliberate indifference to the medical care needs of the Physical Disabilities Subclass such that Defendants have violated the Eighth Amendment to the U.S. Constitution; and whether policies, practices, and procedures of Defendants regarding people with physical disabilities violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

141. **Typicality, Fed. R. Civ. P. 23(a)(3).** The claims of the named Plaintiffs are typical of those of the Physical Disabilities Subclass as the named Plaintiffs' claims arise from the same policies, practices, or courses of conduct as those of the Physical Disabilities Subclass. The named Plaintiffs' claims are based on the same theory of law as the subclass's claims.

142. **Adequacy, Fed. R. Civ. P. 23(a)(4).** The named Plaintiffs are capable of fairly and adequately protecting the interests of the Physical Disabilities Subclass. The named Plaintiffs do not have any interests antagonistic to the Physical Disabilities Subclass. The named Plaintiffs, as well as the members of the Physical Disabilities Subclass, seek to enjoin the unlawful acts and omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

143.   **Fed. R. Civ. P. 23(b)(1)(A) and (B).**  This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B) because the number of members in the Physical Disabilities Subclass is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

144.   **Fed. R. Civ. P. 23(b)(2).**  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) as Defendant MDOC's policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of the Physical Disabilities Subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.  All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central office of MDOC by Defendants. Health care services are provided pursuant to a contract with a health authority and/or medical vendor with policies and practices that are centrally promulgated, disseminated, overseen, and enforced by the health authority and/or medical vendor and by Defendants. Defendants have acted or refused to act on grounds that apply generally to the Physical Disabilities Subclass so that final injunctive relief or corresponding declaratory relief is appropriate and will apply to all members of the subclass.

## VIII.   DRMS'S ASSOCIATIONAL STANDING

145.   DRMS is the duly authorized protection and advocacy agency for the State of Mississippi. DRMS asserts its associational standing to bring its claims on behalf of its constituents who

include any current or future individuals in the physical custody of MDOC who has a disability as that term is used in the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

146.    In support of its claims, DRMS adopts by reference paragraphs as if fully set forth herein.

147.    Plaintiffs who make up the putative class are constituents of DRMS and their factual allegations adopted herein confer upon DRMS associational standing to pursue its claims coextensively with those Plaintiffs.  DRMS has associational standing to pursue its claims, in part, because DRMS's constituents otherwise have standing to sue in their own right.

148.    DRMS serves its constituents by prosecuting its claims herein pursuant to the Protection and Advocacy of Individual Rights (PAIR) Program, 29 U.S.C. §§ 794e, *et seq.*

149.    As Mississippi's protection and advocacy agency, DRMS receives funding via PAIMI, the DD Act, and PAIR to pursue legal, and other appropriate remedies to ensure the protection of people with disabilities who are receiving care or treatment in Mississippi.  Accordingly, DRMS has associational standing to pursue its claims, in part, because the interests DRMS seeks to protect through its claims in this case, *i.e.*, the rights of people with disabilities in the custody of Defendant MDOC, are germane to DRMS's central purpose.

150.    DRMS maintains advisory councils, conducts annual public forums for Mississippians with disabilities to contribute to the agency's goals and priorities, has conducted an administrative investigation into Defendants' practices with respect to DRMS's constituents, and has received communications from its constituents incarcerated in MDOC facilities regarding Defendants' practices.

151.  DRMS further asserts its associational standing to bring its claims to express these collective views and protect the collective interests of its constituents who are now incarcerated, or will in the future be incarcerated, in Defendant MDOC's custody.

## IX.  CLAIMS FOR RELIEF

### A.  FIRST CAUSE OF ACTION: INADEQUATE MEDICAL CARE

152.  Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

153.  Through their policies and practices described herein, Defendants subject Plaintiffs, clients and constituents of P&A Plaintiff, to a substantial risk of serious harm and injury from inadequate medical care in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' ongoing deprivation of rights secured under the Eighth Amendment to the U.S. Constitution.

154.  Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### B.  SECOND CAUSE OF ACTION: VIOLATION OF RIGHTS OF PEOPLE WITH DISABILITIES

155.  Plaintiffs reassert and incorporate by reference the allegations contained in the preceding paragraphs.

156.  Through their policies and practices described herein, Defendants subject Plaintiffs, clients and constituents of P&A Plaintiff, to regular and systemic discrimination based on their disabilities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–

12134 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. These policies and practices continue to be implemented by Defendant MDOC and its agents, officials, employees, and all persons acting in concert with Defendant MDOC under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' ongoing deprivation of rights secured by federal law.

157.    As a result of Defendants' policies and practices regarding people with disabilities, Plaintiffs are denied equal access to activities, programs, and services for which they are otherwise qualified because Defendants have failed to implement a system that ensures people with disabilities are reasonably accommodated with medical supplies and assistive devices.

158.    Defendants have been and is aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

## X.    PRAYER FOR RELIEF

159.    Each section herein is incorporated into every other section herein, such that this Complaint is to be read as a whole. All factual allegations apply to all claims.

160.    Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the class and subclasses they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the U.S. Constitution and the laws of the United States.

161.    Named Plaintiffs and the class and subclasses they represent request that this Court grant them the following relief:

a.    declare that the suit is maintainable as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B), and 23(b)(2);

b.    adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of Plaintiffs and the classes they represent under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, which protects individuals against cruel and inhumane treatment;

c.    preliminarily and permanently enjoin all Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law from subjecting Plaintiffs to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

d.    order Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and constituents of the P&A Plaintiff suffer due to inadequate medical care of Defendants, and due to the policies and practices with regard to persons with disabilities; the plan shall include at a minimum the following:

     i.    staffing: medical and correctional staffing shall be sufficient to provide individuals with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

     ii.    access: policies and practices that provide timely access to health care;

     iii.    screening: policies and practices that reliably screen for medical conditions that require treatment;

      iv.     emergency response: timely and competent responses to health care emergencies;

      v.     medication, supplies, devices, and equipment: timely prescription and distribution of medications, supplies, devices, and equipment necessary for medically adequate care;

      vi.     chronic care: timely access to competent care for chronic illnesses, including, but not limited to, diseases;

      vii.     quality assurance: a regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies; and

      viii.     accommodations: reasonable accommodations in the form of including, but not limited to, medical supplies and assistive devices for people with disabilities, as required by the Americans with Disabilities Act and Section 504;

e.     award Plaintiffs the costs of this suit, reasonable attorneys' fees, and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

f.     retain jurisdiction of this case until all Defendants have fully complied with the orders of this Court, and there is reasonable assurance that Defendants will continue to comply in the future absent the Court's continuing jurisdiction; and

g.     award such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED, the 4th day of March, 2024.

**DISABILITY RIGHTS MISSISSIPPI**
ATTORNEY FOR ALL PLAINTIFFS

/s/ *Greta K Martin*
Greta Kemp Martin, MSB#103672
5 Old River Place, Suite 101
Jackson, Mississippi 39202
Telephone:  (601) 968-0600
Facsimile:  (601) 968-0665
gmartin@drms.ms

PROSKAUER ROSE LLP
Margaret Ukwu (admitted *pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:  (310) 284-4586
Facsimile:  (310) 557-2193
mukwu@proskauer.com

Yena Hong (admitted *pro hac vice*)
11 Times Square
New York, New York 10036
Telephone:  (212) 969-3258
Facsimile:  (212) 969-2900
yhong@proskauer.com

## CERTIFICATE OF SERVICE

I, undersigned counsel of record, do hereby certify that a true and correct copy of the foregoing has been filed with this Court's electronic filing system which automatically sends notification to all attorneys of record.

DATED: March 4, 2024

/s/
**Greta Kemp Martin, MSB#103672**
**5 Old River Place, Suite 101**
**Jackson, Mississippi 39202**
**Telephone:  (601) 968-0600**
**Facsimile:  (601) 968-0665**
**gmartin@drms.ms**